1             UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION

3  UNITED STATES OF AMERICA    )
                          )
4       v.             )  Docket No. 5:21-cr-00244-FB-1
                          )
5  IMAD EDDIN WADI,         )  San Antonio, Texas
                          )  May 24, 2023
6      Defendant.       )
  _____)
7

8                TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE FRED BIERY
9          UNITED STATES DISTRICT JUDGE
                  AND A JURY
10
                   VOLUME VIII

11  A P P E A R A N C E S:

12  FOR THE GOVERNMENT:
    Mark T. Roomberg
13  William R. Harris
    U.S. Attorney's Office
14  601 NW Loop 410, Suite 600
    San Antonio, TX 78216
15
    FOR THE DEFENDANT:
16  Angela Saad Lindsey
    Office of the Federal Public Defender
17  727 E. Cesar E. Chavez Blvd., Suite B-207
    San Antonio, TX 78206
18
    Charles Davidson Swift
19  Constitutional Law Center for Muslims in America
    100 N. Central Expressway, Suite 1010
20  Richardson, TX 75080

21  COURT REPORTER:
    Chris Poage, CRR, RMR
22  United States Court Reporter
    262 West Nueva Street, Rm. 1-426
23  San Antonio, TX  78207
    Telephone:  (210) 244-5036
24  chris_poage@txwd.uscourts.gov

25  Proceedings reported by stenotype.  Transcript produced by
    computer-aided transcription.

```
 1                          INDEX

 2                                                  PAGE

 3   SAMER ABBOUD
```
```
 4   Cross-Examination (Continued) by Mr. Roomberg ..........1196

 5   Redirect Examination by Mr. Swift ......................1211

 6   Recross-Examination by Mr. Roomberg ....................1214
```
```
 7   AMER WADI
```
```
 8   Direct Examination by Ms. Saad Lindsey .................1233
```
```
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (8:25 a.m., jury out)
 2             THE COURT:  Is Dr. Abboud here?
 3             THE CLERK:  He's outside, Your Honor.
 4             THE COURT:  Okay.  All right.  Anything from the
 5   government before we take up more cross-examination?
 6             MR. ROOMBERG:  No, sir.
 7             THE COURT:  For the defense?
 8             MR. SWIFT:  At some point we'd like to readdress the
 9   404(b) issue.  We can do that at any point before we rest, but
10   we'd like to readdress it.
11             THE COURT:  Okay.
12             MR. SWIFT:  That was pending, pending my -- that was
13   pending, pending my questioning.  During questioning on
14   cross-examination on the 404(b) evidence, I was objected to.
15   The Court sustained that.
16        So unlike the case I cited, I was not allowed to do the
17   full cross-examination on it, and I would reoffer it at least
18   for the record so I have a good record going up to the
19   Fifth Circuit, if necessary.
20             THE COURT:  Okay.  Refresh -- hold on just a minute.
21   Refresh my recollection.  Which witness?  Who was it?
22             MR. SWIFT:  This was Mr. Baker.  This had to do with
23   the civil suit against him.
24             THE COURT:  Oh, yeah.
25             MR. SWIFT:  Yes.  And I got into the first two people
```

 1    who had sued him, and then the government objected.  We were

 2    offering that under the 404(b) purpose because at the time that

 3    this investigation going on, he was also being sued in this for

 4    civil fraud.  And, of course, that could be investigated for

 5    criminal, based on the civil fraud.

 6        And we offered that.  We gave notice under 404(b) that we

 7    were offering it for the purpose of showing motive to lie to

 8    the FBI at the time.  We cited to you a court case from the

 9    Fifth Circuit that had noted that that type of 404(b) on a

10    government informant was admissible under 404(b), the substance

11    of it.  You could prove it up with extrinsic manners.  And I

12    would offer the pleadings and the summary judgment from the

13    bankruptcy court, parts on it, to prove it up under 404(b).

14        The government had noted that because there had been

15    extensive cross-examination on that issue, that although the

16    Court -- the Fifth Circuit found that it was error, they did

17    not find that it was reversible.  I would say that's a little

18    different here.  I got into 204 and was cut off.  So I again

19    offer it under 404(b).  And those are Defense Exhibits 702 --

20    or 72 and -- or excuse me -- 78 -- 72, 78 and 79 -- and 79, for

21    the record.

22        THE COURT:  Okay.  They're noted and -- yes.  Hold on.

23    Go ahead.

24        MR. HARRIS:  Just to stand by our prior position that

25    those items under Rule 403, the Court should find --

 1          THE COURT:  Yeah.  You don't -- okay.  You don't have
 2    to lean over.
 3          MR. HARRIS:  The Court should rightfully find, and we
 4    believe the Court did find that the risk of prejudice,
 5    confusion of issues, et cetera, outweigh any possible probative
 6    value.
 7          THE COURT:  Okay.  The fact that they -- there were
 8    questions and answers about him being sued and the car deals
 9    and all that, there's -- is there not enough in for the defense
10    to argue that to the jury?
11          MR. HARRIS:  Indeed.  And we believe that that's the
12    basis for the Court's overnight decision to allow jury
13    instruction, I believe it's 1.14.
14          MR. SWIFT:  I believe they're opposing 1.14; that
15    there is no prior bad acts.  That's your oppose -- you're
16    opposing that, right?
17          MR. HARRIS:  We've opposed.  But I've gotten word that
18    -- I mean, we do oppose it.  But last word I got was the Court
19    was going to include it.
20          THE COURT:  Well, Joani and I talked about it this
21    morning.  But that's, I think, where we're headed.  But we'll
22    see.  Okay.
23          MR. HARRIS:  Well, if the Court's still on the fence,
24    we would still oppose.
25          THE COURT:  Okay.  Well, I know that.

1          MR. HARRIS:  Well, they definitely have room to argue
2     the, you can't believe Baker.

3          THE COURT:  Right.

4          MR. SWIFT:  I would say that if I'm forbidden the
5     instruction in the part on the 404(b), the government can't
6     have it both ways.  It's not probative to continue questioning
7     on this, but you don't get the instruction.  That's both ways.

8          THE COURT:  Okay.  All right.  Where's Dr. Abboud?
9        Okay.  Let's go.

10        (Witness enters courtroom)

11          THE COURT:  Doctor, come on back up.  Oh, and -- have
12    a seat there.

13        Before the jury comes in, Mr. Swift, has the defense made a
14    decision planning-wise and charge-wise whether Mr. Wadi is
15    going to testify or not?

16          MR. SWIFT:  Mr. Wadi will not be testifying.

17          THE COURT:  Will not be.  Okay.  All right.

18          MR. SWIFT:  So we have one more witness after
19    Dr. Abboud.  He'll be fairly brief.

20          MS. SAAD LINDSEY:  No more than 30 minutes with cross.

21          THE COURT:  Okay.  Mr. Roomberg, do you anticipate
22    rebuttal?

23          MR. ROOMBERG:  No, Your Honor.  But we do request an
24    offer of proof on this witness to make sure we are getting into
25    admissible evidence and not hearsay or other items that would

1    not be admissible.

2            THE COURT:  The next witness?

3            MR. ROOMBERG:  For the next witness.

4            THE COURT:  Who is this, Mr. --

5            MS. SAAD LINDSEY:  Yes, Your Honor.  It's Amer Wadi,

6    Mr. Wadi's son.

7            THE COURT:  Oh, okay.  All right.  Yes.  Well,

8    we'll --

9            MS. SAAD LINDSEY:  A fact witness.

10            THE COURT:  Then we should have enough time to do the

11    offer of proof first and then see what happens.  All right.

12    Very well.

13        *(Jury enters courtroom)*

14            THE COURT:  You may be seated.  Thank you.

15        Mr. Roomberg, you may continue.

16            MR. ROOMBERG:  Thank you, Your Honor.

17                    CROSS-EXAMINATION (CONTINUED)

18    BY MR. ROOMBERG:

19    Q.  Good morning, Dr. Abboud.

20    A.  Good morning.

21    Q.  So I want to pick up where we left off.  Just to be clear,

22    you are agreeing that Ahrar -- or Hay'at Tahrir -- HTS --

23    A.  Yes.

24    Q.  -- and Ahrar al-Sham cooperated during the four-week battle

25    for Kafr Nabbudah?

Samer Abboud – Cross

1   A.  Yes.

2   Q.  Okay.  Doctor, are you getting paid to come to testify?

3   A.  I am.

4   Q.  How are you getting paid?  How much?

5   A.  I'm not good at reading contracts, but $2,000 for the

6   testifying, and I believe there's a thousand dollars for

7   sitting around.

8   Q.  Okay.

9   A.  Yeah.

10  Q.  And were you also paid for preparation for writing your

11  reports?

12  A.  I was.

13  Q.  How much was that?

14  A.  $200 an hour.

15  Q.  Okay.  And how many hours did you work on the two reports?

16  A.  I have not billed them yet, but I reached about 20 hours.

17  Q.  Okay.  So about how much are you expecting to bill them

18  for?

19  A.  Depending on how I understand the contract, I think 4,000

20  for the report and then 2,000 for the testimony.

21  Q.  Okay.

22  A.  And then there's the reimbursements, of course.

23  Q.  And plus expenses?

24  A.  Yes.  Sorry.  Expenses.

25  Q.  Okay.  So in your report, on Page 18, you cite to the

1  Wilson Center.

2  A.  Yes.

3  Q.  It's a reputable --

4  A.  It is.

5  Q.  -- think tank, correct?

6  A.  Yes.

7  Q.  And I notice you cited to the HTS report.

8  A.  From the Wilson Center?

9  Q.  From the Wilson Center.

10  A.  Like a profile?

11  Q.  Well, I believe on Page 18, footnote 29,

12  WilsonCenter.org/Article HTS Evolution, Jihadist Group.

13  A.  Yes.

14  Q.  Okay.  So you went to the Wilson Center for HTS.  But I

15  noticed you didn't go to the Wilson Center for their report on

16  Ahrar al-Sham?

17  A.  I don't believe I did.  I can't remember the citations.

18  Q.  But you would agree that the Wilson Center is a

19  reputable --

20  A.  I would.

21  Q.  -- think tank?

22     And you're familiar with Ali El Yassir?

23  A.  Yes.  He is -- I don't know him personally, but I believe

24  he's a writer who has written for many different publications.

25  Q.  And -- well, you cited to him and Robert Ford in an item in

 1  your report as well; is that correct?

 2  A.  An op-ed.  It's escaping me, the publication now.  But they

 3  wrote an op-ed, I believe in 2015 or '16.

 4  Q.  Okay.  So there's a couple things I'd like to show you from

 5  the Wilson Center report on Ahrar al-Sham that you didn't cite.

 6          MR. ROOMBERG:  Your Honor, if I could approach?

 7          THE COURT:  Yes.

 8  BY MR. ROOMBERG:

 9  Q.  And this is from August of 2016.

10  A.  Okay.  I am familiar with this piece.

11  Q.  Okay.

12  A.  Yes.  So --

13  Q.  Okay.  Then let's just jump ahead.

14  A.  Yeah.

15  Q.  Would you agree with the Wilson Center that in March 2013

16  Ahrar al-Sham led an offensive that Jabhat Fatah al-Sham,

17  formerly the Nusra Front, and two other Islamic groups that

18  result in the seizure of the provincial capital of Raqqa from

19  the government troops?

20  A.  Yes.  Yes.

21  Q.  And would you also agree with, in March 2015, Ahrar al-Sham

22  captured Idlib and several other cities in the province, in an

23  operation with the Nusra Front and other Islamic groups that

24  were all under the umbrella of Jaish al-Fatah, the Army of

25  Conquest?

Samer Abboud - Cross

1  A.  Yes.  These are the coalitions that I was speaking about

2  yesterday.  Yes.

3  Q.  And at least one leader of Ahrar al-Sham, Abu Khalid

4  al-Suri, was also the al-Qaeda representative in Syria?

5  A.  Yes.  And so in the period that is being referenced here in

6  the -- so the report is in 2016 -- there would have been people

7  like al-Suri and others who had affiliation with al-Qaeda in

8  some way.

9  Q.  And going to -- so Ahrar al-Sham did have a history of

10 being associated with al-Qaeda?

11 A.  There were figures within that had moved between the

12 different groups.

13 Q.  Now let's talk about that article you cited by Robert Ford

14 and Ali El Yassir.

15 A.  Yes.

16 Q.  There were issues that the Ahrar al-Sham fighters

17 terrorized minority groups; is that correct?

18 A.  I believe in their attacks against civilians.  They were

19 attacking civilians that were not -- yeah, that were of

20 minority groups.

21 Q.  Alawites?

22 A.  Yes.

23 Q.  Okay.  And they're also -- they were accused in 2014 of

24 desecrating Christian sites; is that correct?

25 A.  I'm not --

Samer Abboud - Cross

1   Q.  Kasab in 2014?

2   A.  Perhaps, yes.

3   Q.  Let me show you.

4   A.  I just don't know with certainty.  But I would -- I would

5   accept that to be correct.

6   Q.  Okay.

7   A.  Yeah.

8   Q.  You cited to this report --

9   A.  Yes.  Yeah.

10  Q.  -- op-ed in your report.  And this op-ed that Mr. Ford and

11  Mr. Yassir wrote was prior to the Russian involvement, is that

12  correct, when the opposition forces were pressing Assad's

13  forces?

14  A.  I believe so.  I believe it's a 2015 op-ed.

15  Q.  Okay.  And in it, even Mr. Ford and Mr. Yassir said that

16  the U.S. shouldn't support arming or giving military aid to

17  Ahrar al-Sham?

18  A.  Yes.

19  Q.  Okay.  So going back to the cooperation in Kafr Nabbudah,

20  that battle lasted four to six weeks?

21  A.  My understanding is that it began either May 6th, 7th or

22  8th, I believe.  And it ended, I believe, on June 6th or 8th,

23  again, around that time, with the government capturing the

24  town.

25  Q.  Okay.  So about four weeks?

1  A.  Roughly, yes.

2  Q.  So every day they're cooperating and fighting together?

3  A.  I believe there were three-day cease-fires at some point in

4  between there, that were declared by the Syrian government,

5  that was -- it was recognized by everybody.

6  Q.  Okay.

7  A.  By all the fighters.

8  Q.  And do you understand that if you join -- if you agree even

9  once to commit a crime, that's conspiracy?

10      MR. SWIFT:  Objection.

11      THE COURT:  Overruled.

12      MR. SWIFT:  He's being asked about legal questions.

13      THE COURT:  He may answer that he doesn't know.  But

14  the question may be asked.

15      THE WITNESS:  I'm sorry, sir.  I don't -- I don't know

16  how to answer.  I don't feel qualified to answer that question.

17  Yeah.

18  BY MR. ROOMBERG:

19  Q.  Okay.  But two parties, two groups, two gangs, like HTS and

20  Ahrar al-Sham, they can work together and not have the same

21  command structure.  Isn't that -- that's what happened here,

22  right?

23  A.  I believe that they were fighting the same enemy, yes, or

24  the same -- yes, the same enemy, the same forces.

25  Q.  Okay.  Now, were you aware that U.S. troops were fighting

Samer Abboud - Cross

1   Fateh al-Sham and Ahrar al-Sham, HTS?

2   A.  When was this?  Sorry.

3   Q.  Since U.S. troops have been in Syria -- U.S. troops are in

4   Syria assisting the Kurds; is that correct?

5   A.  Yes.  Yes.  And they were there to fight ISIS.

6   Q.  Okay.

7   A.  Yeah.

8   Q.  But they also fought Fateh al-Sham and HTS.  Isn't that

9   true?

10  A.  They have -- to my knowledge they have attacked them

11  militarily, yes.

12  Q.  Okay.  And to your knowledge has the U.S. attacked Ahrar

13  al-Sham?

14  A.  Prior to 2016, it's possible that they would have.  I'm not

15  directly familiar with any attacks after 2016.

16  Q.  Okay.  But you are aware of U.S. fighting HTS after 2016?

17  A.  As far as I know, the United States has not attacked Idlib

18  province, which is where HTS has been concentrated.  I think

19  that's the -- that's where Russia and Turkey are militarily

20  dominant.

21  Q.  So if we're in 2017 and someone is talking about the U.S.

22  attacking the true opposition, and the only groups we're

23  talking about is Fateh al-Sham/HTS and Ahrar al-Sham, in your

24  opinion what group was the U.S. attacking?

25  A.  In July of 2017 the deescalation zone would have been

Samer Abboud - Cross

1  respected by the United States.  I believe that it would have
2  been respected by the United States military presence in Syria,
3  in which case they would have not been attacking Ahrar al-Sham
4  because they are listed as one of the groups that was allowed
5  to be present in Idlib.
6  Q.  So they may be attacking Fateh al-Sham/HTS?
7  A.  It's -- I don't -- I don't recall any instances where there
8  were attacks in Idlib in 2017 by the United States.
9  Q.  But if it was one or the other, who would the U.S. be
10 attacking?
11 A.  Hypothetically, it would be HTS.
12 Q.  Okay.  Now, again, the U.S. supports the Kurds; is that
13 correct?
14 A.  Yes.
15 Q.  And Turkey attacks the Kurds?
16 A.  Yes.
17 Q.  And you said at some point Turkey, in 2020, took over
18 control of Ahrar al-Sham?
19 A.  When Ahrar al-Sham ceded -- when it became part of the
20 Syrian National Army, the Syrian National Army was under direct
21 Turkish control.
22     Now, this to me is a survival strategy on Ahrar al-Sham.
23 Q.  Well --
24 A.  Yeah.  But that's when the --
25 Q.  The answer is --

Samer Abboud - Cross

1    A.  Yes.

2    Q.  -- yes?

3    A.  2020.  Yeah.

4    Q.  Okay.  And there have been instances where Turkey has

5    attacked the Kurds with U.S. troops there?

6    A.  Yes.  This began in 2016 with Operation Euphrates Shield.

7    Q.  Okay.  Now, you had talked about with Mr. Swift that you

8    believed Ahrar al-Sham was just concerned with Syria; is that

9    correct?

10   A.  I believe so.  Yes.

11   Q.  And that if someone says they want to retrieve the two holy

12   mosques, the two holy mosques are occupied, I want to return to

13   the two holy mosques, is that philosophy more consistent with

14   Ahrar al-Sham or Fateh/HTS?

15   A.  I believe that's more consistent with HTS.

16   Q.  Now, you're not saying it's okay to provide material

17   support to terrorist organizations either directly or

18   indirectly, correct?

19   A.  No.

20   Q.  Okay.

21   A.  Sorry.  Thought that was a trick question.  Yeah.  I'm

22   sorry.

23   Q.  No.

24   A.  Of course not.  Of course not.

25   Q.  No.  And here's another non-trick question.  You're not

Samer Abboud – Cross

1  saying it's okay for U.S. citizens to pick sides and provide

2  weapons to people that may be fighting U.S. forces?

3  A.   Sorry.  Could you repeat the question?

4  Q.   Sure.  You're not saying it's okay for U.S. citizens to

5  provide weapons in a foreign war?

6  A.   No.

7  Q.   Okay.  So on your version two of your report, Page 23, you

8  have a quote.  And can -- I'm sorry.  Page 24.  Showing you

9  what's been marked for identification --

10            MR. ROOMBERG:  Your Honor, may I approach?

11            THE COURT:  Yes.

12  BY MR. ROOMBERG:

13  Q.   Showing you what's been marked for identification as

14  Government's Exhibit 29.

15  A.   Thank you.

16  Q.   Are you familiar with that, on Page 24 of your report?

17  A.   Yes.  This -- yes.

18            MR. ROOMBERG:  Your Honor, we'd move to admit

19  Exhibit --

20            MR. SWIFT:  Objection.  We're just going -- it's from

21  his report.  They can question him on it, but I don't

22  understand why we're admitting an excerpt from the report, as

23  substantive --

24            THE COURT:  I wonder the same.

25            MR. ROOMBERG:  Your Honor, so I can ask questions, and

```
 1    I believe it's important, this is an admission of a party
 2    opponent.
 3              MR. SWIFT:  It's not an admission of a party opponent.
 4    It is the -- it's the part of a report of an expert.
 5              THE COURT:  Well, yeah.  The problem is, if we --
 6    first of all, optional completeness and it's not the whole
 7    report and we've got another witness and it'll just go -- so
 8    you may use it --
 9              MR. ROOMBERG:  Okay.
10              THE COURT:  -- and argue from it at the appropriate
11    time.  But we're not going to start admitting all of that
12    stuff.
13              MR. ROOMBERG:  Yes, sir.
14              THE COURT:  So it's fairly brief.  If you want to have
15    him read it into the record, that's fine.
16              MR. ROOMBERG:  Okay.  Actually, I'll make it into a
17    question and --
18              THE COURT:  Okay.
19              MR. ROOMBERG:  Okay.
20    BY MR. ROOMBERG:
21    Q.  Now, in your report, from September 2018 to August 2019,
22    Ahrar al-Sham and other opposition groups, like HTS,
23    participated in the actions in this paragraph?
24    A.  September 2018 was after the first -- was the first
25    cease-fire declared between Turkey and Russia and Syria.
```

Samer Abboud - Cross

1   Q.  Okay.

2   A.  Yes.

3       And then -- I'm sorry.  Maybe I misunderstood the question.

4   I'm sorry.

5   Q.  Okay.  Let me ask it this way.

6   A.  Yeah.

7   Q.  From that time period, you wrote, the conflict among

8   opposition groups were carried out predominantly with small

9   arms or heavy machinegun fire, 43 percent of the recorded

10  incidents, followed --

11  A.  Oh, yes.

12  Q.  -- followed by improvised explosive device, IED, activity,

13  38 percent or 262 incidents.  The remaining 19 percent of

14  activity was split between murders, 56; kidnappings, 30;

15  extrajudicial executions, 18.

16      Is that another word for "beheading"?

17  A.  Well, it could be beheading.  But it's not how I understood

18  that category.  It would be, yeah, just --

19  Q.  Just murdering them?

20  A.  Yeah.  Well -- yeah.

21  Q.  Okay.  Shelling, 12 times; grenade attacks, nine; and other

22  types of events that could not be categorized.

23      So you're saying -- and I'm just trying to understand this.

24  You're saying this is the opposition groups fighting amongst

25  themselves, say Ahrar al-Sham fighting HTS?

Samer Abboud - Cross

1  A.  Yes.  I believe, if I remember correctly, those statistics

2  are taken from the later period, that is referenced in this

3  passage that you have taken.  So it's closer to 2020.  And I'm

4  using that as evidence to make the claim that this -- the

5  nature of fighting between these groups looks like this now.

6          MR. ROOMBERG:  Okay.  Your Honor, if I could approach?

7          THE COURT:  Yes.

8  BY MR. ROOMBERG:

9  Q.  Just so we can clarify on the date --

10 A.  Yes.

11 Q.  -- you say it comes from September 2018 to August 2019?

12 A.  Oh, yes.  Yes.  Sorry.  I just wanted -- thank you for

13 clarifying that.  Yeah.

14 Q.  So this is groups like Ahrar al-Sham and HTS killing each

15 other?

16 A.  I believe so.  Yes.

17 Q.  Were you aware that the defendant and Mr. Barodi were

18 trying to get funds to purchase grenades, rockets and 50-kilo

19 explosives to put on remote-controlled airplanes for IEDs?

20 A.  I did not know the specifics of that --

21 Q.  And --

22 A.  -- like those specific accusations.

23 Q.  And were you aware that the defendant and Mr. Barodi said

24 this was for war support, not for defending houses?

25 A.  I'm sorry, sir.  I was aware that there was an accusation

1  of transferring weapons.  I didn't know about the specifics of

2  it.

3      The second question, I'm sorry, could you repeat that?

4  Q.  That Mr. Barodi and Mr. Wadi said this was for war support,

5  not for defending houses?

6  A.  I'm not familiar with that from the evidence that I've

7  seen.

8  Q.  Would you agree what's important in the end is what

9  Mr. Wadi and Mr. Barodi knew at the time and agreed to in 2017

10  and 2019 from their battlefield reports?

11      MR. SWIFT:  Objection.  Part on it is, he's here as a

12  historical witness.  He's not here to judge the factual basis

13  on theirs.  In fact, no expert can.  An expert who is not party

14  to the conversations of the individuals cannot comment on their

15  conversations.  So I did not ask him for that.  I asked him for

16  his opinions as to historically what was happening on the

17  battlefield.

18      THE COURT:  Response?

19      MR. ROOMBERG:  Your Honor, I'm asking -- the witness

20  has insisted that there was no fighting.  He's finally conceded

21  that there was cooperation on the battlefield.  I'm just

22  asking, what's important?  Is it what's in the defendant and

23  his coconspirator's mind or his later reports?

24      THE COURT:  Okay.  Well --

25      MR. SWIFT:  That's for the jury.

```
 1              THE COURT:  Excuse me.
 2      Yes.  That's crossing into the jury's responsibility.  So
 3  the objection is sustained.
 4              MR. ROOMBERG:  Your Honor, we'll pass the witness.
 5              THE COURT:  Redirect?  Hold on just a --
 6              MR. ROOMBERG:  Oh, one moment.
 7      (Discussion off the record)
 8              MR. ROOMBERG:  We'll pass the witness, Judge.
 9              THE COURT:  Redirect?
10              MR. SWIFT:  Briefly.
11      Can we bring back up Defense Exhibit 83 and publish it
12  again.  It's been admitted.  Can we go ahead and publish?  Are
13  you -- can we publish back up Defense Exhibit 83?  It's been
14  admitted.
15              THE CLERK:  Yes.  It's to her to put it on the screen.
16              TECHNOLOGY SPECIALIST:  Oh, I'm sorry.
17              THE CLERK:  That's all right.  It's waiting.
18              MR. SWIFT:  It's early in the morning.  The screens
19  and all --
20                         REDIRECT EXAMINATION
21  BY MR. SWIFT:
22  Q.  Now, if you can -- I want to refresh because we've been
23  talking a lot about this battle that occurred in 2019.  And
24  that's the battle of?
25  A.  Kafr Nabbudah.
```

Samer Abboud - Redirect

1  Q.  Where was that battle?  Can you indicate on this map where
2  that battle was occurring?
3  A.  It's in the -- it would be in the southern parts of the
4  ugly highlighter green color, of Idlib.
5  Q.  Yes.
6  A.  The kind of very green color.
7  Q.  All right.  And as you testified, I believe, that battle
8  included some remnants of Ahrar al-Sham?
9  A.  Yes.
10  Q.  Where was the majority of the Ahrar al-Sham at the time of
11  that battle?
12  A.  In the -- I believe them to be in the northern areas, which
13  is in the kind of bluish-green color that is there.
14  Q.  Was there any reports that those individuals up in the
15  northern area, up in the mountains, came down to this battle
16  to -- you know, rally to support, to come to HTS's aid and --
17  A.  I've not seen evidence of that.
18  Q.  So to be clear, what we're talking about is people who had
19  stayed in their villages; is that correct?  And not gone up to
20  the northern area?
21  A.  Yes.  I believe the factions that were fighting in the
22  south were already present in the south, in the southern part
23  of this map.
24  Q.  Yes.
25  A.  Yeah.

Samer Abboud - Redirect

1    Q.  And they'd stayed there.  And then when the battle

2    occurred, they fought in it?

3    A.  Yes.

4    Q.  And to be clear, on all of that low-level conflict, how

5    much of the -- was kidnapping, extrajudicial killing,

6    et cetera, these types of activities?

7    A.  During the battle of Kafr Nabbudah?

8    Q.  No.  During the battles between the two.  I'm going to list

9    some things:  Killings, extrajudicial killings, IEDs,

10   et cetera.  Were those typified things that HTS had done all

11   along?

12   A.  Yes.  All of the groups, when they fought each other, were

13   engaged in those kinds of conflict.

14   Q.  Okay.  Now, Ahrar al-Sham, has the United States designated

15   them as a terrorist group?

16   A.  No.

17   Q.  HTS?

18   A.  Yes.

19   Q.  Are you familiar with the State Department's process for

20   doing that?

21   A.  Whatever is public.  I'm not familiar with the intricate --

22   Q.  Then I won't ask you any questions about it.

23   A.  -- the intricate details of how they do it.

24   Q.  I won't ask you any questions about it.

25   A.  Yeah.  Okay.

Samer Abboud - Recross

1           MR. SWIFT:  I have no further redirect.

2           THE COURT:  All right.  Recross?

3           MR. ROOMBERG:  Just one question on that.

4           THE WITNESS:  Yes.

5                        RECROSS-EXAMINATION

6    BY MR. ROOMBERG:

7    Q.  Just go to the State Department website and look up

8    "designated terrorist organizations," and you get the whole

9    list?

10   A.  Oh, yes.  No.  I was -- I thought I was being asked about

11   the process of designation.

12   Q.  No.  I understand what you thought.  But you can go to the

13   website and look it up?

14   A.  Yes.  Yeah.

15          MR. ROOMBERG:  Okay.  Thank you.

16      Nothing further, Judge.

17          THE COURT:  All right.  Thank you, sir.  You may be

18   excused.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right.  Ms. Saad, if you'll come to

21   the lectern, please.  I think this is where we're going to do

22   some things outside the presence for the next witness?

23          MS. SAAD LINDSEY:  Yes, Your Honor.

24          THE COURT:  Okay.  All right.  Very well.

25      Ladies and gentlemen, we need to take up some legal matters

```
 1   before you hear the next witness.  So while we do that.
 2       Ms. Saad, is this your witness or Mr. Swift's?
 3           MS. SAAD LINDSEY:  It is my witness.
 4           THE COURT:  Okay.  Your estimate if -- on direct would
 5   be?
 6           MS. SAAD LINDSEY:  15 minutes.
 7           THE COURT:  Okay.  So the offer -- what we're going to
 8   talk about should take that or less?
 9           MS. SAAD LINDSEY:  Absolutely.
10           THE COURT:  Okay.  All right.  Well, you all will be
11   in recess for 20 minutes.  Thank you.
12       (Jury leaves courtroom)
13           THE COURT:  You may be seated.
14       Now, before we get into Mr. Amer Wadi, Ms. Herndon was
15   telling me this morning -- we're trying to get everything
16   exhibit-wise into format where the jury can see it.  But there
17   are 15 clips of defense video things, that there's some
18   formatting or technical or ships passing in the night or
19   something.
20           MS. SAAD LINDSEY:  All hands are on deck to fix the
21   problems, Your Honor.  So they are actively working on it.
22           THE COURT:  Okay.  And then Ms. Sullivan and I had a
23   fairly lengthy conversation yesterday afternoon and then this
24   morning about the jury charge.  A lot of stuff was filed, I
25   think last night.  But we'll get to that.
```

1    So would it be more efficient to call Mr. Wadi and do an

2   offer of proof from the witness stand, or how do you propose to

3   proceed?

4        MS. SAAD LINDSEY:  Your Honor, Mr. Wadi will speak

5   about his father's financial situation when he moved to

6   San Antonio approximately in 2012 and then to 2016.  And so

7   this is just putting in context Mr. Wadi's financial situation

8   in this time right before the offense.  So it will take no more

9   than ten minutes.  It's addressing the convenience store that

10  they had opened here in San Antonio.  It closed in 2015, and

11  the financial pressures Mr. Wadi had and their family had at

12  that time specifically.

13       THE COURT:  All right.  Mr. Harris or Mr. Roomberg?

14       MR. ROOMBERG:  Your Honor, we'd object under

15  relevance.  This is more prejudicial than probative.  This

16  witness -- we're not even in the time frame of the indictment.

17  So we don't believe that it matters.  It's not for this witness

18  to talk about his father's financial issues.  We've heard

19  nothing about firsthand knowledge.

20       THE COURT:  So you're offering this to show, because

21  of these financial issues, Mr. Wadi had a reason to -- so

22  what's the point?

23       MS. SAAD LINDSEY:  Sure, Your Honor.  Our position is

24  this provides context to Mr. Wadi's financial situation,

25  specifically into the 2015-2016 period.  We've had testimony

1   from Mr. Baker about their extended relationship.  There's

2   been -- and the fact that Mr. Baker then reported his conduct

3   to the FBI.  He picked him out -- the mosque.  He chose him as

4   someone to target.  This also gets to our legal -- the legal

5   argument in terms of entrapment for inducement.

6       So these are all factors, specifically for entrapment, that

7   I think are crucial for the jury to hear and have context for.

8           THE COURT:  So your argument, if we get there, would

9   be he was motivated to be involved in this, and so he was

10  tempted, lured, whatever you want to call it, to get involved

11  because he had these financial problems and there was this

12  carrot dangling out here for money for this business deal, but,

13  by the way, you've got to do this, too.  Is that --

14          MS. SAAD LINDSEY:  Absolutely.  And if Mr. Wadi had a

15  successful convenient store, this wouldn't have happened,

16  right?  I mean, this is the setting.  And it's been

17  corroborated by Mr. Baker.  But we'd like the jury to hear the

18  facts that led up to this and the pressures Mr. Wadi was under.

19  And this is just --

20          THE COURT:  Well, Mr. Wadi, the defendant, could get

21  up and testify to that, too.

22          MS. SAAD LINDSEY:  These are just facts in terms of

23  the convenient store that they had, that shut down in 2015, and

24  the fact that they couldn't pay the bills, the fact that they

25  couldn't -- the car got repossessed.  These are the facts that

1  we would be offering.

2         THE COURT:  How was the son involved in the convenient

3  store?

4         MS. SAAD LINDSEY:  He worked there.  His name was on

5  the convenient store.  The entire family were employees there.

6  So it was a family business.  It failed here in San Antonio

7  because, unlike Dallas where there are dry counties, a dry

8  convenient store in San Antonio failed, not surprisingly.  So

9  these are the factors that led to the financial situation for

10 Mr. Wadi.

11        THE COURT:  Okay.  I have a question for the

12 government --

13        MR. ROOMBERG:  Yes, sir.

14        THE COURT:  -- in terms of this pre-indictment period.

15 Was Mr. Wadi -- which nothing to do with what we're talking

16 about right now, but I've been wondering about it.  Was

17 Mr. Wadi on the FBI's radar screen before Mr. Baker entered the

18 scene, or Mr. Barodi, either one?  And then Mr. Baker, of

19 course, got involved at his level.

20        MR. ROOMBERG:  Your Honor, if I could have a moment,

21 please.

22        THE COURT:  Sure.

23    (Discussion off the record)

24        MR. ROOMBERG:  Your Honor, I can't answer that in this

25 forum.

1           THE COURT:  Okay.

2           MR. ROOMBERG:  If the Court would like to go *ex parte*,

3   we can.

4           THE COURT:  Okay.

5           MR. ROOMBERG:  What I would say, though, Judge, is,

6   again, one, counsel, in argument to the jury and argument to

7   the Court, can argue whatever they want about Mr. Baker.  But

8   the recordings speak for themselves.

9       And there was no government inducement.  The fact that he

10  needed money -- or this argument that he needed money is

11  contradictory to what the evidence is, where Mr. Wadi -- we've

12  heard numerous recordings.  He's traveling to Nicaragua where

13  he opened a factory.  He's going to Vietnam, to Malaysia, to

14  Egypt, to Iran.

15          THE COURT:  Well, that's another concern.  I mean, I

16  hear these two different versions of Mr. Wadi, who is this poor

17  fellow who's doing handyman work, but -- and I've kept a list

18  as best I could, not that he went to all of them.  But we've

19  covered 18 different countries, and a number of which, the

20  recordings, as I recall, Mr. Wadi was going here and there.

21  And it costs money to get on those airplanes.

22  Q.  And he had -- he received, based on a contract, a $16

23  million letter of credit, which counsel brought out was shown

24  to Mr. Baker.

25      So this whole argument that he's this poor pitiful person

1  doesn't fly based on testimony they elicited and the recordings

2  of Mr. Wadi's own voice.  So we believe that this 2012 to 2016

3  period is not relevant, and it would -- it was more prejudicial

4  than probative and would confuse the jury?

5          THE COURT:  Well, it's for sympathy.

6          MR. ROOMBERG:  Okay.  And that's not admissible.

7          THE COURT:  Right.

8      All right.  Ms. Saad.

9          MS. SAAD LINDSEY:  Your Honor --

10          THE COURT:  Hold on just a minute.  I have a question.

11          MS. SAAD LINDSEY:  Yes.  Sorry.  Okay.

12          THE COURT:  Is there -- this is the only time I get to

13  play lawyer.  Okay?  Is there anything in the record so far

14  that would show this -- and I think there is, about the

15  convenient store and it wasn't terribly successful and so

16  forth, that would -- that would support your argument to the

17  jury that he was in this precarious financial situation, the

18  convenient store wasn't doing well and, therefore, he was the

19  perfect target for Mr. Baker, who needs to make money to

20  support his car business, and he's looking for a target, and

21  Mr. Wadi is a good target because he's in financial need?  Is

22  there enough in there already to make that argument?

23          MS. SAAD LINDSEY:  No, Your Honor.  There have been

24  statements the government elicited from his FBI statement.  But

25  those are things related to Dallas and Mr. Barodi.  That was

1    their focus.

2        What we are trying to do is contextualize the financial

3    situation for Mr. Wadi specific to the time period in 2016.

4    And we have to tell how he got to that point -- what happened

5    with this convenient store.

6        This convenient store has been not -- vaguely referenced

7    but not specifically -- that it was open here.  It was a family

8    business and it failed and why.  That's not here.  And so we'd

9    like to put that into evidence to address the financial need.

10   And that's our argument for that.  I think it's crucial to our

11   entrapment defense.

12       The government, throughout the case, has just presented

13   these statements lump sum.  But there's a progression in these

14   statements, and we will argue that.  But to take the

15   government's, you know, summary of these statements lump sum is

16   a disservice, and it -- I think when -- we will argue at

17   closing how this progressed.  And to be able to show that, we

18   need to show how it started.  And so that is why we would argue

19   that his testimony is crucial.  And we would -- we would ask

20   the Court permit his testimony.

21           THE COURT:  Okay.  I've lost my train of thought.  Oh,

22   the testimony that you would be presenting would be oral

23   testimony from Mr. Amer Wadi as opposed to supporting documents

24   that show what terrible financial situation it is?

25           MS. SAAD LINDSEY:  Yes.  He will just talk about --

1    THE COURT:  But no records?

2    MS. SAAD LINDSEY:  No records.

3    THE COURT:  So how is -- how is the government

4    supposed to -- Mr. Swift, if you want to write it down, it's

5    fine.  But I can't focus when I got people dancing around all

6    the time.

7       So how is the government able to cross-examine?  I mean, he

8    gets up and says A.  And how is the government supposed to

9    cross-examine that?

10    MS. SAAD LINDSEY:  Your Honor, I didn't prepare an

11    exhibit on this.  But we went to the FBI and reviewed the

12    documents they seized from Mr. Wadi's home.  In those documents

13    are documents where Amer Wadi's name is on this convenient

14    store.  So they have these documents in their possession if

15    they wanted to cross-examine him on anything related to this

16    convenient store.

17    THE COURT:  Okay.  All right.  Mr. Swift, did you --

18    MS. SAAD LINDSEY:  I know that if I tried to put it

19    in, they'd sure object.

20    THE COURT:  Mr. Swift, did you have a note for

21    Ms. Saad?

22    MR. SWIFT:  Not anymore.  She addressed what I was --

23    THE COURT:  Okay.  All right.  Let me hear one more

24    response from the government.

25    MR. ROOMBERG:  Your Honor, again, this clearly would

 1    confuse the issues.  It is more prejudicial than probative.  We

 2    have evidence that throughout the time period of the indictment

 3    and immediately before, we have the defendant's own words that

 4    he's traveling abroad, in multiple countries throughout the

 5    world, getting contracts, having a $16 million letter of

 6    credit.

 7        And his son -- and I think, frankly, if this is the same

 8    situation that Mr. Wadi did in Dallas, when he and Mr. Barodi

 9    got Mr. Barodi's nephew because they didn't have good credit,

10    and gave him a hundred thousand dollars to be the front person,

11    frankly, it's bank fraud.  And if the same thing happened with

12    Mr. Wadi, Amer Wadi, he may also be implicating himself in

13    potential financial crimes, if his name is the one that's on it

14    and not his father's name, when clearly we know it's the

15    father's store.

16            THE COURT:  On the Dallas store or the San Antonio

17    store?

18            MR. ROOMBERG:  Well, they're mentioning the

19    San Antonio store.  But we saw on the recordings in the Dallas

20    store that Mr. Wadi and Mr. Barodi set that whole shopping

21    center up in someone else's name because they didn't have

22    credit, and paid the person a hundred thousand dollars.  And

23    then when that person wanted to get the store, according to

24    Mr. Wadi, he told the FBI about Mr. Barodi's past.  And that's

25    how he could say, it's my store, not theirs, and they couldn't

1    sue him back.  But that was bank fraud.

2        So it sounds to me like it's the same scheme, because I'm

3    guessing at that point in time Mr. Amer Wadi was pretty young.

4            THE COURT:  Okay.  Well, the other thing, I hear about

5    all this foreign travel, but, yes, he's in dire financial

6    straights.

7        Well, at any rate, the ruling is that the Court finds this

8    witness and the proffered testimony to be A) irrelevant and B)

9    more prejudicial than probative.

10           MR. ROOMBERG:  Thank you, Your Honor.

11           THE COURT:  Okay.  Can I finish making the ruling?

12           MR. ROOMBERG:  Oh, I'm sorry.

13           THE COURT:  Okay.  All right.  So that's the ruling.

14       So Mr. Wadi, Amer Wadi, is not going to testify.  However,

15   I assume that you want to make a bill, put him on, ask the

16   questions, so the record is complete, which you can do when we

17   get to that.  But in the meantime, then, I think you said he

18   would be your last witness.

19           MS. SAAD LINDSEY:  That's correct, Your Honor.

20           THE COURT:  So then we need to get the jury back in

21   here, call the next witness, the defense rests, any rebuttal,

22   government closes, go through that process.  Then we'll get

23   Mr. Amer Wadi here to make your bill, and then we'll work on

24   the charge.  And that's going to take a while.  And then once

25   we get that hammered out, we still have to make copies and all

1    that.

2    So there's no point in the jury sitting around here for

3    probably three hours because -- let's see.  So is today

4    Wednesday?

5              MS. SAAD LINDSEY:  Yes, Judge.

6              THE COURT:  I think.  All right.  So we could excuse

7    the jury for three or four hours, have them come back.  If we

8    got through, finished, try to start the arguments.  My

9    suggestion is that we do this in a more orderly, not-rushed way

10   amongst us, have the jury come back tomorrow morning and have

11   arguments at 8:30.

12   Ms. Saad, yes?  No?

13             MS. SAAD LINDSEY:  Your Honor, we are ready to go this

14   afternoon if the Court -- for closing arguments.

15             THE COURT:  Well, I know.  But I don't think we can --

16   it would be rushed.  And plus, you know, we still got to do

17   this -- we've got tomorrow morning to argue.  And then that

18   gives a day and a half to deliberate if they need it.

19             MS. SAAD LINDSEY:  Your Honor, and a day and a half

20   may be enough, but we would just like to let the jury have as

21   much of the week, because we're going into a holiday weekend.

22   So if the -- if we do -- I think that we could do it.  I don't

23   anticipate it taking very long to address the jury charge

24   further.

25   So we would -- we would strongly lean toward 1:30, if the

1    Court -- or 2:00, whatever it may be, this afternoon.  That way

2    it's in the jury's hands and they can take as much time as they

3    need.

4            THE COURT:  Okay.  Mr. Roomberg?

5            MR. ROOMBERG:  Sir, one thing I'd like to say before

6    that is we'd ask that -- and I think it's the Court's regular

7    practice anyway, that the Court question Mr. Wadi to make sure

8    it's his choice not to testify, and that he has -- he

9    understands he has the right to testify or not to testify and

10   it's solely his choice.

11           THE COURT:  Okay.  But as far as arguments tomorrow,

12   do you agree or disagree?

13           MR. ROOMBERG:  I think it makes more sense to argue

14   tomorrow.  We're going to ask for an hour and a half, 45

15   minutes each, for closing and for rebuttal.  I would guess the

16   charge itself will take an hour.  And I would guess that

17   defense is going to want the same amount of time.  So I think

18   we really need --

19           THE COURT:  Yes.  That was the other thing I wanted to

20   raise in terms of the -- and I'm getting my antitrust schedule

21   mixed up with this case.  Okay?  So forgive me.  Had we talked

22   about 45 minutes for closing?  All right.  So I'm thinking

23   antitrust.

24     Okay.  So yes, given the magnitude of all of this history

25   and tapes and videos and so forth, I think certainly a longer

 1    period for closing is appropriate in this case.

 2        Ms. Saad, do you agree?

 3            MS. SAAD LINDSEY:  Yes, Your Honor.

 4            THE COURT:  Okay.  All right.  So it'll be an hour and

 5    a half, 45, 45.  And then, Ms. Saad, if you all want to break

 6    yours up, however you want to do it.

 7            MR. SWIFT:  Oh, an hour and a half, and they can break

 8    it 45, 45.  I was saying, I get 45?

 9            THE COURT:  No, no, no, no, no.  You get an hour and a

10    half.

11            MR. SWIFT:  Okay.

12            THE COURT:  But in between --

13            MR. SWIFT:  I won't take an hour and a half.

14            THE COURT:  You're the -- well, I would think not

15    but -- and the government may not use its full time.  But at

16    least you have it.

17        So that makes more sense then.  We'll do the arguments in

18    the morning.  And then they can take however long or short they

19    want.  But as I said yesterday, there's plenty of evidence that

20    if these folks want to go with the government, they can.  If

21    these folks want to go with the entrapment, they can do that

22    too.  Or they can do a little bit of this and a little bit of

23    that, which means we have a hung jury, which wouldn't surprise

24    me.  But I can't read them.  I mean, maybe you all can.  But

25    this is certainly a triable case, and it only takes one to hang

1  it up.

2      All right.  Do you want to put Mr. -- well, let's get the

3  jury in and get them out of here, and then we'll put Mr. Amer

4  Wadi on.

5          MS. SAAD LINDSEY:  Yes, Your Honor.  And after we

6  release the jury, I'll have one additional legal matter to

7  address at that time.

8          THE COURT:  Okay.  All right.  Bring them in.

9      *(Discussion off the record)*

10         MR. SWIFT:  Mr. Wadi, based on the Court's ruling, is

11 reconsidering.

12         THE COURT:  Is reconsidering?

13         MS. SAAD LINDSEY:  We need a moment.

14         MR. SWIFT:  Whether to testify because of the Court's

15 ruling on his sons.  Because his son would have testified that

16 he -- they were loaning tickets.

17     *(Jury enters courtroom)*

18         THE COURT:  You may be seated.

19     Counsel approach, please.

20     *(At the bench)*

21         THE COURT:  Okay.

22         MR. SWIFT:  Well -- had a few seconds there.  We've

23 made decisions based on a good faith belief that we could put

24 his son in to testify that, you know, those convenient store

25 failed, his father had no money during the course of this; that

1    the father would have had to have -- you know, his son paid for

2    his own wedding; that they paid for his father's travel tickets

3    -- but we're not going to do that based on the Court's ruling.

4         THE COURT:  So how long -- how long does he need to

5    make a decision?

6         MR. SWIFT:  I would say ten minutes.  I mean, I need

7    to talk -- we need to talk to him.

8         THE COURT:  Well, haven't you talked to him before?

9         MR. SWIFT:  Yes.  We did not anticipate this ruling,

10   Your Honor.  We had made the decision.  We did not anticipate

11   that the son couldn't testify about their financial conditions.

12        THE COURT:  Well, okay.  All right.

13        MR. SWIFT:  Your Honor --

14        THE COURT:  Hold on.

15     So does the government want to reconsider its objection?

16        MR. ROOMBERG:  No, sir.

17        THE COURT:  Okay.  All right.  Well, I don't want the

18   jury sitting here while you all are trying to confer.  I mean,

19   if -- because we don't know how long.  It could taken ten

20   minutes.  It could be 30 minutes.  Okay.  Let me send them back

21   out.  And then you all have a place you can talk to him?

22        MS. SAAD LINDSEY:  We'll use the conference room right

23   outside.

24        THE COURT:  But, you know, it's his choice, but --

25        MS. SAAD LINDSEY:  Yes, Your Honor.

 1          THE COURT:  Okay.  All right.

 2          MR. SWIFT:  I didn't want to create an error when we

 3   get in there and he tells you that he's reconsidered.

 4          THE COURT:  Right.  Oh, I agree.

 5      *(Open court)*

 6          THE COURT:  All right.  Ladies and gentlemen, we

 7   apologize.  Another matter came up because of the matter that

 8   the Court just ruled on, when you weren't here.  And so that's

 9   going to take a little more time.  So you all have another, oh,

10   let's say 20 minutes, back to your exercise, water.  Just don't

11   add anything else.  We want sober juries.

12      All right.  So we'll see you in about 20 minutes.

13      *(Jury leaves courtroom)*

14          THE COURT:  You may be seated.

15      Also, this latest bench conference reminded me that

16   Mr. Roomberg had suggested that Mr. Wadi himself tell us, as

17   opposed to counsel, whether he's going to testify or not.  And

18   we didn't get to that point.  But now we're going to take this

19   ten, 15 minutes here.

20      Mr. Wadi, your lawyers are going to advise you of the

21   pluses and minuses of whether you testify or not.  You have to

22   make the final decision.  And so when we come back in here, in

23   no less -- or no more than 15 minutes, you're going to have to

24   say, I want to testify, or, I do not want to testify.  Is that

25   clear?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  All right.  Very well.  Thank you.

3    We're in recess.

4    *(Recess at 9:27 a.m. until 9:39 a.m., jury out)*

5    THE COURT:  Okay.  I think we're all here.  So bring

6    them in.

7    Oh, hold on.  Hold on just a minute.

8    For the record -- you can stay there where you are.

9    Mr. Wadi, we're on the record.

10   You all may be seated.

11   And the decision has now come to the point where you have

12   to decide and say on the record whether you want to testify or

13   not.  Do you wish to testify in your defense?

14   THE DEFENDANT:  No, sir.  No, sir.

15   THE COURT:  Okay.  All right.  Thank you, sir.

16   THE DEFENDANT:  Thank you, Your Honor.

17   THE COURT:  Now you can bring them in.

18   *(Jury enters courtroom)*

19   THE COURT:  You may be seated.

20   All right.  Ladies and gentlemen, here's where we are

21   procedurally in what we call due process.  At this time the

22   Court is going to ask the defense for its next witness.

23   MR. SWIFT:  Your Honor, the defense rests at this

24   time.

25   THE COURT:  All right.  The defense having rested,

1  does the government have anything further?

2          MR. ROOMBERG:  No, Your Honor.  The United States

3  closes.

4          THE COURT:  All right.  Ladies and gentlemen, the

5  evidence has been closed.  So everything that you all are going

6  to get to make your decision is in the record.  Now, it's our

7  turn, or responsibility, to get everything ready for the next

8  phase, which are the jury instructions from the Court and then

9  the argument of counsel on behalf of their respective client.

10      Because of a whole number of complex matters, that's going

11  to take -- we also have a technological issue that has to be

12  resolved on some video clips.  At any rate, all of that's going

13  to take probably three or four hours.

14      So there are two choices.  You can go back to your jury

15  room for the next four hours, or you can go home.  So I've made

16  the choice for you.  You're going to go home until tomorrow

17  morning at 8:30.  And that's when you'll hear your

18  instructions, hear the lawyers' arguments, and then it will all

19  be up to you all to deliberate.

20      But, again, keep in mind your instructions.  You're free to

21  go back to work if you want to.  You can go -- whatever you

22  want to do.  That's up to you all.  But just don't talk about

23  this case.

24      And then it will be then -- after the arguments are made,

25  then it'll be up to you as to how much time you want to take to

1   deliberate on your verdict.

2       All right.  Thank you very much.  We're in recess.

3       *(Jury leaves courtroom)*

4           THE COURT:  You may be seated.

5       All right.  Outside the presence, Ms. Saad, do you wish to

6   call a witness to make a complete record?

7           MS. SAAD LINDSEY:  Yes, Your Honor.

8           THE COURT:  All right.  Go ahead.

9           MS. SAAD LINDSEY:  Defense calls Amer Wadi.

10          THE COURT:  All right.  Mr. Wadi, if you'll come up,

11  please.  Raise your right hand.

12      *(The oath was administered)*

13          THE COURT:  All right.  You may be seated.

14              AMER WADI, DEFENDANT'S WITNESS, SWORN

15                      DIRECT EXAMINATION

16  BY MS. SAAD LINDSEY:

17  Q.  Please state your name.

18  A.  Amer Wadi.

19  Q.  Mr. Wadi, what is your relationship to Imad Wadi?

20  A.  I am his son.

21  Q.  And, Mr. Wadi, if you could explain to the jury how your

22  family moved to San Antonio.

23  A.  My family moved to San Antonio in 2013.  They moved down

24  here specifically to open up a convenient store.  That

25  convenient store was located here in the downtown area, just

Amer Wadi - Direct (Jury Out)

1  off of Commerce Street, down the ways.  That convenient store,
2  it failed ultimately due to the fact that we just really
3  couldn't compete here in San Antonio since there were no dry
4  counties at the time.
5      My father, previous to that, in Dallas, had run very
6  successful convenient stores.  He had great customer service.
7  People really liked him down there.  And the only way we could
8  compete was that we operated in dry counties.  We didn't sell
9  alcohol.  We didn't sell liquor, you know.  So it was, you
10  know, very difficult here in San Antonio to compete with the
11  stores that did sell alcohol.
12  Q.  Why didn't you sell alcohol?
13  A.  Religiously.  It was just something that we did not feel it
14  was -- we had an ethical religious obligation not to sell it.
15  Q.  What was the name of the convenient store in Dallas?
16  A.  The name of the convenient store in Dallas was MS Express.
17  Q.  MS Express was here in San Antonio; is that correct?
18  A.  Yes.  We maintained the same name in Dallas as well.
19  Q.  Oh, okay.  Thank you.
20      Did it operate under the name Kidd Jones?
21  A.  I'm sorry?
22  Q.  Strike that.
23      Who worked in the convenient store here in San Antonio?
24  A.  The whole family.  My dad, my mom, my sisters, myself, when
25  I was in town, off of active duty.  You know, we all -- we all

Amer Wadi - Direct (Jury Out)

1   pitched in to make sure that store was a success.  Sadly, it

2   just wasn't.  We weren't able to -- we weren't able to maintain

3   it.

4   Q.  Could you estimate a time frame of when it closed?

5   A.  Yes.  Late 2015 we gave the keys back to the original store

6   owner, and he turned the store over to a good couple who ended

7   up putting beer in that store.  And it's now a successful

8   store.

9   Q.  How did the closure of this convenient store affect your

10  father?

11  A.  The last six months were extremely stressful for him.  You

12  know, the store wasn't turning a profit.  We had a loss almost

13  every single month.  And to offset the loss, he would take on

14  small construction jobs that he would do usually in the evening

15  time, because he would operate the store during the day, and

16  then at night he would go and do some other odd jobs to kind of

17  offset our losses at the store.  Eventually that caught up to

18  us, and we just couldn't -- we just couldn't maintain it.

19  Q.  What was your father's decision -- next decision in terms

20  of business to pursue?

21  A.  The next decision was to look for the next thing.  You

22  know, he had always worked overseas.  He had always traveled

23  overseas when we were younger.  He had always tried different

24  business ventures that he would try to, you know, enact, work

25  on, get going.

Amer Wadi - Direct (Jury Out)

1    None of them really panned out.  We know that.  You know,
2  but at the end of the day, he tried.  And we could see that he
3  tried.  And that's really what mattered most to us, was that at
4  least he was trying.  He wasn't stopping.  He wasn't trying to
5  not do the right thing.
6  Q.  Did you learn about the halal beef business prospect from
7  your father?
8  A.  Yes, I did.  He was very open about it, talking with the
9  house.  He said, hey, look.  I have this business plan.  I have
10 this idea.  This is really viable.
11   The whole reason why we all agreed as a family he should
12 travel in 2016 was because he wanted to pursue this.  And we
13 wanted to give him the opportunity to do that.
14 Q.  While traveling, did you have to financially support him --
15 A.  Yes --
16 Q.  -- to travel?
17 A.  -- I did.  I not only financially supported my father.  I
18 paid the rent at the house.  I paid the bills.  I made sure to
19 take care of what I could at home while he was away, since I
20 was his -- since I'm one of his elder sons.
21   I didn't have a family at the time, like my older brother
22 and sister.  So the burden fell on me, with two sisters in
23 college, a mother who works from home, a little brother who was
24 still in middle school, entering high school at the time.  It
25 fell on me to kind of take care of most things that were around

Amer Wadi - Direct (Jury Out)

1  the house while my dad was away.

2      Sadly, you know, we had a car repossessed.  Our financial

3  situation was not the greatest.  My dad was utilizing credit

4  cards to pay for his travel.  It was hard.  It wasn't easy.

5  Q.  How would you describe this period from 2015 and 2016 for

6  your family?

7  A.  It was probably some of the worst years for us.  You know,

8  from the repossession to just the debilitating state around the

9  house, it was hard.  It wasn't easy.  We didn't have money.  We

10  didn't have anything.  But we all knew that my dad wasn't doing

11  this to us on purpose.  He did this for a purpose.  He said,

12  hey, I have an idea.  I really want to go and get this done.  I

13  need y'all's help to make sure that I can at least have the

14  ability to.

15      And we provided him that.

16  Q.  During this time, was your family friends with Hussein

17  Baker?

18  A.  Yes.

19  Q.  Did he loan the family money?

20  A.  Yes, he did, on two occasions, from what I can recount.  I

21  actually went to his house or met him somewhere where he would

22  give me money to help my dad.

23  Q.  Was Mr. Baker a guest at your wedding in two thousand --

24  A.  Yes, he was.

25  Q.  When was that?

1    A.  In 2018, October 5th.

2        *(Discussion off the record)*

3    BY MS. SAAD LINDSEY:

4    Q.  Did your father pay for your wedding?

5    A.  No.

6    Q.  Was he able to pay for your wedding?

7    A.  No.

8            MS. SAAD LINDSEY:  No further questions.

9            THE COURT:  All right.  Anything for the government

10    for the record?

11            MR. ROOMBERG:  Well, for the record, hearing

12    Mr. Wadi's testimony, I think even more so the proffer shows

13    his testimony's irrelevant.  It's a plea for sympathy.  It's

14    based mostly on hearsay from his father, in addition to the

15    previous 403 objections, that it's more prejudicial than

16    probative.

17            THE COURT:  All right.  Having heard the proffer, the

18    Court reaffirms its previous ruling not to allow the testimony.

19        Thank you, sir.  You may step down.

20        Okay.  Ms. Saad, anything further before we get to the jury

21    charge issues?

22            MS. SAAD LINDSEY:  Yes, Your Honor.  I'd just like a

23    ruling on a motion for mistrial.  We have had previous motions

24    about requesting reports specific to Mr. Wadi that led up to

25    Mr. Baker's initiation -- or of this investigation, beginning

1    of June of 2016.

2        During the trial, testimony from Agent Martinez was cut off

3    in the middle of the testimony regarding the Muhammad Ali, who

4    is Abu Husayn, based on non-disclosure of these reports.  There

5    is additional questions the Court had today that were cut off

6    based on non-disclosures of reports.  While CIPA does permit

7    the government to deem things classified, that does not

8    override Mr. Wadi's right to a fair trial.  And so we would

9    reurge those matters, and we would move for a mistrial at this

10   time.

11       THE COURT:  All right.  Response?

12       MR. ROOMBERG:  Your Honor, first of all, the question

13   that Ms. Saad refers to wasn't asked on direct exam.  It was

14   asked on cross-exam.  So they don't get to open doors that

15   aren't even part of this indictment time period.

16       The Court previously ruled on these motions based on CIPA.

17   There was nothing exculpatory towards what Ms. Saad's referring

18   to.  And there's no basis for a mistrial.

19       THE COURT:  All right.  The motion for mistrial is

20   denied.

21       Mr. Roomberg, anything else before we begin talking about

22   the jury charge?

23       MR. ROOMBERG:  No, sir.

24       THE COURT:  Ms. Saad?

25       MS. SAAD LINDSEY:  Your Honor, we have the original

```
 1   version.  I know Ms. Sullivan has made some changes.  And I
 2   know there are additional ones that I think are still
 3   outstanding.  So if --
 4          THE COURT:  Right.  She's sending what she and I have
 5   so far to the printer.  In fact, it should be here.  And
 6   Mr. Rodriguez is making working copies.  So that should be
 7   ready.
 8       Here we go.  All right.
 9       (Discussion off the record)
10          THE COURT:  Let me see if -- so see if we can get her
11   on audio.  And if not, I'll call her on the phone.
12          THE CLERK:  She should be able to speak now.  She's
13   unmuted herself.
14          THE COURT:  Okay.  What do we know here?
15       (Discussion off the record)
16          THE COURT:  Yes, ma'am.
17          MS. SAAD LINDSEY:  Is it possible to have a digital
18   copy of this draft emailed to us?
19          THE COURT:  Sure.
20          MS. SAAD LINDSEY:  Thank you.
21          THE COURT:  Let me tell her right now.
22          THE CLERK:  Ms. Sullivan's emailing that now, the
23   digital copy.
24       (Discussion off the record)
25          THE COURT:  Okay.  All right.  Well, let's just go
```

1    through it page by page, and we'll see where we are.

2        So the first -- and, Joani, this one has the defendant not

3    testifying?

4            LAW CLERK:  Yes, sir.

5            THE COURT:  Okay.  Answer is yes.

6        All right.  I'm on the middle of Page 5.  The first four

7    pages are the usual instructions.  And I'm looking at

8    "impeachment by evidence of untruthful character."  Now, the

9    second sentence, "You also heard testimony from others

10   concerning their opinion about whether that witness is a

11   truthful person," I'm not remembering that.

12       So, Ms. Saad, that comes out.

13           MS. SAAD LINDSEY:  That's correct.

14           THE COURT:  Okay.  All right.  You got that, Joani?

15           LAW CLERK:  Yes, sir.

16           THE COURT:  Okay.  "It is up to you to decide from

17   what you heard whether Hussain Baker was telling the truth in

18   this trial.  Should bear in mind the testimony" -- well --

19   "concerning the witness's reputation for truthfulness."  Well,

20   that's not in either.

21           MR. SWIFT:  No.

22           THE COURT:  All right.  Take that sentence out.

23       Well, having taken that out, I'm not sure -- it's a true

24   statement:  It's up to the jury to decide whether he was

25   telling the truth.  I don't think that's impeachment by

```
 1    evidence of untruthful character because there is none.  I
 2    mean, not from somebody else.  So should that bolded part -- I
 3    don't see how that applies.
 4              MS. SAAD LINDSEY:  Your Honor, I'm going to pull the
 5    specific cite to the Fifth Circuit pattern jury instructions.
 6    But we would like a means to address Mr. Baker's 404(b) conduct
 7    in this.  And so I'm reviewing in its totality --
 8              THE COURT:  Right.  Okay.
 9              MS. SAAD LINDSEY:  I will also see if we -- suggest a
10    different instruction.
11              THE COURT:  Yeah.  Well, we'll get to that.
12        All right.  So, Mr. Roomberg, this bolded part,
13    "impeachment by evidence of untruthful character," I don't
14    think that applies.
15              MR. ROOMBERG:  It doesn't, Judge.
16              THE COURT:  Okay.  So take -- Joani, take that out.
17        So then you just have the, "You have heard the testimony.
18    It's up to you to decide whether he was telling the truth."
19    Okay.
20        So then we get to "informer."
21        And, Joani, that's pattern jury from the Fifth Circuit?
22              LAW CLERK:  Yes, sir.  Yes, sir.
23              THE COURT:  Okay.  Mr. Roomberg, that seems standard.
24    Any objection to that?
25              MR. ROOMBERG:  No, sir.  I think that was in our
```

```
 1   proposed charges way back when.
 2          THE COURT:  All right.  Ms. Saad?
 3          MS. SAAD LINDSEY:  Yes, Your Honor.  No objections.
 4   We would request it.
 5          THE COURT:  Okay.  All right.  Page 6, "expert
 6   testimony."  And that's standard.  But I see Mr. Devlin's -- he
 7   just testified factually, correct, Ms. Saad?
 8          MS. SAAD LINDSEY:  Yes, Your Honor.
 9          MR. SWIFT:  No.  He actually offered -- he offered an
10   opinion.  He did offer an opinion.  He offered the opinion
11   that -- on whether the groups are together.  It was
12   Mr. Baker -- Mr. Lesch's opinion that --
13          MS. SAAD LINDSEY:  We're talking about Eric Devlin.
14          MR. SWIFT:  Oh, Mr. Devlin.  I'm so sorry.
15          THE COURT:  Okay.  All right.  That's fine.
16          MR. SWIFT:  It was a late night.
17          THE COURT:  So the only two experts are Dr. Lesch and
18   Dr. Abboud?
19          MR. SWIFT:  Yes.
20          THE COURT:  So that is fine.
21      "On or about" is standard.
22      "Caution, consider," that's standard.
23      "Caution, punishment" -- and, Joani, eventually, can you
24   move the bottom of Page 6, "caution, punishment," to the top of
25   Page 7 so it's together?
```

```
 1            LAW CLERK:  Yes, sir.
 2            THE COURT:  Okay.  All right.  "Single defendant,
 3    multiple counts, confession."
 4            MS. SAAD LINDSEY:  Your Honor, we would just ask that
 5    it not be labeled "confession."  It can be "statement,
 6    voluntariness of the defendant."
 7            MR. SWIFT:  Even the government -- can we do -- is
 8    this one horse, one ride or -- or can --
 9            THE COURT:  No.  Go ahead.
10            MR. SWIFT:  The government characterized what we were
11    arguing about this, that this wasn't a confession.  So it's a
12    statement --
13            THE COURT:  Right.  And you all can say one side, and
14    the government can say the other.
15            MR. SWIFT:  Yeah.
16            THE COURT:  So, Joani, take out the word "confession."
17    And I don't think the parenthetical "single defendant" needs to
18    be in there.
19            LAW CLERK:  Okay.
20            THE COURT:  So take that out.  So it'll just -- the
21    title will be "statement, voluntariness."
22            LAW CLERK:  Yes, sir.
23            THE COURT:  All right.  "Transcript of tape-recorded
24    conversation," that's standard.
25         "Transcript of foreign language."
```

```
 1        And you all stop me if you want to object.
 2        "Summaries and charts received in evidence."  Mr. Roomberg,
 3   I don't think -- this never was received over here.  Anything
 4   that is covered by summaries and charts?
 5             MR. ROOMBERG:  Right.  Your Honor, the defendant's
 6   cellphone Hawk summary would fall within that.
 7             THE COURT:  Okay.  All right.  Well, Ms. Saad, do you
 8   agree?
 9             MS. SAAD LINDSEY:  Yes, Your Honor.
10             THE COURT:  Okay.  So that stays in.
11        Reading of the superseding indictment, which I'll read.
12        Okay.  So -- now, wait a minute.  Okay.  So now we're on
13   Page 19, the elements for Count 1.  Any problem with that for
14   the government?
15             MR. ROOMBERG:  No, Your Honor.
16             THE COURT:  Okay.  And you can look at it again later.
17        But for the defense, Ms. Saad?  Standard, I think.
18             MS. SAAD LINDSEY:  One moment, Your Honor.
19             THE COURT:  Okay.
20             MR. SWIFT:  We'll get -- with the elements, no.  The
21   previous version had a unanimity instruction.  And I'm not
22   quite sure where we are on the maiming idea.  Are we --
23             LAW CLERK:  Excuse me.  I put the special unanimity --
24             MR. SWIFT:  Oh, I see it now.
25             LAW CLERK:  -- Page 22.
```

```
 1              THE COURT:  Yeah.  It's in.
 2              MR. SWIFT:  Got it.  Sorry.  I apologize.
 3              THE COURT:  That's all right.  It's on Page 22.  Okay.
 4       (Discussion off the record)
 5              MR. SWIFT:  Count 1, I have -- it largely mirrors what
 6       I suggested, so I should shut up.
 7              THE COURT:  All right.  Any problem through Page 22
 8       for the government?
 9              MR. ROOMBERG:  Your Honor, just thinking about it
10       now -- could I have one moment?
11              THE COURT:  Sure.
12       (Discussion off the record)
13              MR. ROOMBERG:  For the murder and the maiming --
14              THE COURT:  Why don't you use the mic.
15              MR. ROOMBERG:  Yes, sir.
16              THE COURT:  The lectern or the table mic.
17              MR. ROOMBERG:  I'm just wondering if we -- I'd suggest
18       a clarification, that these are the elements to prove if we had
19       to prove a murder charge.  But we're trying -- we're proving a
20       conspiracy.
21              THE COURT:  All right.  Well, I'm looking at the top
22       of Page 22.  "In order to find the first element as proved, the
23       government need not prove that anyone was murdered or maimed."
24              MR. ROOMBERG:  Okay.  I see.  Yes, sir.  Thank you.
25       Then I have no objection.
```

1          THE COURT:  Okay.  All right.

2      So then we go to Page 23.  "Within the jurisdiction,

3  willfully."

4      And then Count 2, "providing material support."

5      Joani, is that all standard, it appears?

6          LAW CLERK:  It's not.  I made some changes this

7  morning based on the submissions last night.  And so on Page

8  24, see where it sets forth the particular -- involved.  And on

9  Page 23 it talks about the specific resources or properties.

10  So all that is new.  They haven't seen that yet.

11          THE COURT:  Okay.  All right.  Then I also see, in the

12  middle of Page 24, this language about "First Amendment,

13  establishment of religion."  How does -- where did that come

14  from, Joani?

15          LAW CLERK:  Both sides had asked for that.

16          MR. ROOMBERG:  Your Honor, I believe that's part of

17  the pattern, the pattern in 2339B.

18          THE COURT:  Okay.

19          MR. SWIFT:  Actually, Your Honor, it is sometimes

20  relevant in cases.  I'll address all of this.  We actually

21  don't ask for the First Amendment part in this particular

22  instruction, because that often comes into cases where --

23  because "material support" can be a lot of things, including

24  advocating for a terrorist group under their direction and

25  control.  And that First Amendment issue comes up on whether it

1    was independent speech or not.  And if you read it, you go,

2    okay, is it independent speech, or is it just religious speech?

3        This one, I don't see the necessity for it.

4               MS. SAAD LINDSEY:  I want it.

5               MR. SWIFT:  Oh, well, my co-counsel wants it.

6               MS. SAAD LINDSEY:  We're keeping it.

7               MR. SWIFT:  We're keeping it.

8               THE COURT:  Okay.  All right.  Mr. Roomberg, any

9    thoughts on the First Amendment language?

10              MR. ROOMBERG:  Judge, it's part of the pattern.  And

11   if they want it, I think, you know --

12              THE COURT:  All right.

13              MR. ROOMBERG:  I stick with the pattern.

14              THE COURT:  Okay.  Is that -- is it from the pattern,

15   Joani?

16              LAW CLERK:  Yes, sir.

17              THE COURT:  Okay.  That's fine.

18       All right.  Now, Page 25, "knowingly, terrorist activity,

19   engages in terrorist activity, terrorism."

20       I'm on Page 26.  Anything, Mr. Roomberg, so far, of those

21   last three or four pages?

22              MR. ROOMBERG:  No, Your Honor.  I believe they're the

23   same as what we initially proposed.

24              THE COURT:  All right.  For the defense?

25              MR. SWIFT:  Yes.  To address the first glaring

```
 1   problem, you don't instruct them on what the elements of a
 2   conspiracy for Count 2 are.  You tell them it's a conspiracy.
 3   But, unfortunately, the pattern did not get patterned down to
 4   different offenses.  There's an attempt.  There's the provision
 5   of, and there's a conspiracy.  Each are separate offenses.
 6               THE COURT:  Right.
 7               MR. SWIFT:  And there is no instruction as to how one
 8   conspires.  We did suggest, this has been dealt with by many
 9   courts, how to talk about conspiracy in the part, because the
10   conspiracy has knowledge elements.
11               THE COURT:  All right.  Mr. Roomberg.
12               MR. ROOMBERG:  Your Honor, we have no issue at all
13   with adding the same pattern language that we have in Count 1
14   to the end of the elements of Count 2 and the ends of elements
15   of Count 3.  We actually agree with defense.
16               THE COURT:  Okay.  All right.  Joani, did you hear
17   that?
18               LAW CLERK:  Yes, sir.  Got it.
19               THE COURT:  So just add in the conspiracy elements at
20   the top or at the beginning of Count 2.
21               LAW CLERK:  Right.
22               THE COURT:  Okay.  Let's see.
23               MR. ROOMBERG:  Your Honor, and that'll be Count 3 as
24   well?
25               THE COURT:  Yes.
```

1          MR. SWIFT:  I have one more objection on Count 2.

2          THE COURT:  Okay.  And then, Joani, make a note to add

3     the conspiracy language to Count 3, also.  Well, wait a minute.

4     No.  Wait a minute.  Count 3's not a conspiracy.

5          MR. ROOMBERG:  Yes, it is, Your Honor.

6          THE COURT:  Huh?

7          MR. ROOMBERG:  They're all conspiracies.

8          THE COURT:  Okay.  "Provided" -- okay.  Just --

9          MR. SWIFT:  We'll get --

10         THE COURT:  I'm sorry.  Yes.  I see the word now in

11    the first line.

12       All right.  So go ahead and add that.

13       Mr. Swift, back on Count 2.

14         MR. SWIFT:  Yes.  We've put it in our briefing, and

15    we'll stand on this part.  But one of the elements -- one of

16    the elements of 2339B, found by multiple courts, is that they

17    have to be designated.  I told you that yesterday.

18         THE COURT:  Right.

19         MR. SWIFT:  You are now instructing the jury that they

20    have -- that an element has been proven.  You are doing that in

21    this pattern instruction.  And our version is, under the Fifth

22    Amendment, you simply can't do that.  I don't know if the

23    clerks or whoever pulled this 2339B pulled from some -- there

24    are several cases, the most famous being *El-Mezain*.  And one of

25    the things that often happens is the parties stipulate.

1    Government never came to us to stipulate because, as everybody

2    points out, you know, the designations are part of a federal

3    register.

4        But there has been no stipulation here.  There's been

5    evidence.  But here, you are instructing them on an element

6    that Congress set out, namely that you -- to a designated

7    terrorist organization, which is designated by the Secretary of

8    State on the part, during the period of time.

9        And so I don't know -- I was shocked to see it in the

10   Fifth Circuit pattern instruction.  But I believe that that is

11   wrong.  And I get that it's in the pattern instruction, and I

12   get that maybe we will and maybe we won't have to have the

13   Fifth Circuit see it.  But I do point out that the simple part

14   on it is -- the other concern I have is --

15            MR. ROOMBERG:  Judge, can I address that one before we

16   go to the second one?

17            MR. SWIFT:  Yes.

18            THE COURT:  Hold on.  Come on up.

19            MR. ROOMBERG:  So on that, one, it's the pattern.  And

20   two, while there's no stipulation, Dr. Lesch testified that all

21   three of these groups were designated.  And Mr. Swift brought

22   out with Dr. Abboud on direct that all these three groups are

23   designated foreign terrorist organizations.

24            THE COURT:  Yeah.  We've had this discussion.  So I

25   think there's enough.

1          MR. SWIFT:  Okay.

2          THE COURT:  It's not a contested issue.

3     All right.  Mr. Swift, you had something else, I think,

4  still on Count 2.

5          MR. SWIFT:  The other issue I have -- we'll wait till

6  we get the pattern instructions, you know -- or the conspiracy

7  put in because -- I'll wait for the next -- the next round on

8  it.  I think it's -- the rest that we've addressed in our

9  suggested alternative.

10          THE COURT:  Okay.

11          MR. SWIFT:  Okay.

12          THE COURT:  All right.  I'm over on Page 26, Count 3.

13  We're going to add in the conspiracy language.  And Joani,

14  that's all standard?  Pattern or not?

15          LAW CLERK:  No.

16          THE COURT:  Huh?

17          LAW CLERK:  No.

18          THE COURT:  Okay.  All right.  Page 27, "entrapment."

19  And that comes from the pattern, Joani?

20          LAW CLERK:  Yes, sir.

21          THE COURT:  Okay.

22          MS. SAAD LINDSEY:  On that, we would request our

23  original filing for the proposed jury instructions on

24  entrapment.  It is a different definition.  I understand that

25  what is before the Court is the Fifth Circuit's pattern jury

 1   instruction.  But we would request the instruction we proposed
 2   back in April.
 3            THE COURT:  And where did that come from?
 4            MS. SAAD LINDSEY:  Yes, Your Honor.  I'm finding the
 5   cite now.
 6            THE COURT:  Okay.
 7            LAW CLERK:  Judge, it comes from a previous version of
 8   the Fifth Circuit pattern.
 9            THE COURT:  Oh, did you hear that?
10            MS. SAAD LINDSEY:  Yes.
11            THE COURT:  Okay.  Well, the new version, was there
12   any -- were there any notes as to what the changes were or why
13   they -- or why they made the change, Joani?
14            LAW CLERK:  Oh, I don't know.  I just put in the
15   current version.
16            THE COURT:  Okay.  All right.  Mr. Roomberg, you want
17   to speak to the entrapment?
18            MR. ROOMBERG:  Your Honor, using an old version of the
19   pattern is wrong.  We believe the current pattern is the one
20   that should and needs to be given.
21            THE COURT:  Yeah.
22            MR. ROOMBERG:  And, frankly, there's an argument to be
23   made that they haven't shown inducement, and we have shown
24   predisposition, and they shouldn't even get it.  But we'll let
25   it -- you know, we'll let it ride.

```
 1            THE COURT:  Yeah.  I think, as I've said several
 2   times, there's enough there for the jury to find for the
 3   government or for Mr. Wadi.  So that's their job.
 4            MR. ROOMBERG:  And so we believe it should be the
 5   pattern --
 6            THE COURT:  Okay.
 7            MR. ROOMBERG:  -- the pattern.
 8            THE COURT:  Well, Ms. Saad, I don't know why -- if the
 9   powers that be say this is the current pattern, why we would
10   use the previous one.  Is the previous one better for the
11   defense?  I mean --
12            MS. SAAD LINDSEY:  Your Honor, the version we are
13   requesting, I'm happy to read into the record if --
14            THE COURT:  That's fine.
15            MS. SAAD LINDSEY:  "The defendant in this case, Imad
16   Wadi, is on trial for conspiracy to kill and maim."  It lists
17   the three.  "You have heard evidence that government agents,
18   namely Hussain Baker and" -- at that time I put the UCE.  We
19   can include his current name -- "persuaded the defendant to
20   agree to send money to Syria to purchase weapons.  To consider
21   that evidence, you need to understand a legal term that we call
22   'entrapment.'  Even though the defendant may have agreed to
23   send money to Syria to purchase weapons, as charged by the
24   government, if it was the result of entrapment, then you must
25   find him not guilty.
```

1    "Government agents entrap if three things occurred.  First,

2    the idea for committing the crime came from the government

3    agents and not from Mr. Wadi, the person accused of the crime.

4    "Second, the government agents then persuaded or talked

5    Mr. Wadi into committing the crime.  Simply giving the

6    opportunity to commit the crime is not the same as persuading

7    him to commit the crime.

8    "And third, the defendant was not ready and willing to

9    commit the crime before the government agents spoke with him.

10    "Consider all of the facts when you decide whether

11    defendant would have been ready and willing to commit the crime

12    without the actions of the government agents.

13    "On the issue of entrapment, as on other issues, the

14    government must convince you beyond a reasonable doubt that the

15    defendant was not entrapped by government agents."

16    I think this more -- this instruction is more tailored to

17    this case.  It fits exactly what has happened.  This was a FBI

18    sting operation.  We've had all of the testimony that supports

19    the elements of this instruction.  And so we would move for the

20    admission of this instruction.  It's much clearer, as well, as

21    to what entrapment is, the legal definition.

22          THE COURT:  Okay.  Mr. Roomberg, even with the current

23    pattern that's in here, for clarity, does it make any sense to

24    name Mr. Baker and the UCE name?

25          MR. ROOMBERG:  No, sir.  And I disagree with Ms. Saad

1    that this -- that her version is cleaner.  It is not cleaner.

2    And it is not the current state of Fifth Circuit law under the

3    pattern instructions.  We believe that we go -- that we should

4    be going with the pattern.

5           THE COURT:  Okay.  Well, the conservative, safer thing

6    to do is to go -- I don't -- I don't get to make those rules,

7    but that's what we follow.  So it will remain as is on

8    entrapment.

9           MS. SAAD LINDSEY:  Yes, Your Honor.  So -- and

10   understand your ruling to deny our instruction.  We would

11   alternatively request the names be included within the

12   Fifth Circuit pattern jury instructions, as the Court has

13   suggested.

14          THE COURT:  Well, let me see.

15          MR. ROOMBERG:  Your Honor, the defendants will clearly

16   argue it.  It does not have to be emphasized by the Court.

17          THE COURT:  Yeah.  I don't -- it doesn't -- this

18   version doesn't lend itself to inserting the names.  And, of

19   course, obviously, you can argue and it's undisputed that the

20   UCE and the CHS are government agents.

21     All right.  "Duty to deliberate," that's standard.

22     All right.  And then, as I think I've told you or those who

23   practice here, each juror will have a copy as a working copy.

24   So before we go through all of that paper, I want to make sure

25   we don't -- rulings have been made and so forth.  So is there

1    other matters that -- I know that both sides have submitted

2    things.  And so other matters that are not included here but

3    that were submitted, that you want to raise.

4        So defense first.

5            MR. SWIFT:  We skipped past quickly the last count,

6    2339A.  It also suffers first from the part that we don't

7    explain what a conspiracy is.

8            THE COURT:  Well, we're going to -- we're going to do

9    that.

10           MR. SWIFT:  But I just -- we had not discussed that.

11   We need to fix it with 2339A as well.

12       It also has an attempt listed, but the government said that

13   they were not pursuing, as far as I understand, unless it's an

14   attempt to conspire, which in this case actually wouldn't hold

15   water.  And the reason for that is, it would be impossible as

16   to law because the 956 case doesn't have an attempt.  There is

17   no attempted conspiracy in 956(a).

18       So you can't attempt to conspire -- you know, if there was

19   an attempt -- if you could commit an attempt in 956(a), you

20   can't conspire to materially support that attempt.  And I can

21   give you a -- it just wouldn't be there.  So we would suggest

22   striking "attempt" from it because the government, in our

23   duplicity motion, said they weren't pursuing attempt.  And

24   here, it's simply a conspiracy because --

25           THE COURT:  Well, I'm --

1          MR. SWIFT:  It's a conspiracy -- the other point that
2    we have on this.
3          THE COURT:  Well, hold on here.  Where does it --
4    you're on Count 3?
5          MR. SWIFT:  Yes.
6          THE COURT:  Okay.  I'm looking for the word "attempt."
7          MR. ROOMBERG:  It's "conspiracy to provide or attempt
8    to provide material support."  What's being twisted is
9    Mr. Swift's argument that we're trying to prove an attempted
10   conspiracy.  We are not.  We never said we were.  We have
11   charged in the indictment a conspiracy to provide or attempt to
12   provide material support.  That is not duplicitous.  This is
13   tracking the language of the statute.  We are not trying to
14   prove an attempted conspiracy.  We're saying they agreed to
15   provide and attempt to provide material support, which is --
16   that's what the statute allows us to charge.  That's how we
17   charged it in the indictment.  That's how it is correctly put
18   in the Court's --
19         THE COURT:  There it is.  In the -- okay.  I see it in
20   the first element here.
21         MR. ROOMBERG:  Yes, sir.
22         THE COURT:  Okay.
23         MR. SWIFT:  Okay.  Now, we made a motion to dismiss
24   based on duplicity in a charge.  Conspiracy and attempt are
25   different crimes.  They are absolutely different crimes.  They

1    have different elements in the part on it.  While they both

2    might be listed, they are absolutely separate crimes.  They are

3    not a pattern of conduct, which, you know -- which you could

4    prove either, which means we're back to having to have separate

5    charges and unanimous verdicts on the part, because an attempt,

6    as we all know, is to do the act with a substantial step in

7    furtherance of the act.  It's the attempt to do the act.  No

8    meeting of the minds is required whatsoever.  There is the

9    attempt to do the act.

10       And it requires a substantial step, and there's a pattern

11   instruction on that.  A conspiracy is the meeting of the minds

12   to do a thing that is unlawful in the part -- the part.  Those

13   are separate.  All of the case law says so.

14       Now, we moved at the beginning of this that they were

15   duplicitous.  The government answered us that there was

16   conspiracy to attempt.  It was two types of conspiracy.  And I

17   would agree that wouldn't be duplicitous under the part.  But

18   now they're saying they're not doing that; that they are

19   actually pursuing an attempt.  And there is no instruction on

20   intent, and we have moved to dismiss this.

21       The government told us, no, we're not pursuing attempt at

22   all.  It's not duplicitous, Your Honor, because we're only

23   pursuing conspiracy.

24       Now it's, oh, no, Your Honor.  It's -- the attempt needs to

25   stay in because it's a separate crime.

1      And in that case it's duplicitous for a completely
2   different reason.  And, again, much like murder and maim on the
3   part, you cannot have two different theories on it.
4      And I admit, the government's charging on this, if I were
5   back teaching law school, I'd give this as a final.  But it is
6   fairly -- is that you can't have a conspiracy and an attempt in
7   a single charge.  They are separate crimes.  And it is
8   duplicitous to do so.  And the government has pursued the
9   conspiracy.  We should strike the attempt.  They haven't asked
10  for an instruction on intent.
11          THE COURT:  Okay.  Mr. -- okay.  Point made.
12      Mr. Roomberg, at the very least, do we need an instruction?
13          MR. ROOMBERG:  No, sir.  There is no attempt charge.
14  It is conspiracy to provide and attempt to provide.  I don't
15  know if -- I don't want to cast aspersions.
16          THE COURT:  So your argument is it's not attempting to
17  conspire but attempting to provide?
18          MR. ROOMBERG:  Correct.
19          THE COURT:  Okay.
20          MR. ROOMBERG:  That they either -- they conspired.
21  They agreed to provide or attempt to provide material support.
22          THE COURT:  So it depends on how you diagram the
23  sentence somewhat, if anybody remembers diagramming.
24          MR. ROOMBERG:  I remember, Judge.  And I don't need
25  flashbacks.  But --

1           MR. SWIFT:  Well, you know --

2           MR. ROOMBERG:  Just let me finish, Charlie.

3      His argument is nonsensical.  That's what it comes down to.

4  We've charged a conspiracy --

5           THE COURT:  Well, I don't like the word "nonsensical."

6  You disagree with his arguments, fine.

7           MR. ROOMBERG:  I'm sorry.

8           THE COURT:  But let's not use those words.

9      Go ahead.

10          MR. ROOMBERG:  Okay.  We've charged a conspiracy to

11  provide and attempt to provide.  We're not charging an

12  attempted conspiracy to provide and attempt to provide.

13          THE COURT:  Well, here's the bottom line.  If the

14  government is wrong and they -- and the government obtains a

15  conviction, then Mr. Wadi has, according to Mr. Swift --

16          MR. ROOMBERG:  Correct.

17          THE COURT:  -- a gut-cinch reversal on appeal.  So

18  both sides get something.  So we'll go with what it is right

19  now.

20      All right.  Yes, ma'am.  Were there --

21          MS. SAAD LINDSEY:  Yeah.  We have additional requests.

22          THE COURT:  Right.

23          MS. SAAD LINDSEY:  Our proposed instructions filed in

24  April also requested the instruction for testimony of a paid

25  informant.

 1          THE COURT:  Okay.  Testimony of paid informant.  Okay.

 2          MS. SAAD LINDSEY:  Correct me if -- Mr. Swift is

 3  indicating it's in here.  But I don't see it specific to that.

 4          MR. ROOMBERG:  It's under "informer."

 5          LAW CLERK:  It's on Page 5.

 6          THE COURT:  Page 5?

 7          LAW CLERK:  Yes, sir.

 8          THE COURT:  Yeah.  I think I saw that word.

 9          MS. SAAD LINDSEY:  Let me just verify.  If it was

10  pulled from what we originally requested, then I'll just --

11          THE COURT:  Yeah.  Bottom of Page 5.

12          MS. SAAD LINDSEY:  So what we requested is more

13  specific.

14          THE COURT:  Well, this is the pattern, Joani?

15          LAW CLERK:  Yes, sir.

16          THE COURT:  We're going with the pattern.

17          MS. SAAD LINDSEY:  Okay.  Just getting my record,

18  Judge.

19      The next proposed instruction we had is law enforcement

20  officer testimony, instructing the jury that they can't give

21  special weight to a law enforcement officer.

22          THE COURT:  Okay.  Is that in there in some form,

23  Joani?

24          LAW CLERK:  No.  I didn't find a pattern for that one.

25  Maybe I missed it.

1          MS. SAAD LINDSEY:  There are patterns we cited out of

2    the Sixth Circuit.

3          THE COURT:  Well, we're in the Fifth.

4      Mr. Roomberg?

5          MR. ROOMBERG:  Your Honor, it's covered by the general

6    credibility of witness.  And we don't -- we believe it's unfair

7    to emphasize one person over another person.

8          THE COURT:  Yeah.  And they were voir dired on, just

9    because they're law enforcement, you don't have to believe them

10   or you don't have to disbelieve them.  So I think we'll leave

11   that out, unless there's a Fifth Circuit pattern.  But there's

12   not, correct?

13         MS. SAAD LINDSEY:  No.

14         THE COURT:  Okay.  All right.  Next?

15         MS. SAAD LINDSEY:  Your Honor, I would like to --

16   since we have given -- been given the opportunity to question

17   Mr. Baker on 404(b)-like acts, I would like to draft and

18   propose a instruction that addresses that.  While similar acts

19   on 1.32 is addressed in the Fifth Circuit pattern jury

20   instructions, that is specific to a defendant.

21      In this case we provided 404(b) notice for a witness.  And

22   I'd like to reformulate and propose that.  And I could do

23   that -- I could email that out.

24         THE COURT:  Okay.  Joani, is there anything -- this

25   404(b) instruction anywhere in here?

 1          LAW CLERK:  There's a 1.32 similar acts.  But as
 2  Ms. Saad says, that goes to the defendant.
 3          THE COURT:  Where is that?
 4          LAW CLERK:  I don't think you have a pattern charge
 5  book there in front of you.  Let me email that to you.
 6          MS. SAAD LINDSEY:  It's not relevant to Mr. Wadi, but
 7  we would be requesting a reformulated one as to Mr. Baker.
 8          THE COURT:  Okay.  Well, go ahead and send it, Joani.
 9  I don't think it applies.
10    Mr. Roomberg.
11          MR. ROOMBERG:  It does not apply at all, Judge.  They
12  can -- they can argue based on the informer instruction and the
13  other instruction that they're getting.  And this doesn't apply
14  at all.
15    And they're not similar acts.  They were allowed to bring
16  it in to attack his credibility, but they're not similar acts.
17  So we believe that it's not --
18          THE COURT:  All right.  But we all sat here and
19  listened to Mr. Baker confess to at least two federal felonies
20  of income tax and bankruptcy.  Can they -- it's in the
21  evidence.  Can they argue that as far as his credibility?
22          MR. ROOMBERG:  Sure.
23          THE COURT:  I mean --
24          MR. SWIFT:  If the government doesn't want it, we'll
25  take it off, because I have free license.  I can say anything I

1  want on it.

2          THE COURT:  Well, based on the evidence.

3          MR. SWIFT:  Based on the evidence, on the part.

4          THE COURT:  Right.

5          MR. SWIFT:  But usually, when I've been on the

6  receiving end of it, I've wanted it limited.  But if the

7  government doesn't care about me limiting it, I'm good.  I'm

8  good.  I'm good.

9          MR. ROOMBERG:  As long as he argues based on the

10  evidence --

11          THE COURT:  Right.  That's fine.  And if the jury

12  wants to disbelieve what they heard on the tapes that support

13  the government's case because Mr. Baker is an unconvicted

14  federal felon, they can -- or they don't like Mr. Baker, that's

15  their prerogative.

16          MR. ROOMBERG:  Though, Your Honor, there is no

17  evidence that it is a felony or that he's unconvicted or --

18          THE COURT:  Well, okay.

19          MR. ROOMBERG:  But, I mean, if that's where defense

20  wants to go with it, they can't argue that.  They can argue

21  that he didn't report it on his tax returns.

22          THE COURT:  Right.

23          MR. ROOMBERG:  And he didn't report it on

24  his bankruptcy petition.

25          MR. SWIFT:  Actually, there is evidence, because we

 1  asked Agent Martinez about, wasn't it a crime, and did you

 2  report it?  So we'll argue the evidence, Your Honor.

 3          THE COURT:  Okay.

 4          MR. SWIFT:  I would have thought the government wanted

 5  to restrict us, but I'm going to argue the evidence.

 6          THE COURT:  Okay.  All right.  Ms. Saad.

 7          MS. SAAD LINDSEY:  Yes, Your Honor.  We would -- I

 8  understand the First Amendment is addressed specific to Count

 9  2.  I would request a more general First Amendment instruction.

10  The one we proposed, I could read into the record, if that

11  would be helpful, Judge.

12          THE COURT:  Okay.  Let me find the other one here.

13  This is in addition to or in lieu of?

14          MS. SAAD LINDSEY:  I think it should be in addition

15  to.

16          THE COURT:  Okay.  Hold on.

17     Joani, where is that?

18          MS. SAAD LINDSEY:  Page 24.

19          THE COURT:  Page 13?

20          MS. SAAD LINDSEY:  24.

21          THE COURT:  24.  Okay.  Well, I don't -- okay.  Here

22  it is.

23          LAW CLERK:  -- clarify.  1.32, similar acts, that's

24  out, right?

25          THE COURT:  Okay.  Go ahead.  I'm on Page 24, in the

1   middle of the page.  Go ahead.  And so you're proposing what?

2        MS. SAAD LINDSEY:  "Proof that people simply met

3   together from time to time and talked about common interests,

4   such as political views or religious beliefs, or engaged in

5   similar conduct is not enough to establish a criminal agreement

6   in a conspiracy.  You may consider these things in deciding

7   whether the government has proved an agreement.  But without

8   more, they are not enough."

9        The reference is out -- specific to a jury charge in a 956

10  prosecution out of the Sixth Circuit.

11        THE COURT:  Okay.  Mr. Roomberg?

12        MR. ROOMBERG:  Your Honor, she's talking about a 956

13  charge out of the Sixth Circuit, on Count 2, on a 2339B charge.

14  That doesn't make sense.  And we believe that Count 2, as it

15  is, follows the pattern for the Fifth Circuit for 2339B, which

16  is -- that's the charge.  And we don't believe there should be

17  any change like that.

18        THE COURT:  Well, again, there's enough in here on

19  Page 24 already that the defense can argue, if it wants to,

20  this is free speech and they weren't doing anything illegal and

21  so forth.  So that's all you need.  And then they can decide

22  what they want to decide.  So the request is noted.  It's

23  overruled, and we're going with what we have.

24        All right.  Other requests by the defense?

25        MR. SWIFT:  We don't have any other at this time.

```
 1         Just for clarification, Your Honor, it was not with respect
 2    to Count 2.  It's with respect to Count 1, the 956 charge, for
 3    which there is no pattern instruction in the -- in the
 4    Fifth Circuit.  And we were borrowing from the Sixth Circuit on
 5    that one.  Everybody did.  There is no pattern instruction.
 6    But for the record, that's that point.
 7              THE COURT:  Okay.
 8              MR. SWIFT:  Because I think it got messed up in the
 9    agreed -- the Fifth Circuit has given a pattern instruction on
10    the First Amendment for 2339B.  This is the pattern
11    instruction -- there is no pattern instruction for 956.
12              THE COURT:  Oh.
13              MR. SWIFT:  So what we are asking for is an additional
14    First Amendment that was given in conjunction with a 956 case.
15    So I do think it's relevant.  But --
16              THE COURT:  Okay.  Well, hold on here.  Let me see.
17    Yes.  I notice now Page 24 is a part of Count 2.
18              MR. SWIFT:  Yeah.  Yes.
19              THE COURT:  All right.  So, Mr. Roomberg, the
20    government's position on having a First Amendment instruction
21    in Count 1, even if it's just a repeat of the -- what we
22    already have in Count 2?
23              MR. ROOMBERG:  I think the pattern from Count 2 could
24    be used, but there'd have to be some changes because Count 2
25    mentions al-Qaeda in Iraq, al-Nusra --
```

1          THE COURT:  Well, here's the other -- okay.  Here's

2    the other thing, that we -- sometimes we don't see the forest

3    for the trees.  Count 2 is talking about providing material

4    support.  Okay?  And, therefore, Mark, how would you and I like

5    to -- why don't we go out and collect money and send some money

6    to Ukraine?  Well, that's material support.  But it's -- and

7    we're free to do -- it's not a crime unless it's -- unless it's

8    weapons or bombs or whatever.  All right?

9      So Count -- but Count 1, it's a conspiracy to kill.  You

10   don't have any First Amendment right to talk about killing

11   people or maiming or injuring.  So I think that's why there's

12   no First Amendment pattern for 956.  I mean, does that make

13   sense?

14         MR. ROOMBERG:  I think that's a good analysis, Judge.

15         THE COURT:  Okay.  All right.  So there won't be --

16   there won't be an instruction on that.

17     But for the record, the defense request for a First

18   Amendment instruction on Count 1 is noted.  But for the reasons

19   the Court just said, it's denied.

20         MR. SWIFT:  Last one, and I promise.

21         THE COURT:  You what?

22         MR. SWIFT:  Last one, and I promise.  Last --

23         THE COURT:  Last one?  Okay.  That's fine.

24         MR. SWIFT:  I promise.

25         THE COURT:  That's fine.

1          MR. SWIFT:  The last part that hits me is a point of

2    law on Count 1 and Count 3.  As you just pointed out, Your

3    Honor, the first one is an agreement to kill.  And the Count 3

4    is an agreement to provide weapons.  Okay.  Separate.

5          But the problem here is, I suspect that the government is

6    arguing that one agreement is both.  And it can't be.  It

7    cannot.  One agreement cannot be both in this part.  Because if

8    the agreement is to kill by providing these weapons, et cetera,

9    that's but one agreement.  And the Supreme Court, and we put a

10   cite to it, explained this.  An agreement may violate many

11   statutes.  Okay?  But it is but one conspiracy in this part.

12   That's -- I quote the Supreme Court on it and their

13   instructions on it.

14         Now, I point out, 2339B is a very different statute because

15   it's an agreement to provide support to an organization.  Not

16   to a crime.  An organization.  It is a very unique agreement.

17   And 2339B and 2339A can sit side by side because of that.

18         But 965 is to murder.  And the way it's charged, it's fine.

19   But my concern is that the government will argue that the

20   956 -- that the same agreement constitutes both offenses.  And

21   it can't.  And my concern on the part is to make sure to the

22   jury that they know that these are separate agreements; that

23   there must one agreement to kill and then a separate agreement

24   to murder -- to provide or attempt to provide the support to

25   that agreement.

1       In other words, Mr. Wadi, Mr. Baker -- or Mr. Wadi and Mr.

2   -- and I had one other point.  One part that I am concerned

3   about -- it's been hit in this, but it's not clear to the jury.

4   Mr. Wadi and Mr. Barodi -- or Mr. Wadi cannot conspire with the

5   undercover law enforcement or the confidential human source.

6       And there are a lot of periods here where that's relevant.

7   Because you start out in 2017, up to 2018, when the only

8   conversations are between Mr. Barodi -- or excuse -- Mr. Wadi

9   and the confidential human source and the undercover law

10  enforcement officer, and where he may agree to do things with

11  them.  There's no evidence that Mr. Barodi is party to that.

12      Then there is a period of time when they are both together.

13  And then there are other periods of time when Mr. Barodi is

14  talking separately.  Sometimes they're on the phone.

15      But the way we have -- I had two solutions to this

16  dilemma -- and the law is very clear, those guys can't meet the

17  minds.  I don't think the government disagrees -- was just to

18  explain in the conspiracy that it's an agreement between -- as

19  charged, the agreement between Mr. Barodi and Mr. Wadi that's

20  charged.  It's not an agreement with anyone else.

21      Unless -- if they want to say somebody else in --

22  potentially Abdul Jabbar, I'm not going to disagree.  You know,

23  there's enough evidence.  I don't think it would -- that's

24  really their theory.  But if they wanted to say Abdul Jabbar or

25  somebody else or -- and other persons in Syria, I'd go with

```
 1   that.  But it's not very clearly an agreement between the
 2   confidential human source.
 3       Because I could see a juror getting back there and saying,
 4   hey, look.  I think he agreed with Mr. Baker, right here.
 5       Well, no.  That's not it.  And how does the jury know from
 6   these instructions that it has to be the agreement?  The
 7   problem is, is that the way we wrote the indictment -- and I
 8   understand this in national security cases and now in every
 9   conspiracy case --
10            THE COURT:  Okay.
11            MR. SWIFT:  -- undercover -- you know, Unindicted
12   Coconspirator 1, along with -- the part on it -- and known and
13   unknown persons, and we don't except out.  And so there's two
14   ways to do it, is a standard part can be to add an instruction:
15   You are instructed, with regards to a conspiracy, that neither
16   the confidential human source in this case, Mr. Baker, nor the
17   undercover agent, who was referred to throughout as Taher, can
18   be parties to the agreement for the -- for the purpose of a
19   conspiracy.
20            THE COURT:  Okay.
21            MR. ROOMBERG:  Let's take --
22            MR. SWIFT:  Oh, whoops.  I'm sorry.  I missed it.
23            MS. SAAD LINDSEY:  It is in here.  I think it could be
24   clearly -- I would request it be repeated for Count 2 and Count
25   3.
```

 1          MR. SWIFT:  3.  It was in my first one.

 2          MS. SAAD LINDSEY:  It's in bottom of Page 19.

 3          THE COURT:  Right.  Yes.  I see it now.  Okay.

 4          MR. SWIFT:  If we could repeat that then with Count 2

 5   and Count 3.

 6          MS. SAAD LINDSEY:  As opposed to just state it should

 7   apply to 2 and 3, in the last sentence to the top of Page 20.

 8          THE COURT:  Hold on here.  Is it -- Joani, is the

 9   language about the law enforcement people in Count 2 also?

10   Hold on.  I've got to turn my volume up because I was getting

11   feedback.  Well, doggone it.  Okay.  Joani, are you there?

12   Hello.  I cut her off.

13      *(Discussion off the record)*

14          THE COURT:  Yes.  It's equally applicable to the

15   conspiracies charged in Counts 2 and 3.

16          MR. SWIFT:  Yes.

17          THE COURT:  So it's in there.

18          MR. SWIFT:  Okay.

19          MS. SAAD LINDSEY:  I am just requesting it get

20   repeated for Counts 2 and 3, so it's clear to the jury that it

21   applies.

22          THE COURT:  Well, we just said it.  We don't have

23   to -- I mean, with my daughters, when they were little, I had

24   to say things four times.  Okay?

25          MS. SAAD LINDSEY:  Yes, Your Honor.

1      THE COURT:  But these are adults.  And you can argue

2  four times, if you want to, now, look right here, it says.

3  Okay?  But I'm not going to -- it's long enough and hard enough

4  to read all this stuff without repeating it four times.

5      MR. SWIFT:  And I apologize, Your Honor.  Up until

6  just recently, we didn't have my version.  I put it in.  I

7  didn't see it.

8      THE COURT:  Okay.  That's fine.  Not a problem.

9    All right.  Before I get to Mr. Roomberg, any other --

10  Mr. Swift promised just one more.  But now, Ms. Saad, are

11  you -- are you bound by Mr. Swift's promise?

12      MS. SAAD LINDSEY:  We'd be in a lot of trouble if I

13  was bound by what Mr. Swift said.

14      THE COURT:  Go ahead.

15      MS. SAAD LINDSEY:  Your Honor, I would request that

16  any reference to the UCE lists his name as he testified, as

17  Steve -- we could say Steve Abdullah, also known as Taher,

18  but --

19      THE COURT:  And, of course, Mr. Baker is in there.

20      MS. SAAD LINDSEY:  Right.

21      THE COURT:  His name is in there.

22    Okay.  Mr. Roomberg, on that issue?

23      MR. ROOMBERG:  We don't oppose, Judge.

24      THE COURT:  Okay.  All right.  So, Joani, you and

25  Ms. Saad find a place appropriate -- well, let me just do it

1    now, without having to -- let's go back to Page 19.

2        All right.  Here it is.  The bottom of Page 19, "The

3    alleged unlawful agreement cannot include either the UCE" --

4    and then put his stage name in there, slash, however you spell

5    that, Taher.

6        Joani, you know how to do that?

7            LAW CLERK:  (Inaudible).

8            THE COURT:  Okay.  The spelling of his -- well, he had

9    a stage name here, Steve something.  And then -- and then he

10   had a stage name in the operation, which started with a T.

11           MR. ROOMBERG:  It's T-A-H-I-R.

12           THE COURT:  Okay.  You got that, Joani?

13           LAW CLERK:  Yes, sir.

14           THE COURT:  Okay.  All right.

15       Now, Mr. Roomberg.

16       Mr. Swift, there was -- before we got into -- go ahead.

17           MR. ROOMBERG:  I'll take it backwards.

18           THE COURT:  Go ahead.

19           MR. ROOMBERG:  The indictment does charge "both known

20   and unknown."

21           THE COURT:  Oh, yes.

22           MR. ROOMBERG:  So --

23           THE COURT:  Right.  And the argument about, there's

24   two different agreements.  There's a conspiracy to kill and

25   maim, and there's a conspiracy to -- and that argument.

```
 1          MR. ROOMBERG:  I think, Judge, what we're talking
 2   about are separate elements.  And as Mr. Swift points out, you
 3   can have the same agreement go for different crimes.  In this
 4   case they had an agreement that encompassed both.  Their
 5   agreement was to provide these weapons for murder and maiming
 6   in Syria.  So that's why we have different elements and
 7   different crimes.
 8      I disagree with Mr. Swift's analysis of it.  And if I'm
 9   wrong on that and the jury convicts on both and the
10   Fifth Circuit says, elect which one, then we'll come back here
11   for, you know, resentencing.  And one of the charges that the
12   Court would have sentenced on would not have a penalty.
13          THE COURT:  Okay.  All right.  We're going to go with
14   it like it is.
15      So for the record, Mr. Roomberg, anything else for the
16   government request-wise?
17          MR. ROOMBERG:  No, Your Honor.  Thank you.
18          THE COURT:  All right.  So, Joani, get those changes
19   made, send them -- Mr. Roomberg, is it okay to send you all
20   digital right now, on this last tweaking that Joani's going to
21   do?
22          MR. ROOMBERG:  Yes, Your Honor.  That's fine.
23      Mr. Harris points out that we haven't discussed the verdict
24   form.  We don't object to the verdict form, but we wanted to
25   make the record --
```

1        THE COURT:  Okay.  All right.  But before I leave that

2  point, Ms. Saad or Mr. Swift, any objection to the sending a

3  digital to you all on this last draft copy?

4        MS. SAAD LINDSEY:  None at all.

5        THE COURT:  Okay.  So, Joani, get that done, send it

6  to them.  And then the objections already lodged don't need to

7  be repeated.  But unless there's a typo or something else, then

8  we will make the copies today and have them ready to go for in

9  the morning.

10    All right.  So now, the verdict form.  Count 1, it has --

11  let me see here.  That's strange.  Now, the top of the

12  indictment says Count 1 is "kill, kidnap, maim or injure

13  persons or damage property."  The verdict form only has "murder

14  or maiming."

15    Mr. Roomberg?

16        MR. ROOMBERG:  Your Honor, in that top right-hand

17  corner, when we do indictments, we copy the title from the code

18  itself.  But as we charged in the indictment, it was only

19  murder and maim.

20        THE COURT:  Okay.  All right.

21        MR. ROOMBERG:  So that's why we're sticking to that.

22        THE COURT:  Okay.  Ms. Saad, on Count 1, anything?  Or

23  Mr. Swift?

24        MR. SWIFT:  On the verdict form?  No, Your Honor.

25        THE COURT:  Verdict form.

1          MR. SWIFT:  It now reflects the instructions that

2    you've given and the unanimity instruction that you gave.

3          THE COURT:  Well, and, of course, the key is the blank

4    where they put "guilty" or "not guilty."

5          MR. SWIFT:  Yes.  Well, it also respects both --

6    they're separate theories.

7          THE COURT:  Well, and I'm assuming, Mr. Swift or

8    Mr. Roomberg, if they check "murder," it affects sentencing, as

9    opposed to maiming?

10          MR. SWIFT:  Yes.

11          MR. ROOMBERG:  Yes, Your Honor.

12          THE COURT:  So it's a sentencing issue?

13          MR. ROOMBERG:  Yes, Your Honor.  It's *Apprendi*.

14          MR. SWIFT:  It's also, they have to have a unanimous

15    verdict on either theory, as you've explained to them.

16          THE COURT:  Right.  Okay.  All right.  Very well.

17       Now, while Joani is getting that done, Ms. Herndon, let's

18    go revisit what you need to do in terms of the exhibits

19    generally that are in, whatever, but in specifically -- have

20    you received anything on the technological on the 15?

21          THE CLERK:  Yes, sir.  It's all corrected.

22          THE COURT:  It's done?

23          THE CLERK:  Yes, sir.

24          THE COURT:  Okay.  All right.  And so sometimes we

25    send -- and somebody will teach the jurors how to pull the

1    exhibits up on the screen?

2            THE CLERK:  I will, Your Honor.

3            THE COURT:  Okay.  All right.  But sometimes we also

4    send these back.  But I'm not sure.  This may have stuff in it

5    that's not in.

6            MR. ROOMBERG:  That's correct, Your Honor.

7            THE COURT:  Okay.  So we won't do that.

8        All right.  Anything else logistically for you?

9            THE CLERK:  I have lists of what I have recorded as

10   admitted, and I'm going to give them to both the government and

11   the defense to check and make sure that they see what -- it's

12   just a counterbalance, sir, just to check them off.

13           THE COURT:  Yeah.  Just -- okay.  Make sure?

14           THE CLERK:  Yes, sir.

15           THE COURT:  All right.  And I will be available by

16   phone, but I'm going to leave it to -- and Ms. Sullivan, of

17   course, is by Zoom.  But Ms. Herndon will be here, and Gibby.

18       So, Mr. Roomberg, anything else right now?

19           MR. ROOMBERG:  No, sir.

20           THE COURT:  Okay.  Ms. Saad?

21           MS. SAAD LINDSEY:  Not at this time, Your Honor.

22           THE COURT:  All right.  Very well.  We're in recess.

23   Thank you very much.

24   * * *

25       *(Overnight recess at 10:58 a.m.)*

1          -oOo-

2    I certify that the foregoing is a correct transcript from

3 the record of proceedings in the above-entitled matter.

4

5 Date:  9/13/2023        /s/ Chris Poage
                          United States Court Reporter
6                         262 West Nueva Street
                          San Antonio, TX  78207
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25