```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA    )
                                 )
 4        v.                     )   Docket No. 5:21-cr-00244-FB-1
                                 )
 5   IMAD EDDIN WADI,            )   San Antonio, Texas
                                 )   May 25, 2023
 6        Defendant.             )
     _____)
 7                        TRANSCRIPT OF TRIAL
 8               BEFORE THE HONORABLE FRED BIERY
                    UNITED STATES DISTRICT JUDGE
 9                        AND A JURY

10                          VOLUME IX

11   A P P E A R A N C E S:

12   FOR THE GOVERNMENT:
     Mark T. Roomberg
13   William R. Harris
     U.S. Attorney's Office
14   601 NW Loop 410, Suite 600
     San Antonio, TX 78216
15
     FOR THE DEFENDANT:
16   Angela Saad Lindsey
     Office of the Federal Public Defender
17   727 E. Cesar E. Chavez Blvd., Suite B-207
     San Antonio, TX 78206
18
     Charles Davidson Swift
19   Constitutional Law Center for Muslims in America
     100 N. Central Expressway, Suite 1010
20   Richardson, TX 75080

21   COURT REPORTER:
     Chris Poage, CRR, RMR
22   United States Court Reporter
     262 West Nueva Street, Rm. 1-426
23   San Antonio, TX  78207
     Telephone:  (210) 244-5036
24   chris_poage@txwd.uscourts.gov

25   Proceedings reported by stenotype.  Transcript produced by
     computer-aided transcription.
```

```
1                        INDEX

2                                             PAGE

3  Court's Instructions ...................................1286

4  Closing Argument by Mr. Harris  ........................1322

5  Closing Argument by Mr. Swift  .........................1339

6  Closing Argument by Mr. Roomberg  ......................1369

7  Verdict .............................................1400

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (8:26 a.m., jury out)
 2            THE COURT:  Before the jury comes in, Mr. Roomberg,
 3   are you and Mr. Harris going -- both of you argue or not?
 4            MR. ROOMBERG:  Mr. Harris will argue closing, Your
 5   Honor, and I'll argue rebuttal.
 6            THE COURT:  All right.  And do you want a time
 7   warning?
 8            MR. ROOMBERG:  We have split it 45/45.  A five-minute
 9   time warning would be great, Judge.  Thank you.  I think both
10   of it, as we've timed it, we're not going to get to the
11   warning.
12            THE COURT:  Okay.  All right.  And, Mr. Swift, are you
13   and Ms. Saad both --
14            MR. SWIFT:  I'm arguing the closing.
15            THE COURT:  You're going to do --
16            MR. SWIFT:  Yes, on behalf of the defendant.
17            THE COURT:  Okay.  And you want five-minute?
18   Ten-minute?
19            MR. SWIFT:  Five minutes.  And then five, ten minutes
20   before.  But I don't think -- I don't think I'll get to an hour
21   and a half.  But if I suddenly --
22            THE COURT:  The jury hopes --
23            MR. SWIFT:  Yeah.  I think -- you know, fairly cover
24   the evidence.  But we have covered the evidence.
25            THE COURT:  Oh, yes.  We'll see what they say.
```

```
 1            MR. SWIFT:  We have covered the evidence.
 2            THE COURT:  All right.  And so Ms. Saad is I guess --
 3            THE CLERK:  I'm trying to call her.
 4            MR. SWIFT:  Is the plan you'll read, they'll do
 5   opening, then we'll take a break -- midmorning break and
 6   then I'll --
 7            THE COURT:  Right.  I'm going to -- I'm going to do
 8   the charge and the first opening by the government.  Then we'll
 9   break.  Then yours.  And depending on how much time goes by, we
10   might take another break before Mr. Harris, but we might go
11   straight through.
12            MR. HARRIS:  Other way around.
13            MR. SWIFT:  Other way around.
14            THE COURT:  Yes.  I don't know hand signal.
15            MR. HARRIS:  I'm first, then Mark.
16            THE COURT:  Oh, you're going to go -- I'm sorry.  Yes.
17   You're going to go first.
18       (At the bench off the record)
19            THE COURT:  Okay.  Everybody here?
20            COURT SECURITY OFFICER:  Yes.
21       (At the bench off the record)
22            THE COURT:  Bring them in.
23            COURT SECURITY OFFICER:  Yes, sir.
24       (Jury enters courtroom)
25            THE COURT:  You may be seated.
```

1          Good morning, ladies and gentlemen.  We're now at the stage
2    where these officers of the Court and this officer of the Court
3    is going to turn the case over to those -- to you officers of
4    the Court.
5          Before we do that, let me say a couple of things.  Number
6    one, each of you have a working copy of your instructions at
7    your place to use during your deliberations to follow along
8    with while we go over that together.  At the close of the case
9    you're free to take that home with you if you want to.  You can
10   show your friends and family what you've been doing, what the
11   case was about and so forth.
12         But until that time, of course, the only time that you all
13   can talk about the case is when all of you are together in the
14   jury room.  We had -- oh, it's been two or three years ago,
15   that I guess I didn't make the instruction clear enough.  But
16   there was -- one of the jurors was -- at the breaks that they
17   would take, was lobbying the other jurors.  And we didn't find
18   out about that until later.  So don't do that, please.
19         When you do begin your deliberations, you will, as I told
20   you at the beginning of this process, have a twofold
21   obligation:  Number one, to ensure that the government meets
22   its burden of proof and to be a buffer between the power of
23   government and a citizen, but equally as important, to enforce
24   the laws of the United States if, indeed, you find the
25   government has met its burden of proof.

1    So with that in mind, if you will follow along with me in

2  your instructions, and then you will hear the closing

3  statements by the counsel.

4                    COURT'S INSTRUCTIONS

5         THE COURT:  Members of the jury, in any jury trial

6  there are, in effect, two judges.  I am one of the judges.  The

7  other is you, the jury.  It is my duty to preside over the

8  trial and to decide what evidence is proper for your

9  consideration.  It is also my duty at the end of the trial to

10  explain to you the rules of law that you must follow and apply

11  in arriving at your verdict.

12    First, I will give you some general instructions which

13  apply in every case, for example, instructions about the burden

14  of proof and how to judge the believability of witnesses.  Then

15  I will give you some specific rules of law about this

16  particular case.  And, finally, I will explain to you the

17  procedures you should follow in your deliberations.

18    You, as jurors, are the judges of the facts.  But in

19  determining what actually happened -- that is, in reaching your

20  decision as to the facts -- it is your sworn duty to follow all

21  of the rules of law as I explain them to you.

22    You have no right to disregard or give special attention to

23  any one instruction or to question the wisdom or correctness of

24  any rule I may state to you.  You must not substitute or follow

25  your own notion or opinion as to what the law is or ought to

1  be.  It is your duty to apply the law as I explain it to you,

2  regardless of the consequences.

3      It is also your duty to base your verdict solely upon the

4  evidence, without prejudice or sympathy.  That was the promise

5  you made and the oath you took before being accepted by the

6  parties as jurors, and they have the right to expect nothing

7  less.

8      The superseding indictment, or formal charge against the

9  defendant, is not evidence of guilt.  Indeed, the defendant is

10 presumed by the law to be innocent.  The law does not require

11 the defendant to prove his innocence or produce any evidence at

12 all, and no inference whatever may be drawn from the election

13 of the defendant not to testify.

14     The government has the burden of proving the defendant

15 guilty beyond a reasonable doubt.  And if it fails to do so,

16 you must acquit the defendant.  While the government's burden

17 of proof is a strict or heavy burden, it is not necessary that

18 the defendant's guilt be proved beyond all possible doubt.  It

19 is only required that the government's proof exclude any

20 "reasonable doubt" concerning the defendant's guilt.

21     A "reason doubt" is a doubt based upon reason and

22 commonsense, after careful and impartial consideration of all

23 the evidence in the case.  Proof beyond a reasonable doubt,

24 therefore, is proof of such a convincing character that you

25 would be willing to rely and act upon it without hesitation in

1  making the most important decisions in your own affairs.

2      As I told you earlier, it is your duty to determine the

3  facts.  To do so, you must consider only the evidence presented

4  during the trial.  Evidence is the sworn testimony of the

5  witnesses, including stipulations and exhibits.  Remember that

6  the questions, statements, objections and arguments made by the

7  lawyers are not evidence.

8      The function of the lawyers is to point out those things

9  that are most significant or most helpful to their side of the

10  case and, in doing so, to call your attention to certain facts

11  or inferences that might otherwise escape your notice.  In the

12  final analysis, however, it is your own recollection and

13  interpretation of the evidence that controls in the case.  What

14  the lawyers say is not binding upon you.

15      During the trial, I may have sustained objections to

16  certain questions and exhibits.  You must disregard those

17  questions and exhibits entirely.  Do not speculate as to what

18  the witness would have said if permitted to answer the question

19  or as to the contents of an exhibit.  Also, certain testimony

20  or other evidence may have been ordered stricken from the

21  record, and you may have been instructed to disregard this

22  evidence.  Do not consider any testimony or other evidence

23  which has been stricken in reaching your decision.  Your

24  verdict must be based solely on the legally admissible evidence

25  and testimony.

1    Also, do not assume from anything I may have done or said

2 during the trial that I have any opinion concerning any of the

3 issues in this case.  Except for the instructions to you on the

4 law, you should disregard anything I may have said during the

5 trial in arriving at your own verdict.

6    In considering the evidence, you are permitted to draw such

7 reasonable inferences from the testimony and exhibits as you

8 feel are justified in the light of common experience.  In other

9 words, you may make deductions and reach conclusions that

10 reason and commonsense lead you to draw from the facts which

11 have been established by the evidence.

12    You should not be concerned about whether evidence is

13 "direct evidence" or "circumstantial evidence."  You should

14 consider and weigh all of the evidence that was presented to

15 you.

16    "Direct evidence" is the testimony of one who asserts

17 actual knowledge of a fact, such as an eyewitness.

18 "Circumstantial evidence" is proof of a chain of events and

19 circumstances indicating that something is or is not a fact.

20    The law makes no distinction between the weights to be

21 given either direct or circumstantial evidence.  But the law

22 requires that you, after weighing all of the evidence, whether

23 direct or circumstantial, be convinced of the guilt of the

24 defendant beyond a reasonable doubt before you can find him

25 guilty.

1    I remind you that it is your job to decide whether the
2  government has proved the guilt of the defendant beyond a
3  reasonable doubt.  In doing so, you must consider all of the
4  evidence.  This does not mean, however, that you must accept
5  all of the evidence as true or accurate.
6    You are the sole judges of the credibility or
7  "believability" of each witness and the weight to be given the
8  witness' testimony.  An important part of your job will be
9  making judgments about the testimony of the witnesses who
10  testified in this case.  You should decide whether you believe
11  all, some, part or none of what each person had to say, and how
12  important that testimony was.
13    In making that decision I suggest that you ask yourself a
14  few questions:  Did the witness impress you as honest?  Did the
15  witness have any particular reason not to tell the truth?  Did
16  the witness have a personal interest in the outcome of the
17  case?  Did the witness have any relationship with either the
18  government or the defense?  Did the witness seem to have a good
19  memory?  Did the witness clearly see or hear the things about
20  which he or she testified?  Did the witness have the
21  opportunity and ability to understand the questions clearly and
22  answer them directly?  Did the witness' testimony differ from
23  the testimony of other witnesses?  These are a few of the
24  considerations that will help you determine the accuracy of
25  what each witness said.

1    Your job is to think about the testimony of each witness
2  you have heard and decide how much you believe of what each
3  witness had to say.  In making up your mind and reaching a
4  verdict, do not make any decisions simply because there were
5  more witnesses on one side than on the other.  Do not reach a
6  conclusion on a particular point just because there were more
7  witnesses testifying for one side on that point.  You will
8  always bear in mind that the law never imposes upon a defendant
9  in a criminal case the burden or duty of calling any witnesses
10 or producing any evidence.
11    You have heard the testimony of Hussain Baker.  It is up to
12 you to decide from what you heard whether Hussain Baker was
13 telling the truth in this trial.
14    The testimony of one who provides evidence against a
15 defendant as an informer for pay must always be examined and
16 weighed by the jury with greater care and caution than the
17 testimony of ordinary witnesses.  You, the jury, must decide
18 whether the witness' testimony has been affected by these
19 circumstances, by the witness' interest in the outcome of the
20 case, by prejudice against the defendant, or by the benefits
21 that the witness has received financially.  You should keep in
22 mind that such testimony is always to be received with caution
23 and weighed with great care.
24    You should never convict the defendant upon the unsupported
25 testimony of such a witness unless you believe that testimony

1  beyond a reasonable doubt.

2       During the trial you heard the testimony of Dr. David Lesch
3  and Dr. Samer Abboud, who expressed opinions concerning Syria
4  and the Islamic extremist groups fighting in Syria.  If
5  scientific, technical or other specialized knowledge might
6  assist the jury in understanding the evidence or in determining
7  a fact in issue, a witness qualified by knowledge, skill,
8  experience, training or education may testify and state an
9  opinion concerning such matters.

10      Merely because such a witness has expressed an opinion does
11 not mean, however, that you must accept this opinion.  You
12 should judge such testimony like any other testimony.  You may
13 accept it or reject it and give it as much weight as you think
14 it deserves, considering the witness' education and experience,
15 the soundness of the reasons given for the opinion and all
16 other evidence in the case.

17      You will note that the superseding indictment charges that
18 the offenses were committed on or about specified dates.  The
19 government does not have to prove that the crime was committed
20 on that exact date, so long as the government proves beyond a
21 reasonable doubt that the defendant committed the crime on a
22 date reasonably near the dates stated in the superseding
23 indictment.

24      You are here to decide whether the government has proved
25 beyond a reasonable doubt that the defendant is guilty of the

1   crimes charged.  The defendant is not on trial for any act,

2   conduct or offense not alleged in the superseding indictment.

3   Neither are you called upon to return a verdict as to the guilt

4   of any other person or persons not on trial as a defendant in

5   this case, except as you are otherwise instructed.

6        If a defendant is found guilty, it will be my duty to

7   decide what the punishment will be.  You should not be

8   concerned with punishment in any way.  It should not enter your

9   consideration or discussion.

10        A separate crime is charged in each count of the

11   superseding indictment.  Each count, and the evidence

12   pertaining to it, should be considered separately.  The fact

13   that you may find the defendant guilty or not guilty as to one

14   of the crimes charged should not control your verdict as to any

15   other.

16        In determining whether any statement, claimed to have been

17   made by the defendant outside of court and after an alleged

18   crime has been committed, was knowingly and voluntarily made,

19   you should consider the evidence concerning such a statement

20   with caution and great care.  You should give such weight to

21   the statement as you feel it deserves under all the

22   circumstances.

23        You may consider in that regard such factors as the age,

24   sex, training, education, occupation, and physical and mental

25   condition of the defendant, his treatment while under

1    interrogation, and all the other circumstances in evidence
2    surrounding the making of the statement.
3        Certain exhibits have been identified as typewritten
4    transcripts of the oral conversations, which can be heard on
5    the tape-recordings received in evidence.  The transcripts also
6    purport to identify the speakers engaged in such conversations.
7        I have admitted the transcripts for the limited and
8    secondary purpose of aiding you in following the content of the
9    conversations as you listen to the tape-recordings, and also to
10   aid you in identifying the speakers.
11       You are specifically instructed that whether the
12   transcripts correctly or incorrectly reflect the content of the
13   conversations or the identity of the speakers is entirely for
14   you to determine based upon your own evaluation of the
15   testimony you have heard concerning the preparation of the
16   transcripts and from your own examination of the transcripts in
17   relation to your hearing of the tape-recordings themselves as
18   the primary evidence of their own contents.
19       And if you should determine that the transcripts are in any
20   respect incorrect or unreliable, you should disregard them to
21   that extent.  It is what you hear on the tapes that is
22   evidence, not the transcripts.
23       Among the exhibits admitted during the trial were
24   recordings that contained conversations in the Arabic language.
25   You were also provided English transcripts of those

1    conversations.  The transcripts were provided to you by the

2    government and the defendant so that you can consider the

3    content of the conversations on the recordings.  Whether a

4    transcript is an accurate translation, in whole or in part, is

5    for you to decide.  You should not rely in any way on any

6    knowledge you may have of the language spoken on the recording.

7    Your consideration of the transcripts should be based on the

8    evidence introduced in the trial.

9        In considering whether a transcript accurately describes

10   the meaning of a conversation, you should consider the

11   testimony presented to you regarding how, and by whom, the

12   transcript was made.  You may consider the knowledge, training

13   and experience of the translator as well as the nature of the

14   conversation and the reasonableness of the translation in light

15   of all the evidence in the case.

16       Certain charts and summaries of other records have been

17   received into evidence.  They should be considered like any

18   other evidence in the case.  You should give them only such

19   weight as you think they deserve.

20       Now I will give you my instructions with reference to the

21   essential elements alleged, which must be proven by the

22   government beyond a reasonable doubt before you can convict the

23   defendant of any count or counts of the superseding indictment.

24       You will have a copy of the superseding indictment with you

25   in the jury room.  I remind you that the superseding indictment

1  is not evidence of guilt.  The superseding indictment charges

2  the defendant as follows:

3      At all times relevant and material to this indictment:

4      On October 15, 2004, the United States Secretary of State

5  designated al-Qaeda in Iraq, then known as Jama'at al-Tawhid

6  wal-Jihad, as a foreign terrorist organization, under Section

7  219 of the Immigration and Nationality Act and as a

8  specially-designated global terrorist under Section 1(b) of

9  Executive Order 13224.

10     On December 11, 2012, the Secretary of State amended the

11 designation of AQI to include the following aliases:  Al-Nusra

12 Front (ANF), Jabhat al-Nusra, Jabhet al-Nusra, the Victory

13 Front and al-Nusra Front of the People of the Levant.

14     On May 15, 2014, the Secretary of State, in response to the

15 evolving nature of the relationships between ANF and AQI,

16 amended the FTO designation of AQI to remove all aliases

17 associated with al-Nusra Front.

18     Separately, the Secretary of State then designated al-Nusra

19 Front, also known as Jabhat al-Nusra, also known as Jabhet

20 al-Nusra, also known as the Victory Front, also known as

21 al-Nusra Front of the People of the Levant, also known as

22 al-Nusra Front in Lebanon, also known as Support Front for the

23 People of the Levant, and also known as Jabhat al-Nusra li-Ahl

24 al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as a foreign

25 terrorist organization under Section 219 of the Immigration and

1  Nationality Act and as a specially-designated global terrorist

2  entity under Section 1(b) of Executive Order 13224.

3      On October 19, 2016, the Secretary of State amended the FTO

4  and SDGT designations of ANF to include the following new

5  aliases:  Jabhat Fath al Sham, also known as Jabhat Fath

6  al-Sham, also known as Jabhat Fatah al-Sham, also known as

7  Jabhat Fateh al-Sham, also known as Fatah al-Sham Front, also

8  known as Fateh al-Sham Front, also known as Conquest of the

9  Levant Front, also known as the Front for Liberation of al

10 Sham, also known as Front for the Conquest of Syria/the Levant,

11 also known as Front for the Liberation of the Levant, also

12 known as Front for the Conquest of Syria.

13     On May 17, 2018, the Secretary of State amended the FTO and

14 SDGT designations of ANF to include the following aliases:

15 Hay'at Tahrir al-Sham, also known as Hay'et Tahrir al-Sham,

16 also known as Hayat Tahrir al-Sham, also known as HTS, also

17 known as Assembly for the Liberation of Syria, also known as

18 Assembly for Liberation of the Levant, also known as Liberation

19 of al-Sham Commission, also known as Liberation of the Levant

20 Organisation, also known as Tahrir al-Sham, also known as

21 Tahrir al-Sham Hay'at.  To date, ANF remains a designated FTO.

22     The introduction of the indictment is hereby realleged and

23 incorporated as if fully set forth.

24     And for the record I'm reading on Count 1 of the

25 indictment.

1    From on or about March 13, 2017, to on or about June 17,
2  2020, in the Western District of Texas and elsewhere, the
3  defendant, Imad Eddin Wadi (hereinafter WADI), unindicted
4  coconspirator 1 (hereinafter CC-1), and other persons known and
5  unknown to the grand jury knowingly and intentionally combined,
6  conspired, confederated and agreed together with each other,
7  within the jurisdiction of the United States, to commit, at a
8  place outside the United States, acts that would constitute the
9  offenses of murder and maiming if committed in the special
10 maritime and territorial jurisdiction, and one or more of the
11 conspirators committed one or more acts within the jurisdiction
12 of the United States to effect an object of the conspiracy.
13    The manner and means.
14    Wadi and CC-1 communicated with a confidential human source
15 (CHS) and an undercover law enforcement employee (hereinafter
16 UCE) about securing a wealthy investor, the Sheikh, to invest
17 funds to support Wadi's purchase of a business and other
18 commodities.
19    Wadi and CC-1 agreed with each other and others to use a
20 percentage of investment funds and subsequent profits from the
21 above-mentioned investments to conceal, launder, and funnel
22 funds to fighters overseas with the understanding that funds
23 would be used to purchase weapons that would be used by
24 fighters, including members and affiliates of FTOs (including
25 al-Nusra Front aka Fateh al-Sham), to murder and maim

1  individuals in Syria.

2      During the course of the conspiracy, Wadi was principally

3  located in the United States, in the Western District of Texas,

4  and CC-1 was principally located in Colombia.  In furtherance

5  of the conspiracy and to effect the objects thereof, Wadi and

6  CC-1, together with others, committed and caused to be

7  committed among others the following acts in the Western

8  District of Texas and elsewhere:

9      On or about March 13, 2017, Wadi and the CHS discussed a

10  proposed business deal involving securing investment funds for

11  Wadi to start a business.  Wadi told the CHS and CC-1's

12  family -- about CC-1's family ties to an FTO (al-Nusra Front

13  aka Fateh al-Sham) in Syria.

14      Between in or about March 2017 and in or about June 2019,

15  Wadi and CC-1 had numerous conversations with each other and

16  the CHS and the UCE relating to the investment funds, the

17  future business, and how the anticipated profits from the

18  business would be used.

19      In those communications, numerous topics were addressed,

20  including but not limited to:  The plan to funnel money to

21  fighters in Syria, including members of the al-Nusra Front, aka

22  Fateh al-Sham, how those funds would be used in Syria,

23  including to buy weapons and other items that would be used by

24  fighters in Syria; and information relating to how the money

25  would be transferred and methods of concealing the financial

transfers.

On or about May 24, 2017, during a discussion about the plan to funnel money to fighters in Syria, Wadi told the CHS, "Man, we have been putting our lives in danger way before you, way before you."

On or about July 9, 2018, CC-1 sent CHS a photograph of an FTO fighter with a reference which read, "He is one of those who committed a crime against the civilians and the revolutionaries." CC-1 also sent an audio message to the CHS stating that he was under pressure and asking for an update on the intended business deal.

On or about July 24, 2018, Wadi and CC-1 discussed with the CHS setting a meeting with the UCE to further discuss business arrangements concerning the investment plan.

On or about August 29, 2018, Wadi discussed with the UCE and the CHS an investment opportunity that would result in a percentage of moneys to be sent to the Mujahideen in Syria, including how the money would be transferred.

On or about August 29, 2018, Wadi discussed with the CHS using a trusted associate in Turkey to transfer cash commodities and/or possible weapons to support the FTO in Syria.

On or about October 8, 2018, CC-1 forwarded to CHS audio clips of a conversation between CC-1 and a relative in Syria who was a purported Mujahideen fighter. The relative described

1   the morale of the Mujahideen fighters and expressed hopes of

2   initiating battles and strengthening interrelations among all

3   Mujahideen.

4       On or about October 9, 2018, Wadi and CC-1 discussed with

5   the CHS funds to be sent to the Middle East, which group the

6   funds would benefit, and the use of an associate in Turkey to

7   facilitate the funds and/or possibly weapons transfers to

8   CC-1's relatives fighting in Syria.

9       On or about October 10, 2018, Wadi discussed with the CHS

10  and the UCE a $9 million business investment deal for the

11  purpose of a slaughterhouse, the transfer of beef commodities

12  to Turkey for sale and the transfer of proceeds to the

13  Mujahideen in Idlib, Syria.

14      On or about November 8, 2018, while in Bogota, Colombia,

15  Wadi and CC-1 discussed with the UCE and the CHS further

16  details of the business deal concerning the provision of funds

17  to fighters in Syria.  CC-1 also conducted a video call to a

18  fighter known to him in Syria who told Wadi, CC-1, the CHS and

19  the UCE the needs of the fighters, to include weapons.

20      On or about November 8, 2018, Wadi provided a hand-drawn

21  map to the UCE and the CHS to show the regional boundary lines

22  in Syria known to Wadi and CC-1 to facilitate money transfers

23  to the Mujahideen.

24      On or about January 17, 2019, Wadi told the CHS and the

25  CC-1 that -- that CC-1 gets daily reports from frontline

1   fighters, including how many people they have killed.  Wadi

2   stated, "You feel the ecstasy of jihad when you talk to them."

3   Wadi and CC-1 told the CHS that they would use the investment

4   profits to buy "rifles, grenades and rockets" and

5   remote-controlled aircraft capable of carrying 50 kilograms of

6   explosives, all "for the sake of war assistance."

7       On or about February 13, 2019, CC-1 discussed with the UCE

8   and the CHS an initial monetary amount to be sent to the

9   Mujahideen in Syria.  Also discussed was the means of

10  transferring weapons purchases to Syria that purportedly had

11  been utilized by Wadi and CC-1 in the past.

12      On or about February 13, 2019, Wadi sent the UCE an invoice

13  for the proposed business deal, which contained bank

14  information and a routing number for the UCE to provide funds

15  for the conspiracy to Wadi and CC-1.

16      On or about May 13, 2019, CC-1 forwarded the CHS an audio

17  message stating that the FTO (al-Nusra Front, aka Fateh

18  al-Sham) is "returning.  They are all now in one alliance."

19      On or about May 29, 2019, CC-1 sent the CHS videos of

20  rocket strikes.

21      On or about June 6, 2019, CC-1 sent the CHS an audio

22  message with a reference to helicopters shot down by rockets.

23      On or about June 6, 2019, Wadi sent a text message to the

24  CHS with Wadi and CC-1's company name in Colombia for the

25  purpose of sending funds.

On or about June 11, 2019, CC-1 forwarded audio messages to the CHS of a conversation CC-1 had with a fighter detailing the armed conflict and successes of Mujahideen fighters in Syria, to include decapitations of their enemies.

On or about June 22nd, 2019, CC-1 forwarded the CHS a conversation between CC-1 and a Mujahideen fighter discussing the fight against the Syrian regime and descriptions such as "slaughtering them like dogs."

On or about June 17, 2020, Wadi discussed with CHS and CC-1 that they must be careful while discussing the Mujahideen on the telephone.  Wadi discussed the fact that they might be being recorded and that they can talk in code, such as using the words "Freedom Fighters" rather than "working with terrorism."

Wadi further stated "I have my God's law.  The law of the United States or any other stupid law, as far as I'm concerned, is the last thing" I care about.  "I don't give a damn.  They can put me in jail, they can -- I don't give a" -- an expletive.  All in violation of Title 18, United States Code, Section 956.

Count 2, the introduction of this indictment, as well as the manner and means, and overt acts set forth in Count 1 of this indictment are hereby realleged and incorporated as if fully set forth.

From on or about March 13, 2017, to on or about June 17,

2020, in the Western District of Texas and elsewhere, the
defendant, Imad Eddin Wadi, unindicted coconspirator CC-1 and
other persons known and unknown to the grand jury, did
knowingly and willfully combine, conspire, confederate and
agree with each other to provide, and attempt to provide,
material support and resources, as defined in Title 18, United
States Code, Section 2339A(b), including:  Money and property,
to include the purchase of rifles, grenades, drones and other
military equipment, knowing and intending that such money and
property were to be provided to a foreign terrorist
organization, namely, al-Nusra Front aka Fateh al-Sham, which
at all relevant times was designated by the United States
Secretary of State as a foreign terrorist organization pursuant
to Section 219 of the Immigration and Nationality Act, knowing
that al-Nusra Front, aka Fateh al-Sham, was a designated
foreign terrorist organization, as defined in Title 18, United
States Code, Section 2339B(g)(6), that al-Nusra Front and Fateh
al-Sham engages and has engaged in terrorist activity (as
defined in Section 212(A)(3)(b) of the Immigration and
Nationality Act), and that al-Nusra Front, aka Fateh al-Sham,
engages and has engaged in terrorism (as defined in Section
140(d)(2) of the Foreign Relations Authorization Act, fiscal
years 1988 and 1989).

    All in violation of Title 18, United States Code, Section
2339B.

1    Count 3, the introduction of this indictment, as well as

2    the manner and means, and overt acts set forth in the Count 1

3    of the indictment are hereby realleged and incorporated as if

4    fully set forth.

5    From on or about March 13, 2017, to on or about June 17,

6    2020, in the Western District of Texas and elsewhere, the

7    defendant, Imad Eddin Wadi, unindicted coconspirator CC-1, and

8    others, did knowingly combine, conspire, confederate and agree

9    with each other, to provide and attempt to provide material

10    support or resources, as defined in Title 18, United States

11    Code, Section 2339B, including money and property, knowing and

12    intending that such money and property were to be used in

13    preparation for and in carrying out a violation of Title 18,

14    United States Code, Section 956(a), that is, a conspiracy to

15    commit, at places outside the United States, acts that would

16    constitute offenses of murder and maiming if committed in a

17    special maritime and territorial jurisdiction of the

18    United States, with one or more of the conspirators committing

19    an act within the jurisdiction of the United States to effect

20    the object of the conspiracy.

21    All in violation of Title 18, United States Code, Section

22    2339A.

23    Count 1.  The defendant is charged in Count 1 of the

24    superseding indictment with conspiring to kill or maim persons

25    in a foreign country.

1    For you to find the defendant guilty of this crime, you

2  must be convinced that the government has proved each of the

3  following beyond a reasonable doubt:

4    First, that the defendant agreed with one or more other

5  persons to murder or maim another person at a place outside the

6  United States, and such acts would constitute the crimes of

7  murder and maiming if committed in the territorial jurisdiction

8  of the United States, as I will define those offenses;

9    Second, that the defendant willfully joined the agreement

10 with the intent to further its purpose;

11   Third, that the defendant was within the jurisdiction of

12 the United States when he conspired; and

13   Fourth, that, during the existence of the agreement, one of

14 the conspirators committed at least one overt act within the

15 jurisdiction of the United States to effect any object of the

16 agreement.

17   A "conspiracy" is an agreement between two or more persons

18 to join together to accomplish some unlawful purpose.  It is a

19 kind of "partnership in crime" in which each member becomes the

20 agent of every other member.

21   The alleged unlawful agreement cannot include either the

22 UCE Steve Abdullah (also known as Tahir Masri) or Hussain

23 Baker.

24   These individuals were acting on behalf of the

25 United States government and, as such, they could never

actually agree to commit the crimes charged.  Therefore, in considering Count 1, you must find that the defendant agreed with another person who was not the UCA or Hussain Baker.  This instruction is equally applicable to the conspiracies charged in Counts 2 and 3 as well.

The overt act need not be of a criminal nature so long as it is done in furtherance of the conspiracy.

One may become a member of a conspiracy without knowing all of the details of the unlawful scheme or the identities of all of the other alleged conspirators.  If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government does not need to prove that the alleged conspirators entered into any formal agreement or that they directly stated between themselves all the details of the scheme.  Likewise, the government does not need to prove all of the details of the scheme alleged in the superseding indictment were actually agreed upon or carried out.  Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge

1  that a crime is being committed, or the mere fact that certain

2  persons may have associated with each other, and may have

3  assembled together and discussed common aims and interests,

4  does not necessarily establish proof of the existence of a

5  conspiracy.  Also, a person who has no knowledge of a

6  conspiracy, but who happens to act in a way which advances some

7  purpose of a conspiracy, does not thereby become a conspirator.

8      Title 18, United States Code, Section 111(a) makes it a

9  crime for anyone to murder another human being with

10  premeditation in the commission or attempted commission of

11  certain felonies.

12      For you to find the defendant guilty of this crime, you

13  must be convinced that the government has proven each of the

14  following acts beyond a reasonable doubt:

15      First:  That the defendant unlawfully killed another human

16  being;

17      Second:  That the defendant killed this defendant human

18  being -- killed this human being with malice aforethought;

19      Third:  That the killing was premeditated or perpetrated by

20  lying in wait or that the killing was committed in the

21  perpetration or attempt to perpetrate arson, escape, murder,

22  kidnapping, treason, sabotage, child abuse, burglary, robbery,

23  a pattern or practice of assault or torture against a child or

24  children; and

25      Fourth:  That the killing took place within the territorial

1  jurisdiction of the United States.

2      To find "malice aforethought," you need not be convinced

3  that the defendant acted out of spite, hatred, malevolence or

4  ill-will toward the defendant.

5      In determining whether the killing was with malice

6  aforethought, you may consider the use of a weapon or

7  instrument and the manner in which death was caused.

8      A killing is "premeditated" when it is the result of

9  planning or deliberation.  The amount of time needed for

10  premeditation of a killing depends on the person and the

11  circumstances.  It must be long enough for the killer, after

12  forming the intent to kill, to be fully conscious of that

13  intent.

14      "Maiming" is cutting, biting or slitting the nose, ear or

15  lip or cutting out or disabling the tongue or putting out or

16  destroying on eye or cutting off or disabling a limb or any

17  member of another person; or throwing or pouring upon another

18  person scalding water, corrosive acid or caustic substance,

19  with the intent to torture, maim or disfigure.

20      "Torture" is an act committed by a person acting under the

21  color of law specifically intended to inflict severe physical

22  or mental pain or suffering (other than the pain or suffering

23  incidental to unlawful sanctions) upon another person within

24  his custody or physical control.

25      Manner or means.  In order to find the first element is

proved beyond a reasonable doubt, the government need not prove that anyone was murdered or maimed as I have defined above. What the government must prove beyond a reasonable doubt is that the alleged agreement in Count 1 included the intent to do acts defined as murder or maiming.

You have been instructed that your verdict, whether it is guilty or not guilty, must be unanimous. The following instruction applies to the unanimity requirement as to Count 1. Count 1 of the indictment accuses the defendant of committing the crime of conspiracy to commit murder and maiming abroad in two different ways.

The first is that the defendant conspired to commit an act or acts abroad that, if done in the special maritime and territorial jurisdiction of the United States, would constitute murder.

The second is that the defendant conspired to commit an act or acts abroad that, if done in the special maritime and territorial jurisdiction of the United States, would constitute maiming.

The government does not have to prove all of these facts for you to return a guilty verdict on this charge. Proof beyond a reasonable doubt on one is enough. But in order to return a guilty verdict, all of you must agree that the same one has been proved. In other words, all of you must agree that the government proved beyond a reasonable doubt that the

1  defendant conspired to commit acts that would constitute

2  murder, as I have defined for you; or all of you must agree

3  that the government proved beyond a reasonable doubt that the

4  defendant conspired to commit an act constituting maiming, as I

5  have defined for you.

6      The term "outside the United States" means anyplace outside

7  the states of the United States, the District of Colombia and

8  the territories and possessions of the United States, including

9  the territorial sea and the overlying airspace.

10     The term "within the jurisdiction of the United States"

11  means anyplace inside the states of the United States, the

12  District of Colombia and the territories and possessions of the

13  United States, including the territorial sea and the overlying

14  airspace.

15     The word "willfully," as that term has been used from time

16  to time in these instructions, means that the act was committed

17  voluntarily and purposely, with the specific intent to do

18  something the law forbids; that is, with a bad purpose either

19  to disobey or disregard the law.

20     Count 2.  The defendant is charged in Count 2 of the

21  superseding indictment with conspiring to provide material

22  support to a designated foreign terrorist organization.  Title

23  18, United States Code, Section 2339B makes it a crime for

24  anyone to knowingly conspire to provide material support or

25  resources to a designated foreign terrorist organization.

1    For you to find the defendant guilty of this crime, you

2    must be convinced that the government has proved each of the

3    following beyond a reasonable doubt:

4    First, that the defendant knowingly conspired to provide or

5    attempt to provide material support or resources, including:

6    Currency and monetary instruments (collectively "money") to

7    purchase property, to include:  Rifles, grenades, drones and

8    other military equipment, to al-Nusra Front, aka Fateh al-Sham,

9    aka Hay'at Tahrir al-Sham; and

10    Second:  That the defendant did knowingly -- did so knowing

11    that al-Nusra Front, aka Fateh al-Sham, aka Hay'at Tahrir

12    al-Sham, is a designated terrorist organization or has engaged

13    in or engages in terrorist activity.

14    A "conspiracy" is an agreement between two or more persons

15    to join together to accomplish some unlawful purpose.  It is a

16    kind of "partnership in crime" in which each member becomes the

17    agent of every other member.

18    One may become a member of a conspiracy without knowing all

19    of the details of the unlawful scheme or the identities of all

20    of the other alleged conspirators.  If a defendant understands

21    the unlawful nature of a plan or scheme and knowingly and

22    intentionally joins to that plan or scheme on one occasion,

23    then that is sufficient to convict him of the conspiracy even

24    though the defendant had not participated before and even

25    though the defendant played only a minor part.

1    The government need not prove that the alleged conspirators

2  entered into any formal agreement, nor that they directly

3  stated between themselves all of the details of the scheme.

4  Similarly, the government need not prove that all of the

5  details of the scheme alleged in the indictment were actually

6  agreed upon and carried out.  Nor must the government prove

7  that all of the persons alleged to have been members of the

8  conspiracy were such or that the alleged conspirators actually

9  succeeded in accomplishing their unlawful objectives.

10   Mere presence at the scene of an event, even with knowledge

11  that a crime is being committed, or the mere fact that certain

12  persons may have associated with each other and may have

13  assembled together and discussed common aims and interests,

14  does not necessarily establish proof of the existence of a

15  conspiracy.  Also, a person who has no knowledge of a

16  conspiracy, but who happens to act in a way which advances some

17  purpose of a conspiracy, does not thereby become a conspirator.

18   The term "terrorist organization" means an organization

19  designed as terrorist organizations under Section 210 of the

20  Immigration and Nationality Act.  I hereby instruct you that

21  al-Qaeda in Iraq ("AQI)," al-Nusra Front ("ANF)," Jabhat

22  al-Nusra, Fatah al-Sham and Hay'at Tahrir al-Sham are related

23  designated foreign terrorist organizations.

24   Nothing in this section shall be construed or applied to

25  abridge the exercise of rights guaranteed under the First

1    Amendment to the Constitution of the United States.  The First

2    Amendment to the United States Constitution provides:  Congress

3    shall make no law respecting an establishment of religion, or

4    prohibiting the free exercise thereof; or abridging freedom of

5    speech, or the press; or the right of the people peaceably to

6    assemble, and to petition the government for a redress of

7    grievances.

8        The amendment -- this amendment guarantees to all persons

9    in the United States the right to freedom of religion, and

10   freedom of association.  Because these constitutional

11   guarantees, no one can be convicted of a crime simply on the

12   basis of his belief, his expression of those beliefs, or his

13   associations.  The First Amendment, however, does not provide a

14   defense to a criminal charge simply because a person uses his

15   associations, beliefs or words to carry out an illegal

16   activity.

17       Stated another way, if a defendant's speech, expression or

18   association were made with the intent to willfully provide

19   funds, goods or services to or for the benefit of al-Qaeda in

20   Iraq, Jabhat Nusra, Fatah al-Sham or Hay'at Tahrir al-Sham, or

21   knowingly to provide material resources to al-Qaeda and those

22   other entities, then the First Amendment would not provide a

23   defense to that conduct.

24       "Knowingly," as that term has been used from time to time

25   in these instructions, means that the act was done voluntarily

1    and intentionally, not because of mistake or accident.

2        The term "terrorist activity" includes any activity that is

3    unlawful under the laws of the place where it is committed (or

4    which, if it had been committed in the United States, would be

5    unlawful under the laws of the United States or any state) and

6    that involves conspiracy to murder and maim:

7        The seizing or detaining and threatening to kill, injure or

8    continue to detain, another individual in order to compel a

9    third person (including a governmental organization) to do or

10   abstain from doing an act as an explicit or implicit condition

11   for the release of the individual seized or detained;

12       The use of any explosive, firearm or other weapon or

13   dangerous device (other than for mere personal monetary gain),

14   with intent to endanger, directly or indirectly, the safety of

15   one or more individuals or to cause substantial damage to

16   property; or a threat, attempt, or conspiracy to do any of the

17   following:

18       The term "engages in terrorist activity" means, for the

19   purpose of this offense:  To commit or insight to commit, under

20   circumstances indicating an intention to cause death or serious

21   bodily injury, a terrorist activity; or

22       To prepare or plan a terrorist activity; or

23       To solicit funds or other things of value for a terrorist

24   activity; or

25       A terrorist organization; or

1    To solicit any individual.

2    To engage in conduct otherwise described in this

3    definition; or to commit an act that the actor knows, or

4    reasonably should know, affords material support, including

5    funds, transfer of funds or other material financial benefit,

6    weapons (including chemical, biological, or radiological

7    weapons), or explosives for the commission of a terrorist

8    activity, to any individual whom the actor knows, or reasonably

9    should know, has committed or plans to commit terrorist

10   activity; or

11   To a terrorist organization.

12   The term "terrorism" means premeditated, politically

13   motivated violence perpetrated against noncombatant targets by

14   substantial groups of -- or clandestine groups.

15   I'm sorry.  Subnational groups.

16   Count 3.  Count 3 of the superseding indictment charges the

17   defendant with conspiracy to provide material support to

18   terrorists.  Title 18, United States Code, Section 2339A makes

19   it a crime for anyone to conspire to provide material support

20   and resources, knowing or intending that they are to be used in

21   preparation for carrying out a violation of a conspiracy to

22   murder or maim individuals overseas, in violation of Title 18,

23   United States Code, Section 956.

24   For you to find the defendant guilty of this crime, you

25   must be convinced that the government has proved each of the

following beyond a reasonable doubt:

First:  That the defendant conspired to provide and attempt to provide material support or resources, including money and property;

Second:  That the defendant did so knowing or intending that the material support or resources were to be used to prepare for or carry out a violation of conspiracy to murder or maim overseas.

A "conspiracy" is an agreement -- all right.  We've done that twice before.  So if you will skip over now to the second paragraph on Page 29.

The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities or financial services.

Entrapment:  The defendant asserts that he was a victim of entrapment.

Where a person has no previous intent or purpose to violate the law but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law, as a matter of policy, forbids that person's conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that the government agents provide what appears to be a favorable

opportunity is not entrapment.  For example, it is not
entrapment for a government agent to pretend to be someone else
and to offer, either directly or through an informer or other
decoy, to engage in an unlawful transaction.

If you find beyond a reasonable doubt from the evidence in
the case that, before anything at all occurred respecting the
alleged offense involved in this case, the defendant was ready
and willing to commit such a crime as charged in the
superseding indictment, whenever opportunity was afforded, and
that the government officers or their agents did no more than
offer the opportunity, then you should find that the defendant
is not a victim of entrapment.

If the evidence in this case should leave you with a
reasonable doubt about whether the defendant had the previous
intent or purpose to commit an offense of the character
charged, apart from the inducement or persuasion of some
officer or agent of the government, then it is your duty to
find the defendant not guilty.

The burden is on the government to prove beyond a
reasonable doubt that the defendant:

Was not induced to commit the offense by a government
agent; or

Had a predisposition or intention to commit that offense
prior to being approached by a government agent.

You are instructed that a paid informer is an "agent" of

1  the government for purposes of this instruction.

2      To reach a verdict, whether it is guilty or not guilty, all

3  of you must agree.  Your verdict must be unanimous on each

4  count of the superseding indictment.

5      It is your duty to consult with one another and to

6  deliberate in an effort to reach agreement if you can do so.

7  Each of you must decide the case for yourself, but only after

8  an impartial consideration of the evidence with your fellow

9  jurors.  Do not let any bias, sympathy or prejudice that you

10  may feel toward one side or the other influence your decision

11  in any way.  In particular, do not let racial, ethnic, national

12  origin or other bias influence your decision in any way.

13      During your deliberations do not hesitate to reexamine your

14  own opinions and change your mind if convinced that you were

15  wrong.  Do not hesitate to examine your own opinions and change

16  your mind if you were convinced that you were wrong.  But do

17  not give up your honest beliefs as to the weight or effect of

18  the evidence solely because of the opinion of your fellow

19  jurors or for the mere purpose of returning a verdict.

20      Remember at all times, you are the judges, judges of the

21  facts.  Your duty is to decide whether the government has

22  proved the defendant guilty beyond a reasonable doubt.

23      When you go to the jury room, the first thing you should do

24  is select one of your members as your presiding juror, who will

25  help to guide your deliberations and will speak for you here in

1  the courtroom.

2      A verdict form has been prepared for your convenience.

3      The presiding juror will write the unanimous answer of the

4  jury in the space provided for each count of the superseding

5  indictment, either guilty or not guilty.  At the conclusion of

6  your deliberations, the presiding juror should date and sign

7  the verdict.

8      If you need to communicate with me during your

9  deliberations, the presiding juror should write the message and

10  give it to the court security officer.  I will either reply in

11  writing or bring you back into the courtroom to answer your

12  message.

13      Bear in mind that you are never to reveal to any person,

14  not even to the Court, how the jury stands, numerically or

15  otherwise, on any count of the superseding indictment, until

16  after you have reached unanimous verdict.

17      Following that, then, ladies and gentlemen, is the verdict

18  form.  "Verdict" comes from the Latin word "*veritas*," which

19  means the truth.  So what you all fill out in this document is

20  the truth as you all unanimously find it to be.

21      So in Count 1, Mr. Harris and Mr. Roomberg are going to

22  advocate on behalf of the United States, in just a bit, why

23  they believe the evidence requires you to write the word

24  "guilty" in there.

25      Mr. Swift is going to advocate on behalf of Mr. Wadi why

1    Mr. Wadi believes you should write the words "not guilty" in
2    there.
3        In Count 1 then, if you do find the defendant guilty, you
4    would then also need to make a decision as to whether the
5    conspiracy intended to result in murder and/or maiming.
6        In Count 2, likewise, the lawyers tell you why each side
7    believes you should write "guilty" or "not guilty," as well as
8    in Count 3.
9        Now, that took -- I thought that was going to take 30
10   minutes.  So we're going to take a 15-minute recess before we
11   begin the closing statements.  And keep in mind your
12   instructions.  We'll see you in 15 minutes.  Thank you.
13       *(Recess at 9:48 a.m. until 9:59 a.m., jury out)*
14           THE COURT:  You may be seated.
15       *(At the bench off the record)*
16           THE COURT:  Before we bring the jury in, Mr. Harris or
17   Mr. Roomberg, anything outside the presence?
18           MR. HARRIS:  No, Your Honor.
19           THE COURT:  Mr. Swift?
20           MR. SWIFT:  No, Your Honor.
21           THE COURT:  Okay.  All right.  So, Mr. Harris, you
22   want to just be in that place --
23           MR. HARRIS:  Yes.
24           THE COURT:  -- ready to go?  Okay.  That's fine.
25           MR. HARRIS:  Yes.

1    *(Jury enters courtroom)*

2        THE COURT:  You may be seated.

3    Ladies and gentlemen, before we have the closing

4    statements, I want to mention a couple of things.  Number one,

5    when you are deliberating and reach a verdict, this copy of the

6    instructions and the verdict form have the court seal right

7    here, the clerk's.  And this -- so this is the one that will be

8    signed and brought back into court as the official verdict of

9    the jury.

10        Now, Mr. Harris is going to begin with the government's

11    argument first, then Mr. Swift, and then Mr. Roomberg will make

12    the final argument.  We split those up because the government

13    has the burden of proof.  So the government gets to go both

14    first and last.  But, of course, it's up to you as to whether

15    the United States has met that burden of proof.

16    So with that, Mr. Harris, you may proceed.

17        MR. HARRIS:  Thank you very much, Your Honor.  May it

18    please the Court.

19                        CLOSING ARGUMENT

20        MR. HARRIS:  Good morning, ladies and gentlemen.

21    The question that you're going to be called upon to answer

22    is, have we proven each element of each offense with proof

23    beyond a reasonable doubt?  I submit we have.  I submit there

24    can be no reasonable doubt.

25    This is my opportunity to point out to you why.  In jury

```
 1   selection, Judge Biery spoke of rabbit trails and rabbit holes.
 2   I am also, but in a very different use, a very different
 3   context.
 4       I submit to you that throughout trial and in closing
 5   argument to come the defense is going to want you to go down
 6   rabbit trails.  This will be mostly to attack the credibility
 7   of Hussain Baker.  I think you're going to hear a lot about
 8   reasonable doubt and acting on the most important of your own
 9   affairs and how there's no way in the world you would possibly
10   act upon the most important of your own affairs on the word of
11   Hussain Baker.
12       Rabbit trail.  And I'll get to why.  I'll get to why
13   momentarily.
14       The defense throughout trial, and I believe in closing,
15   wants you to focus on anyone but the defendant, Mr. Wadi.
16   Horrible Hussain Baker, terrible Taher, awful Agent Martinez, I
17   think maybe even big bad Barodi.  Anyone but Mr. Wadi.
18       The reason I say it's a rabbit trail is that, first, just
19   about everything that Mr. Baker told you was confirmed by what
20   you saw and heard in the recordings and in the documents.  But
21   more importantly is this.  You can disregard just about
22   everything that any of our witnesses said and still find
23   Mr. Wadi guilty beyond a reasonable doubt because Mr. Wadi's
24   own words, and those words spoken by the others with which he
25   agreed, are self-convicting.
```

And you saw them flowing by in realtime, some of them twice, not just stopped and isolated and parsed, flowing in realtime.  Let's focus on those as we go through the charges and the elements and the proof.

Judge Biery read to you the indictment, and each of you have a copy.  And I'm going to state the obvious.  CC-1 is Daniel Ahmed Barodi.

Let's go to Count 1.  The charge is conspiracy to murder or maim in a foreign country.  Judge Biery went through the elements with you.  First, that the defendant, Mr. Wadi, agreed with one or more other persons to murder or maim another person at a place outside of the United States.

Secondly, that he willfully joined the agreement with the intent to further its purpose.

Third, that he was within the jurisdiction of the United States when he conspired.

And, fourth, that during the time of the conspiracy, one of the conspirators committed at least one overt act within the jurisdiction of the United States to try and carry out the agreement.

Let's go through the proof as to that first element, agreement to murder or maim.  Mr. Wadi and Mr. Barodi were partners.  You saw Mr. Wadi's extreme devotion to Mr. Barodi both in the undercover recordings and in the post-arrest interview, how, as a -- how Mr. Wadi took Barodi under wing

1   when Barodi first left Syria and came to the United States, put

2   him to work at night at his gas station and convenient stores

3   in Dallas because he didn't have status, how at a later time,

4   when Barodi had spread his own wings a little bit and went off,

5   the defendant tried to help Barodi with his businesses.

6       When that didn't work out and Barodi came back to the

7   defendant, they came back as business partners, working

8   together in the convenient stores, the gas distribution, until

9   the time, post-9/11, when Barodi, lacking status, got swept up

10  by immigration officials and was detained in north Texas, as we

11  heard.

12      And the defendant visited him in north Texas.  And as we

13  heard from the defendant, he assisted Barodi.  When Barodi got

14  a forged birth certificate, the defendant assisted Barodi.  And

15  I believe the words from the tapes were something to the effect

16  of, I got him to Colombia.  Never thought it would be Colombia.

17  But that's where the papers were.  I got him to Colombia.

18      So there is -- there is a bond there that goes way back, a

19  devotion.

20      They were partners in business, and they were partners in

21  material support for terrorists and terrorism, and they were

22  partners in promoting murder and mayhem and had been for years.

23  To quote Mr. Wadi, "Our work is not new, since the year '98."

24  And they each and together partnered up with others known and

25  unknown, primarily in Syria and Turkey.

The agreement to murder or to maim showed that they wanted to send money to Syria as lethal aid. "It will get weapons for them." And, again, these are Mr. Wadi's own words. "Rifles, grenades and rockets." "Explosives that they place into the small planes." "I mean, you feel the ecstasy of jihad when you talk to them."

The second element, that he willfully joined -- and before I get to the second element, the term that I use, "partnership," you know the technical term that that partnership becomes: "Conspiracy."

Going now to that second element, that he willfully joined the agreement with the intent to further its purpose. In a conspiracy, different participants play different roles. Here, as you've heard, our conspiracies are, first, to murder and maim abroad; second, to support designated foreign terrorist organizations; and, third, to support terrorists abroad in their conspiracies to murder and maim.

This could not be done solo. Barodi had the contacts to his relatives in Syria, who are members of organizations engaging in terroristic acts. They are also conspirators. Barodi also was passing on news from the front. This was to induce Baker and Taher to get the Sheikh to provide the money.

Wadi, Mr. Wadi, had the connection to Turkish smugglers, money *hawala* dealers, arms brokers and the like. Mr. Wadi also had the connection to Baker and, through Baker, to the

1    financiers.  It doesn't matter that the latter was fictitious.

2        The aim to murder and maim were real.  Syrian and Russian

3    soldiers, other rebels and civilians.  And while many of us may

4    not like what Syrian soldiers and Russian soldiers were doing

5    on the ground in Syria, the legal status remains, that

6    attacking them there is the same standard as others killing

7    U.S. soldiers on U.S. soil.

8        Mr. Wadi's own words, "I mean, you have -- we have that who

9    secures weapons from Turkey; Abu Husayn and such, he will

10   secure."

11       Abu Husayn, another conspirator.

12       "He'll bring you whatever you want, Abu Husayn.  Abu Husayn

13   has traded arms in huge quantities."

14       Count 3, within the jurisdiction of the United States when

15   Mr. Wadi conspired.  I submit that this one is beyond dispute,

16   beyond question.  We had numerous recorded conversations in

17   San Antonio, Texas, in Dallas, Texas.  And needless to say, but

18   I'm going to say it anyway, Texas is within the United States.

19       Finally, to the fourth element, that one of the

20   conspirators committed at least one overt act within the

21   jurisdiction of the United States to try and carry out the

22   agreement.  As you heard from the reading of the indictment,

23   there are 20 overt acts alleged.  I submit to you that we have

24   proven them all beyond a reasonable doubt, but you only need to

25   find one.

1        So let me give you an easy example, an easy description.

2   I'm sure you will recall Government's Exhibit 14.  That was the

3   video, you saw it twice, of the meeting on February 13, 2019,

4   at a hotel room here in San Antonio, Texas.  Mr. Baker was

5   seated in a chair at a right angle, more or less with his back

6   right shoulder to us.  Mr. Wadi was seated on the couch.  Taher

7   was seated on the couch.  You recall that video.

8        During that video there is the call to Barodi, and they

9   discussed the plans for the movement of money with Barodi down

10  there in Colombia.  After the call, at some point Taher says,

11  in so many words, send me an invoice.  And what do we see?  We

12  see Mr. Wadi with his phone, and basically says, I just sent it

13  to you.  And Taher says, got it.

14       And we saw that invoice.  That's Government's Exhibit 15.

15  Remember that?  The Abu Sayf project, nine million dollars,

16  $250,000 down.  You all recall that.  That is overt act 15.

17  Just one.  That's just one.

18       Moving on to Count 2.  The charge is conspiracy to provide

19  and attempt to provide material support to designated foreign

20  terrorist organizations.  As Judge Biery said, the elements

21  are, first, that the defendant knowingly conspired to provide

22  material support or resources to an organization and -- excuse

23  me -- second, that the defendant did so knowing that the

24  organization is a designated terrorist organization or has

25  engaged or engages in terrorist activities.

So the proof.  First, the agreement to provide material support or resources to an organization.  We have countless discussions of money going to Fatah al-Sham, al-Nusra -- I'll make it easy on myself.  HTS and Ahrar al-Sham.

That there was material support, I submit to you, is also beyond questioning.  From the jury instructions, and I quote, "The term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities or financial services."  Money and resources.  As I point out in that first bullet point, beyond dispute.

We focused on lethal aid, but your jury instruction does not limit it to that.

Second, knowing that the organization is a designated terrorist organization or has engaged or engages in terrorist activity, as his Honor further defined those terms.  We heard about the beheading of captured prisoners, the attacking of women and children, the attacking of minorities, civilian groups.  Defendant Wadi knows darn well who he is supporting.  And despite the past skirmishes, as one of -- either he or Mr. Barodi stated, they are all fighting together in Idlib.

We heard from both Professor Lesch and Professor Abboud that the support of one supports the others; that they were fighting a common enemy at times, despite having their gang warfare, if you will.  We had Mr. Barodi saying, "They have all

joined now into one body.  They are all together."

    Professor Abboud told Mr. Swift in questioning that all the groups had engaged in "extrajudicial activities," which Professor Abboud had previously defined for Mr. Roomberg to include beheadings, murder, et cetera.  But it was lethal aid that we are focusing on.

    To quote Mr. Wadi, when he was in Colombia, "Orphanage is for cover."  This is being done "so that he would help them with weapons."

    Defendant Wadi knew that they were dealing with a designated foreign terrorist organization.  He spoke of the United States attacking the true opposition.  He knew the name Fatah al-Sham and used it repeatedly.  He spoke in code or cover words, trying to keep it from, as Mr. Barodi had put it, "the FBI and CIA and all that filth in existence."

    Mr. Wadi kept up on current affairs in Syria.  We hear him talking about who is where, gaining and losing territory, who is fighting together and when.

    Mr. Wadi knew that Mr. Barodi's California cousin went to prison for 30 months for sending scopes to Ahrar al-Sham. Then, of course, there's the whole two mosques, near enemy, far enemy thing that Barodi espouses, that, as we heard from Professor Abboud, as well as Professor Lesch, is more attune to the philosophy of Fatah al-Sham, HTS, than it is Ahrar al-Sham. And as Mr. Wadi put it, "I don't care about U.S. law.  They can

1  put me in jail."

2     All of that goes to show that Mr. Wadi knew that Fatah

3  al-Sham was a designated foreign terrorist organization.  To

4  say otherwise is sort of like knowing that you're selling

5  cocaine but claiming that you don't know that it's illegal.

6     Turning further to the terrorist activity aspect of Ahrar

7  al-Sham and the other groups, I hope you recall this exchange

8  between Mr. Swift and Professor Lesch.

9     Question:  So if I'd given weapons in 2017 to Ahrar

10 al-Sham, odds are I'm going to be shooting at HTS, right?

11    Answer:  Yeah.

12    Later in the trial there was a similar exchange between

13 Mr. Swift and Professor Abboud.  Similarly, Mr. Swift asked

14 Taher about -- was talking -- asked Taher about what Abdul

15 Jabbar had said.  Question:  He's in Syria.  He's fighting.

16    I submit to you that, in trying to avoid guilt for Count 2

17 by somehow establishing that the money was not knowingly going

18 to a designated foreign terrorist organization, and I submit

19 that it really does not detract from Count 2, those questions

20 and answers in and of themselves establish the defendant's

21 guilt for Counts 1 and 3.

22    Even if Ahrar al-Sham is not a designated foreign terrorist

23 organization for purposes of that element of Count 2, but you

24 believe it is fighting the others, that's still murder and maim

25 under Counts 1 and 3.  Ahrar al-Sham shooting at HTS with

1    weapons, the funding of which is arranged by Mr. Wadi and

2    Mr. Barodi, someone is going to get murdered or maimed.

3         This was acknowledged in the call from Bogota with Abdul

4    Jabbar.  "There was fighting among each other in several

5    streets."  Murder and maim.

6         And, again, the words of Mr. Wadi, knowing darn well the

7    murderous activities, "rockets, grenades and rockets,

8    explosives in small planes."

9         Moving on to Count 3, which I've pretty well actually

10   covered with most of what I've already spoken to, the charge is

11   slightly different than Count 1.  This is now conspiracy to

12   provide material support to terrorists to murder and maim

13   outside the United States, the elements being, first, that he

14   conspired to provide material support or resources; and,

15   second, they did so, knowing or intending that the material

16   support would be used to prepare to carry out a violation of

17   conspiracy to murder or maim overseas.

18        But still, let's go through the proof.  Conspire to provide

19   material support or resources.  Once again, I submit that there

20   was material support is beyond question, the conspiracy to

21   provide that material support is beyond question.

22        They were conspiring to have the tools for Abdul Jabbar and

23   Bilal and their groups in Syria to attack and kill others.  We

24   have clearly proven this beyond a reasonable doubt.  Again,

25   wanted to send money to Syria.  And to quote Mr. Wadi about how

1  this would be done, "We can send -- we send from there a

2  *hawala*, and we can take care of it over there to Turkey.  We

3  have business in Turkey.  We have work here and there.  We have

4  Abu Husayn in Turkey.  We don't have a problem.  From Turkey,

5  they can pay the money to them over there.  In other words, we

6  have 20 different ways."

7      On to the second element, knowing or intending that the

8  material support or resources would be used to prepare to carry

9  out a violation, the conspiracy to murder, maim overseas,

10  again, countless examples of defendant Wadi's knowledge and

11  intent.  "The ecstasy of jihad when you talk to them."  "It

12  will get weapons for them."  "Rifles, grenades and rockets."

13  "Explosives in small planes."

14      The conspiracy agreements by defendant Wadi with Barodi and

15  others, I submit to you, are clear.  The next subject I expect

16  that you'll hear a lot about from the defense, that I submit to

17  you is yet another rabbit trail, is entrapment.  Judge Biery

18  instructed you on what it takes for entrapment.

19      Under this evidence, I submit to you Mr. Wadi was not

20  entrapped.  He had, from the jury instruction I quote, "the

21  readiness and willingness to break the law."

22      Mr. Baker providing "what appears to be a favorable

23  opportunity is not entrapment."

24      The UCE, Taher, a Federal Bureau of Investigation personnel

25  pretending to be someone is not entrapment.

1       As Mr. Wadi put it, he was in 100 percent, one million
2  percent.
3       Mr. Wadi and Mr. Barodi were pressuring Baker from the
4  beginning.  The pressure wasn't going from Baker to them.
5  Baker was presenting the opportunity, but all pressure was
6  coming from Wadi.
7       How many times do we have the asked question of both Baker
8  and Taher, were you pushing this or were they trying to sell
9  you?  They were -- the conspirators were trying to sell the
10  financiers.  Any pressure they were feeling was from the
11  fighters oversea or the sellers in Colombia.  It was not the
12  government pressuring.
13       Mr. Wadi and Mr. Barodi were pushing Baker and Taher both
14  for their own profit motive and to help the terrorists and
15  terrorist groups.  Making money for themselves and raising
16  money for their cause are not mutually exclusive.  Yet, in that
17  conversation in Bogota they kept reducing how much they would
18  each keep for themselves, giving -- pledging more and more
19  support, more and more of the profits of the venture to go to
20  the terrorists.  We heard it go from 50 percent to 70 percent
21  of the profits, to 90 percent of the profits, even 100 percent
22  of the profits to the fighters if necessary.
23       The defendant's predisposition to commit these crimes, to
24  engage in these conspiracies, his being all in is clear from
25  his words.

1  Talking about Barodi's cousins, his family, his people, all

2  revolutionaries.  All of them belong to Fatah al-Sham and

3  Jabhat al-Nusra.

4  "Just say that we have, we have a way to smuggle anything."

5  Done it before, predisposed, no entrapment.

6  "Man, we've been putting our lives in danger way before

7  you, way before you," he tells Baker.

8  "We give Abu Husayn the guy's number," meaning Abdul

9  Jabbar, "and he'll sort it all out for them.  Abu Husayn, I

10  trust him for a long time, even with weapons."

11  Predisposition, not entrapment.

12  "He'll bring whatever you want.  Abu Husayn has traded arms

13  in huge quantities."

14  I'm a little behind in my clicks.

15  "The Americans are thinking about hitting ISIS.  Did they

16  attack ISIS?  No.  They did not hit anything except the rebels,

17  the true opposition."

18  All counts, all in, no question about intent.  There is no

19  entrapment.

20  "I've been here for 40 years.  I've played numerous games

21  and outmaneuvered them numerous times."

22  Recall the testimony.  "Them" is the United States

23  government.  No entrapment, predisposition.

24  "When I talk to him, I talk in code."

25  Regarding giving to "the women, to the elderly, to the

injured," we heard in that one recording was "for appearances."
As Mr. Wadi said, "This is for cover."

"The ecstasy of jihad.  It will get weapons for them."

All in, all counts, no question about intent, no
entrapment, pure disposition.

"Abu Husayn and such, he will secure weapons from Turkey."

"Abu Husayn has sold more weapons than I can tell."

Done this before, predisposition, no entrapment.

"Let me tell you something:  If there is anything that has
to do with helping the Free Army against the regime, then I am
in, wherever it was and whatever it was, even if it was on the
expense of my health."

All in, predisposed, no entrapment.

This is a good one.  "The Sheik wants to know that this
will go for the sake of war assistance."  "They need rifles.
They need stuff.  You understand?"

Barodi:  "Of course.  Of course.  They need everything."

That is conspiracy, right there.

"That is what I am telling.  We have your buddy, your
buddy, Abu Husayn, who has dealt with the weapons before."

All in, all counts, no question of intent, no entrapment,
predisposed.

"This money will generate very good income.  This good
income will go to become support over there.  There will be a
continuous stream."

 1     And then this one:  "Talking bluntly, potatoes and carrots,

 2   throwing them.  Do you understand what he meant?  No."

 3     Mr. Wadi:  "Fine, man.  Rifles, grenades and rockets,

 4   enough with that," to which Barodi chimes in, "Exactly,

 5   exactly."

 6     That is conspiracy.  All counts, all in, no question of

 7   intent, no question about entrapment, purely predisposed.

 8     This was one of the times where Baker testified that he was

 9   giving Wadi, Mr. Wadi, the opportunity to back out, but didn't.

10   "No.  This conversation has not changed.  But the main thing

11   is, this kind of discussion shouldn't be carried out over the

12   phone.  You know?  You never know who's going to be listening.

13   You start talking about this stuff.  Everything's being

14   listened to.  The WhatsApp is being listened to.  If you say

15   grenade" -- he used the English word, or he used the Arabic

16   word for grenade, you say it in a different language -- "it's

17   being listened to."

18     Keywords.  "Murder, I want to kill someone, being listened

19   to."

20     All in, no question of entrapment.

21     "Tell him they want weapons, ammunition, anti-aircraft."

22     "Coffee is a cover.  The coffee and whatnot are for

23   transferring money.  That's all."

24     "I have my God's law.  The law of the United States or any

25   other stupid law, as far as I'm concerned, this is the last

thing I care about/think about/pay attention to."  "Like they
say, I don't give a damn.  They can put me in jail.  I don't
give a shit."  "They can put me in jail."

Ladies and gentlemen, Imad Eddin Wadi and Daniel Ahmed
Barodi and others combined, conspired, confederated and agreed
with each other to commit the following conspiracies:  As to
Count 1, conspiracy to commit murder and maiming abroad; Count
2, conspiracy to provide material support and resources,
knowing and intending that that money and property were to be
provided to a foreign terrorist organization; and Count 3, a
conspiracy to provide material support and resources, knowing
and intending that that money and property were to be used in
preparation for and in carrying out a conspiracy to commit
murder and maiming outside of the United States.

So I go back to the question I asked you at the start.
Have we proven defendant's guilt of each of these three counts?
I submit that we have.  Every element, each count, beyond a
reasonable doubt.

At the start of this trial each of you took an oath that
you would return a true verdict.  And I submit to you that
under the laws instructed by the Court, under the evidence that
has been presented to you during the trial, that the only true
verdict as to each count is guilty.

THE COURT:  Mr. Swift.

MR. SWIFT:  Yes, Your Honor.  Can we have about one

```
 1   minute in place while we change over the computer?
 2             THE COURT:  That's fine.
 3             MR. SWIFT:  Is it okay that I present from here?
 4             THE COURT:  If you stay right there.
 5             MR. SWIFT:  I will stay right here.
 6             THE COURT:  Okay.
 7             MR. SWIFT:  If for some reason I were to mess this up,
 8   let me know.  Okay.
 9             THE CLERK:  Yes, sir.  I will.  If it vanishes, I'll
10   let you know.
11             MR. SWIFT:  Okay.
12             THE COURT:  Are the monitors in the jury box working?
13             THE JUROR:  Yes.
14             THE COURT:  Okay.  All right.  Go ahead.
15                       CLOSING ARGUMENT
16             MR. SWIFT:  Ladies and gentlemen of the jury, and may
17   it please this Court, 2016, Mr. Wadi wasn't looking to fund
18   terrorism.  When he met Mr. Baker, he was looking to fund a
19   slaughterhouse.  Not a slaughterhouse in Syria, a
20   slaughterhouse in Colombia.  Not to kill people, to send beef,
21   halal beef.  He'd gotten a great business plan.  And Mr. Baker
22   had gotten along with -- gotten there.  And the evidence is
23   going to show the government took advantage of that situation.
24        And the policies and laws of the United States forbid --
25   demand a verdict of not guilty.  You see -- and we're going to
```

1    start out by talking about entrapment.  The judge gave you that

2    big instruction, that's what you're going to use at the back.

3    I like to say -- and sometimes you got to get to the end of the

4    book to find out what the case was about.  In this case, you go

5    to the end of the instructions.  I'm going to highlight some

6    stuff before we start talking.

7        Entrapment is where somebody doesn't have an intent or

8    purpose to violate the law that's charged but is induced or

9    persuaded by law enforcement or their agents to commit a crime.

10   That person is a victim of entrapment.

11       Now, government talks in some parts on this -- and we're

12   going to be looking -- what you're really examining in the

13   first part is the government's conduct.  Okay?  Now, it's not

14   in this part wrong for the government to come with an

15   undercover.  That's what the instruction says.  And use that

16   undercover to present an opportunity to violate the law.  Might

17   be a favorable opportunity.  Hey, look.  You know, I've got a

18   great cocaine deal for you.  Great cocaine deal.  The guy

19   comes, well, hey, yeah.

20       Now, it's part -- that's not necessarily at all unlawful.

21       However, the burden's on the government for you to find

22   beyond a reasonable doubt that anything at all could -- that

23   anything at all occurred respecting the alleged offense

24   involving the case, the defendant was ready and willing to

25   commit the crime at the beginning.  So where we're going on

1    that is 2016.  Not during the course of the negotiations, but

2    2016.  Let's look at the start, before we start.

3        A reasonable doubt.  What is a reasonable doubt?  That's

4    what would cause you, in something of -- an affair -- a

5    personal affair.  For this purpose what I like to -- sometimes

6    on part is an operation, because we're going to be looking at

7    the doctors and all this stuff.  I want you to look at

8    everything that's said and say, would I trust that with going

9    in for an operation?  No.  We put a lot of trust -- and that's

10   a big decision in your life.  I'm going to get a very big

11   operation.  Okay.  Let's think about it that way as we go

12   through.

13       The burden's on the government to prove, one, that he

14   wasn't induced or persuaded.  The government didn't cause this.

15   And that he had the -- or that he had the predisposition

16   beforehand.

17       Now, the first question, we're walking through is, does the

18   evidence establish that the government induced or persuaded

19   Wadi to commit an offense?  I think there's three reasons it

20   does.  Number one, the government suggested every criminal

21   venture.  At no point will you -- going through all this

22   evidence, did Wadi ever come to the government and say, hey,

23   I've got this criminal plan.  At every point the criminal plan

24   comes from the government.  We'll see that as we go through.

25   I'll show you the evidence of it.

1       Second, at no point were Wadi and Barodi willing to do
2  anything criminal if the -- if they weren't getting funding for
3  their slaughterhouse.
4       And third, the government keeps changing what they have to
5  do.  And you'll see that.  They're not changing what they'll
6  do.  The government keeps changing it.
7       Who's inducing criminal action, if I'm the one saying, hey,
8  could you do this?  Could you do that?  Could you do the other
9  thing?  I'm the one asking you to do this.
10      Government suggested every criminal venture.  Baker,
11  after -- after introducing that -- the Sheikh, and we'll talk
12  about him at length, he says, funding Fatah al-Sham's a
13  prerequisite.  Mr. Wadi didn't come to Mr. Baker and say, I
14  want to fund Fatah al-Sham.  Do you have any investors?
15      Mr. Wadi didn't say, once we have the Sheikh, hey, I want
16  to do a slaughterhouse.  Would he be willing to use some of the
17  profits or give some of the money to Fatah al-Sham?
18      No.  This all comes from Baker.  Mr. Wadi doesn't even
19  bring up Fatah al-Sham unless Baker's asking him about it,
20  asking him again and again.  And he tells him at the beginning,
21  I don't know who Barodi's relatives are with.  Keep asking.
22  Keep asking.  Guess.  Get it wrong.  Move.  Go on it.
23      Taher.  4,000 support -- 4,500 in support of Fatah al-Sham.
24      Baker.  4,500 for Ahrar al-Sham to buy weapons.  And we'll
25  talk about why that matters.

1     Sheikh.  The percentage of the profit -- the Taher --
2  Sheikh's percentage of profit to Ahrar al-Sham.  Always coming
3  from the government.
4     Baker.  No charity, percentage of your profits can fund
5  orphans.  Percentage of your profits.
6     But the Sheikh's, those buy 450,000.
7     Each time the criminal actor, the one who wants to act
8  criminally, is coming from the government.
9     In July 24th, 2018 -- and we showed you from Government's
10  Exhibit 6 that what the Sheikh wants, his prerequisite is
11  funding Fatah al-Sham.  For this deal, Mr. Wadi's prerequisite
12  isn't that.  He'd happily take the $13 million.  The
13  government's prerequisite is that he commit a crime.
14     And August 29th, the Sheikh tells -- again, Taher, who's
15  representing the Sheikh, tells Mr. Wadi what the Sheikh's
16  interest in doing is funding Fatah al-Sham.
17     On August -- on October 18th, okay, after Mr. Wadi's made
18  his proposal -- he's making a proposal.  You can go back and
19  look at the exhibit -- on the slaughterhouse, you will note
20  that nowhere in that proposal is 13 million for the
21  slaughterhouse and money for Fatah al-Sham.  That proposal was
22  for a slaughterhouse.
23     Okay.  You get nine, but five percent has to go to Fatah
24  al-Sham.  Is that Mr. Wadi's idea or the government's?
25     Then it changes.  And it changes on -- in the October 10th

1  and November 8th meeting.  And it suddenly goes.  Okay.  500 or

2  450,000 to buy weapons.  We're going right along, just money.

3  And part of the reason for that change, ladies and gentlemen of

4  the jury, is something the government had talked about.  So,

5  you see, material support to a designated foreign terrorist

6  organization can be anything.

7      Government's plan is get Wadi just to send money to Fatah

8  al-Sham.  That's a crime.  That's it.  We're done.  That's

9  their plan.  But there is a small problem with that plan.  And

10  we'll get to that in just bit on it in part.

11      On January 17th, it changes here.  Sheikh Nasser Sabah will

12  give you 13 million.  And we'll get to that.  After the meeting

13  down in November, it's not good enough to get them to -- you

14  know, there were problems.  So they change -- the government

15  ups the offer.  13 million.  He can pay for anything.

16      Next, Wadi and -- Barodi and Wadi are not willing to do

17  anything, criminal act, without funding for a slaughterhouse.

18  In August 29th, the first meeting, hey, the Sheikh comes in.

19  His real interest is Fatah al-Sham.  The sea is full of tahini

20  and these other business stuff, but his real interest is Fatah

21  al-Sham.

22      Now, I'd submit to you that this would be a very, very

23  different case if we'd left it here.  We also wouldn't be here.

24  You know why we wouldn't be here?  Because he wouldn't have

25  done a thing.  Not a thing.  He's here for a slaughterhouse.

1    So they have to come back in October.  In October they say,
2    nine million for the slaughterhouse, or eight and a half.  Now,
3    that's not enough to buy it.  How do we know that he wants the
4    slaughterhouse?  Because he keeps wanting to talk to his
5    partner to find out, hey, can we do it for that, you know?  On
6    the slaughterhouse, the incentive.
7    And on February 19th -- and we'll talk about that one at
8    the end of this because I think it really shows you a lot.  On
9    February 19th, even for the first principal part, the first
10   payment of 250,000, three-fifths of it goes to the
11   slaughterhouse.  We're not taking any money or doing anything
12   without assurances on our slaughterhouse.
13   Why are they here -- or why is Mr. Wadi here?  He's here
14   for a slaughterhouse.  Government's here trying to cause a
15   crime.
16   And one of the things to ask yourself is, if they'd never
17   promised Mr. Wadi a slaughterhouse or money for it, would we be
18   here?  Would we be here?  And you've got to be convinced beyond
19   a reasonable doubt that we would.  Okay?  Beyond a reasonable
20   doubt, we'd be here.  No slaughterhouse, just come to Mr. Wadi,
21   fund fighters in Syria, he'd have done it.
22   And you see that throughout.  Mr. Wadi is always talking to
23   him.  You know, he wants the funds for the slaughterhouse.
24   That's on August 29th.  And when this -- he says, I'm not going
25   to sucker you.  I'm not going to give it to you.  But there was

no -- there was no deal.  Mr. Wadi doesn't come back to him and
say, here's our plan.  Here's our plan.  We're going to get --
we've been doing this for a long time.  Let me get it to you.
Okay?

Probably be a far different case if he'd done that.  But we
know he wouldn't have done it.  We are definitely interested in
the business, and I've been looking at the information you
sent.  That's what he sends him later, Taher.  And you heard
that when he was on the stand.  I read through that email, and
he agreed that's what he sent.

You get -- and on October 9th you get the nine million.
Needs to talk about the slaughterhouse.  And you see that,
again, in the government exhibits.  As they came by, you can
see Mr. Wadi trying to get his slaughterhouse or the funding
for it.

And in February 19th, okay, after all of this, after
basically six months of negotiations, what Barodi -- 250- and
other with -- out of the -- a thousand is going -- a hundred's
going to them.  And we'll talk about what the hundred was going
to buy.  It's not exact, a hundred to be exact, almost 82,000
exactly.

And at some point Baker asks, why only 82-?  Why not the
full amount?  Why not 2,500 at least to the fighters right
upfront.

Wadi, the slaughterhouse down payment.

1       I submit to you -- and we'll go toward this on part -- on
2    whether he had the intent.  If my interest is funding fighters
3    and that's what I'm here to do, and somebody says, hey, look,
4    first off, submit -- give me -- get the fighters 250-, and
5    we'll go from there, and that's what I've been doing and that's
6    what I'm in the business of doing it and that's why I do
7    business, as the government would push this, then I say yes.
8    What else would I say?  What else would I say?

9       They don't say yes.  And as I said, they keep changing
10   them.  First, it's a prerequisite in Government Exhibit 5.
11   Sheikh wants to fund Fatah al-Sham.  Then, okay, if you'll help
12   us fund Fatah al-Sham, if you'll help the Sheikh fund Fatah
13   al-Sham, you get 8.5 million or thereabouts.

14      In the middle of the deal they had to change because
15   Barodi's relatives are with Fatah al-Sham -- aren't with Fatah
16   al-Sham.  So I talked to you about that.  And it becomes very
17   clear in this.  They've been guessing.  Mr. Wadi guessed.

18      Let me ask a question.  This -- it goes back to intent.
19   How could he get something so wrong?  How could he get that so
20   wrong?  Seriously.  In this process, he's sitting there, okay,
21   and he doesn't know who his relatives are with?  They've been
22   doing this for years, and he doesn't know who he's funding?

23      And when you go back and you look, what you see is that on
24   the part he says I don't know, and he keeps getting pressure.
25   So he gives an answer.  He guesses, and he guesses wrong.  But

the fact that he had to guess in the first place should tell
you something.

And at some point before the meeting, having heard that
it's a condition, he calls Baker on the night before.  Now,
that wasn't a call -- or excuse me.  He calls Mr. Barodi.
That's not a call Mr. Baker wanted to have happen.  But it
happened.  It happened.  And he asked him, he says, Ahrar
al-Sham, does that matter?  The government seems to act like,
no, that doesn't matter.  It matters.

What's the problem?  Well, Fatah al-Sham, al-Nusra Front,
HTS, all the same group, it's a designated terrorist
organization.

He didn't -- the judge did not instruct you that Ahrar
al-Sham is a designated terrorist organization.  And that's
because, as both Professor Lesch and Professor Abboud said,
Ahrar al-Sham is not a designated foreign terrorist
organization.

I think there's an easy way to kind of think about this.
Foreign terrorist organizations are enemies of the
United States.  They're designated as enemies of the
United States.  Non-designated organizations are not enemies of
the United States.

Now, just because you're not an enemy, there can still be
some problems.  But if you give anything to an enemy, that's
against the law.  Whereas, if you're not an enemy, it depends

1    on what you give, depends on what you give and what for.  Okay?

2       So just giving money to a group that's not designated isn't

3    a crime.

4       To fix that problem, in jumps Baker.  The first time we

5    hear about weapons, who's it from?  Was it from Mr. Wadi?  Hey,

6    they've been buying weapons forever.  Nope.  It's from Baker.

7       Of course, to help him with the buying of weapons, to help

8    them.  He's had 24 hours.  May have talked it over with the

9    government.  May not have.  Thought about the problem in the

10   car, maybe 18 hours before this meeting.  There's a problem.

11   It's not going to be the plan we have in place.  Let's change

12   the plan.

13      Okay.  We're cool.  We're going down.  We're going to buy

14   weapons.  We're good to go.  We got a new plan.  Okay?

15      Now, the next problem comes up is, you see, nobody told

16   Barodi about the change in the plan.  If you look at the

17   evidence, you see that.  Barodi starts into a proposition.

18   Now, what Barodi doesn't say at the beginning of it is, now, we

19   have a cover scheme to get weapons there.  Barodi starts in.

20   And he says, they distribute it here, there, et cetera.  We

21   distribute to the children.  Okay?

22      And at some point an unidentified male.  Now, we heard from

23   Taher as to why.  Interesting fact, Baker's in here, and he

24   won't identify it.  I can't tell.  I can't tell.

25      Taher's been talking to Wadi -- what?  Four times?  Four

1    times?  Baker's known Wadi since 2012.  Baker can't identify

2    it?  I submit to you, ladies and gentlemen, because the guy who

3    always jumps in to fix it jumped in.

4        And these guys want the money.  That's something you have

5    to keep in mind at every step.  We'll talk about that again.

6    They want the money.  So it changes.  It's for cover.  The

7    problem is that when they talk to Abdul Jabbar, it does not

8    seem like he's going to buy weapons.  The prescripted, we're

9    going to call somebody and do this, we looked at the beginning

10   of that tape.  He starts, I was at a shelter, all this stuff.

11   He's got his -- I have videos.

12       No, no, no, no.  We're going to go talk about -- no

13   weapons, because he has nothing to talk about on weapons.  Not

14   because they're trying to hide something.  And when we keep

15   asking him questions, we start to see that.  When we ask him,

16   what do you need?  Lack of livelihood.

17       Now, there is a phenomenon called cognitive bias.

18   Cognitive bias isn't the same as --

19           MR. ROOMBERG:  Your Honor, I'm going to object.  This

20   was not part of any evidence.

21           MR. SWIFT:  I think I have a fair argument on the

22   part.

23           THE COURT:  Overruled.

24           MR. SWIFT:  We have -- there's a type of bias.  I

25   don't like this group or that group.  But there's also the idea

1 that, I've already got my mind made up.  And the more my mind

2 is made up, okay, that's what I'm going to see.

3     My wife has a phrase for it.  She says, if you're a hammer,

4 everything's a nail.  Okay?  Taher is a hammer, and

5 everything's a nail.

6     Lack of livelihood is, they're killing people.  It sure

7 sounds to a reasonable person looking at this, hey, that sounds

8 like they need a job.  Okay?  They're missing the essentials.

9 Why don't you say, hey, we're missing all our arms.  They've

10 been moved.  What we know I the part is they've been moved up

11 to Idlib.  They don't have the essentials like bags.  They got

12 on buses.  What do they need?  Humanitarian aid.

13     Do they have medical care?  No one to take care of them

14 financially.  Plenty of deficits.  Sounds like humanitarian

15 aid.

16     When they ask him about weapons, to be frank, we can't

17 bring them in.  Keep pushing.  Well, I guess we could buy them

18 from somebody.  But does he sound excited?  Yes.  Get us

19 weapons.  No.

20     I don't have issues but for the young men and these issues,

21 the part.  How about if I want to arm my battalion?  I'm a

22 military commander.  Okay.  Let's be very frank.  We need

23 10,000 rounds of ammunition.  We're running low on this or low

24 on that.  Laundry list, be frank, tell them what you want.

25     Again, if Abdul Jabbar isn't going to buy weapons, it's not

1  a crime.  If he sends humanitarian aid to a non-designated

2  group, not a crime.  To fix this, Baker visits with Wadi in

3  January.  Again -- by the way, if it was a crime, we're done.

4  We're done.  If he says, hey, look, I'm going to buy all these

5  weapons, do all this stuff, we don't need a January 13th

6  meeting.  We're done.

7      Okay?  What's he tell him?  You know, he says -- orphans, I

8  hate -- I have whole charity institutions.  However, I've come

9  to hate this.  He leads Mr. Wadi right down the path to what

10 he's got to do.  Mujahideen -- I want to make sure.

11     Now, if we were sure, as the government suggested from the

12 stand, why do we need this conversation?  For what purpose

13 would it serve?  We come back in and say the Sheikh has to have

14 that?  So the way we change that now is we got to make sure.

15 And since they can't buy them, you have to.

16     Government induced or persuaded every single violation,

17 every single one.  At no point does Mr. Wadi come in and say,

18 here's my criminal plan.  At every point it's in response to

19 the government's request.

20     The burden's on the government to prove beyond a reasonable

21 doubt they did not induce Wadi.  And here's what they have to

22 come back with.  He was not induced with a federal offense

23 because we didn't pressure him.  Okay.  Really?  Who is

24 pressuring who here?  Wadi and Barodi had a good idea for a

25 halal beef business.  The government created the prerequisites.

What did they want to do?  All they wanted to do was ship halal beef from Colombia to Islamic countries.  That's a good business plan.  Beef's cheap in Colombia.  No dispute. Colombia would offer export incentives.  Ship the beef to the Middle East, had to be halal.  They believed it would have been incredibly profitable.

Even Baker.  Nobody's told you that this wasn't a legit business plan.  It is a legit business plan.  There is, however, a major problem with it.  They need a slaughterhouse because the beef's got to be halal.  And we heard there aren't very many Muslims in Colombia.  So the slaughterhouses are not halal.  And if it's not halal, it's not going into the Middle East.  Their great plan, small problem.  And that costs $10 million, at least.

Now, they thought they still had a great opportunity because they were free of bankruptcy.  But what they needed was an angel investor.  An angel investor, ladies and gentlemen, is someone who comes into a startup corporation.  I've got a great idea and just don't have the money to fund it.  And they've got the money.  They take the share of the profits, but I win.  I get my business off the line.  We see this.  It's called *Shark Tank*.  You walk in.  You make your presentation.  Here's your money.  Or no.

Okay?  They need an angel.  Instead of an angel, he got Baker.  Let's talk a little about Baker.  Baker, of course, is

1  the agent of the government.  And in the instruction he's the

2  agent of the government.

3      Baker is no angel.  Baker's being paid by the FBI.  He got

4  $338,000.  He acknowledged he had to pay taxes on that stuff.

5  Baker's above the rules.  Baker tells you, for my special job,

6  I don't have to do that.  I don't have to -- never asked the

7  FBI for help.  He never reported it, and to this date he's

8  never filed it.

9      Now, he said he has a meeting with the IRS and he's going

10 to file amended.  The only year you file an amended tax return

11 for is this year.  And Mr. Baker doesn't have to ever worry

12 about actually paying those taxes, because what did Agent

13 Martinez tell you?  No.  I'm not reporting it to anybody.  I

14 haven't reported it.

15     He's not paying.  Are you kidding?  And the reason he

16 doesn't have to pay is he works for them.  He's above the law.

17     Same thing with the bankruptcy report.  They know about it.

18 They know he didn't list his income.  Okay?

19     He's been sued for fraud.  Does he have to worry about it?

20 No.  No.  Why?  Because he works for them.

21     And who is he representing?  The investor.  He's been a

22 longtime friend of Mr. Wadi, and he tells about Sheikh Nasser.

23 He's a member of the royal family of Kuwait.  And that's a lot

24 of money.  Okay?

25     You can't imagine Baker tells Mr. Wadi the amount of money.

Oh, Mr. Wadi's been in the Middle East.  I think he could.  So this comes to the rescue.  They come down to December.  Does he come up in December and say, hey, at the very start, there's a sheikh who wants to fund fighters in Syria in December 16.  He wants to fund fighters in Syria.  And I think I could put you with him, and he might fund this business?

No.  No, he doesn't.  No.  Let's get the hook in the fish a little.  Let's hook that fish.  Let's drive it home before we start letting him know that he's actually on the line.

He meets with him.  You know, unfortunately, Mr. Barodi thinks -- or Mr. Wadi thinks the deal's fallen through because, doggone it, Barodi's detained.  And no Barodi, no deal.  Early on, that's what he tells him.

But, oh -- coming back to that one for a moment.  But it turns out that that's because the Sheikh wants to fund Fatah al-Sham, and that's his prerequisite.  You know, of course, after that, Barodi's with Fatah al-Sham.

And Baker has complete control of Mr. Wadi.  And that's something you should remember and watch, as you see in those videotapes and you saw there, Baker has complete control of him.  He can get him to do almost anything.

Wadi works for him, garage repair, plumbing repair.  He's loaned Wadi -- Wadi owes him $4,000.  He has control of the investigation.  He chooses Sheikh Nasser.  He knows what will appeal to Wadi.  And he's good at this.  When Mr. Wadi gets on

the wrong track, he interrupts him.  He talks over him.  He
leads him exactly where he needs him to go.

He decides what to record and what he doesn't record.  And
you can run right over Mr. Wadi.  Okay?  We saw that in court.
We played that part for you.  He asked for a lawyer at this
point.  He wants to know what he's been charged with.  No.  The
agents just, ah, if we don't answer that question, he'll just
keep talking.  We don't have to clarify.  Let's just go.
Mr. Wadi won't stand up for himself.  And he doesn't.

The money.  The pressure put on Mr. Wadi.  You get nine
million, the possibility of more, 13 million.  Government may
claim, when they come up here, they didn't -- Wadi doesn't need
it.  After all, there's talk of a $13 million letter of credit.
Now, the government didn't put that into evidence.  And there's
a reason for that.  A letter of credit doesn't equal money.
What it means is that Mr. Wadi can ship halal beef to the
Middle East where there's a guaranteed buyer.  But if you want
to get money, you've got to actually ship the beef.  And he
can't do that without a slaughterhouse.

And we know Wadi's financial conditions.  The idea that
Mr. Wadi doesn't need money is ridiculous.  His car's been
repossessed.  He's borrowed money from his children, from
Baker.  Agent Martinez acknowledged that he has credit card
debt.  He's financially limited.  He's working as a handyman.
He has a ton of failed businesses, and he has bad credit.  Does

 1  that sound like a guy who can go to the banks and borrow ten

 2  million dollars?

 3      And the government knew all of this.  Why?  Why did the

 4  government know all this?  Because Baker's his friend and Baker

 5  knew it all.

 6      On January 17th -- the government's not putting on pressure

 7  after the October meeting.  Why does Baker say, as you can

 8  imagine, the money is at your disposal.  Anything then even --

 9  even the money that will come, he does not want to, as an

10  investment.

11      Right here.  Fine.  In other words, are we going to buy the

12  slaughterhouse or not?  Okay.  Go at it again.  The man will

13  pay the amount you asked.

14      How much did Wadi ask for, again?  13 million.

15      The man will pay the amount you asked.

16      Wait a second.  Who's pressuring who?  We can do it.  If

17  you'll -- and a lot of those statements that the government

18  played come out right after the Sheikh promises to pay 13

19  million.  Your dreams are coming true.

20      8.5 is now 13 million, if you'll buy weapons.  Now, we

21  can't just send it now.  You need to buy weapons.  And, of

22  course, that's because Abdul Jabbar can't buy weapons.

23      So the first question is, did the government induce Wadi to

24  agree to send weapons to Ahrar al-Sham?  Do you have a

25  reasonable doubt -- but remember, I don't have to prove to you

1  that they did.  They have to prove beyond a reasonable doubt

2  that they didn't have anything to do with this; that they

3  didn't induce it, when every step was pushed by them, every

4  step.

5      Second question.  And this is where they're going to try,

6  was he ready and willing to break the law?  Yeah.  It doesn't

7  matter if he was ready and willing.  And that does -- the

8  instruction says that.  But they have to prove this beyond a

9  reasonable doubt.  I don't have to prove that Wadi wasn't ready

10 and willing.  That's not my burden.

11     It sits squarely on that table.

12         THE COURT:  Mr. Swift.

13         MR. SWIFT:  I'm sorry.  I'll stay seated.

14     And they rely -- and they showed up there all of Wadi's

15 statements, right?

16     Now, here's the really interesting thing.  First thing that

17 I would have you point out on those statements.  When were they

18 made?  Did they bring you any statements from before this deal

19 got going, that I'm funding them?  In fact, the only statement

20 before Fatah al-Sham that Mr. Wadi ever made was, Barodi's not

21 sending any money.  Before the prerequisites, before we start

22 negotiating, the only statement is, there's no money going.  He

23 just has relatives over there, who I don't know who are with.

24     And as I said, I want you to look at these statements on

25 beyond a reasonable doubt -- is if I heard these statements

1    under these conditions, would I trust a doctor to operate on

2    me?  And we'll look at each one of them.  And, you know,

3    there's a part for looking at credibility of witnesses.  That's

4    in your instructions.  I suggest respectfully to you that it's

5    also helpful for looking at the statements in context here in

6    determining whether there's a reasonable doubt to their

7    believability.  Okay?

8        Did the witness impress you as honest?  And so we're going

9    to talk about what did -- in the course of these negotiations

10   would Mr. Wadi -- as honest as to his capabilities, what he's

11   done in the past?

12       Well, what did Mr. Baker say about that?  He exaggerates a

13   lot about his past dealings.  Why is he doing that?  What did

14   Baker say?  To impress us, right?  To impress us, the

15   investors, because he wants to.

16       So can we trust things?  You know, look at, it might be an

17   exaggeration of anything that had happened, particularly when

18   it's a prerequisite?

19       Does he have any particular reason not to tell the truth?

20   If he can't do what the Sheikh wants, is there ever a point

21   where he'll get -- you know, I can't do it.  I'm sorry.  I

22   can't do it.  I don't want to do it.  You'll give me the 13

23   million, right?

24       No.  No.  That's the prerequisite.

25       Does he have a personal interest?  Well, yeah.  He has 13

1  million by the end.  Say what they wanted to hear.

2      It's at your disposal by January 17th -- or by January

3  13th -- or 19th -- I'm -- in January of 2019.

4      And, of course, we don't have everything that he said,

5  thanks to Baker.  So he said they have lots of other calls.

6  And we know that Baker leads him.  So can we trust that Wadi's

7  speaking his words or what Baker has suggested to him to speak?

8      And a question here.  Ladies and gentlemen, if they'd been

9  doing this way before and we subpoena all the business records

10  and we subpoena all this stuff, there is no evidence, none, no

11  unusual transfers out of banks.  Nothing?  Nothing?  We've been

12  doing this way before.  Hey, yeah, I can do it.  I'll do it.

13  No.  It's, yes, sure.  I want -- can you pay me 13 million?

14      Were they really willing and able to fund Fatah al-Sham?

15  Of course not.  Of course not.  The only reason Fatah al-Sham

16  is in this case is that Barodi guessed -- is that Wadi guessed.

17      And that's a really wild guess, isn't it?  A bad guess.  In

18  2017 and 2018 what were Fatah al-Sham and Ahrar al-Sham doing?

19  And the testimony's been fighting.  And this is an interesting

20  thing -- we know, because we've gone far enough down the story,

21  who Barodi's relatives are with.  Ahrar al-Sham.

22      So he sends this thing.  Now, this guy, the testimony he's

23  with HTS, which is Fatah al-Sham.  Right?  Okay.  So if I'm

24  with a group, that's my enemy right now.  And what are we

25  saying about him?  Those who commit crimes against civilians

1   and rebels and acts of terrorism and racketeering.  This isn't

2   like, oh, this is a great guy, is it?  Look at my hero.  That

3   my hero?  That's a guy who's attacking my family.  Government

4   thinks somehow that's inculpatory.  But that's the guy who's

5   attacking my family.

6       And we know that.  Professor Abboud, et cetera.  Ahrar

7   al-Sham fought HTS from 2017 to 2019.  Professor Lesch also

8   acknowledged that.  And Ahrar al-Sham gives up control in Idlib

9   January of 2019.  Moves up into the mountains.  And we'll talk

10  about why that's important later.

11      "We have everything prepared for them.  He has no problem.

12  Abu Husayn has sold more weapons than I can tell."  Now, that

13  was said right after $13 million was promised.  All you got to

14  do is find somebody who will assure us that they will buy

15  weapons, and you get $13 million.

16      So in February they come in, and they say, we can't buy

17  weapons.

18      I will submit, ladies and gentlemen of the jury, that you

19  can use your commonsense.  If I have known an arms dealer for

20  years, and I have basically unlimited money to buy with, why,

21  for what reason, after that conversation, he has tons of money,

22  more than you can imagine, would I limit the amount to a

23  hundred thousand dollars?  Why would I do that?  I'm coming

24  back with my best offer.

25      Hey, bad news.  It's going to cost a million to get arms.

1    Bad news.  We get the 13 million.  But if the Sheikh has a
2    million, we can get the weapons.  He's got contacts.  Maybe
3    your arms dealer has a minimum, but they weren't giving a
4    minimum going in.  And their part on Wadi, hundred thousand
5    dollars for rifles.
6        Taher sat there and said, that shows that he knows the
7    price of weapons, the price of weapons.  The $50,000
8    Kalashnikov.  I wish.  It would not be the weapon of choice
9    throughout the world, in poor countries like Syria, if they
10   cost $50,000 a copy.
11       What he's saying is, I was BSing.  I don't want to come in
12   and say I don't know how to do it.  I can't do it.  I never had
13   an idea to do it.  I said that just so you -- I could get the
14   13 million.
15       See, if you've been dealing in arms and sending them since
16   way back when -- no arms dealer should do it.  And that's where
17   we come to that idea of the cocaine dealer.  If I'm a cocaine
18   dealer, okay, you come to me and you say, hey, look, I want to
19   buy a hundred thousand dollars' worth of cocaine.  I can get
20   it.  I know the people to get it from.
21       Okay?  Maybe I come back and say, look, it's hard on the
22   supply.  I can only get 50.  You buy 50?
23       And may have changed up quantities or something like that
24   on supply.  But I don't come back to you, if I'm a cocaine
25   dealer, and say, I can't get any cocaine.

1    Next question is, if they'd sent money all this time to
2  Abdul Jabbar, why couldn't they -- why could Abdul Jabbar not
3  recognize him by voice or phone?  He talks to them all the time
4  over there.  Okay?  And he doesn't know who he is.  You're
5  sending 10,000, $5,000 to relatives, and you don't know who
6  they are.  And, obviously, you can contact them.  You can use a
7  cellphone.  Obviously, we could do it.  We get on Skype or
8  WhatsApp or whatever call, and you can do it.
9    So you've been sending the money for all this time, and
10  they don't know who you are and you don't know who they are?
11  Now, I guess maybe your niece or nephew or something, you
12  might -- who you haven't actually seen, send $25 to or stuff
13  like that.  But this nephew of your brothers, who you've never
14  met or seen, you're sending $10,000 and we have close
15  connections.  Does that make sense?
16    See, when you look at the actual evidence, it doesn't back
17  up the words.  So let's back up for reasonable doubt on those.
18  If a doctor came in to you and said, I've been to Harvard
19  Medical School.  I just graduated.  I am the best in my field.
20  And I guarantee this operation.  And just happens to be
21  happening at Harvard and nobody knows him -- you're walking --
22  who's that guy?  Who's that guy?  Well, maybe it's a big
23  school, but nobody there knows him.
24    You know, not so sure about that Harvard claim, are you?
25    Haven't seen the diploma.  Probably go check on it.  I

don't know.  Am I going to trust this guy who's making claims
that people aren't acting to?  Okay?

Going back, when I say I absolutely can get the pacemaker
for your heart.  It's this model, and I can get it.  You know
what?  I can't get the pacemaker for your heart.  It won't be
that model.  It won't be anything like it.  I have long
connections with pacemaker people.  No, no, no, no.  We just
can't do that, et cetera.  And I put a different price on it.

You believe he does pacemaker business?  You're going to
say, okay, Doc.  Go ahead.  Stick it in my heart.  Whatever you
got here.  Because that's what the government's asking you to
do.

Okay?  So it's down to this, Mr. Wadi's statements at the
end.  I wanted to help my family.  I wanted to help poor people
in Syria, in his interrogation.  That's where we ended.

You know what?  He did have a bit of a predisposition.
February 13th, 2019.  You saw these excerpts.  And you saw the
government say on -- he can't lie to them.  And you'll note on
the indictment that there's no charge for lying.

So let's talk about the 19th meeting.  Because all of this,
the next hour was about the 19th of February.  What happened in
that?  This is the only time that Wadi and Barodi make an
offer.  The only time.  Okay?  All other times they're
responding.  But this time they make an offer.

What are they going to do?  Well, 2,500K as a down payment,

1    8.7 million.  Barodi and Wadi will use a hundred K of the down

2    payment to send 82K worth of aid to Barodi's relatives in the

3    mountains.

4        The remaining 150K will be used to make a down payment on a

5    slaughterhouse.  The 875-, purchase it.  The 875- will be what

6    we need for the rest of the purchase.

7        They didn't go for the 13 million for sending arms.  What

8    is the 82,000 going to buy?  Food and drinks so they can eat.

9    Food and drinks so they can eat.  Well, it's appreciated.

10       Why not the full amount?  Why only 82-?  Slaughterhouse

11   down payment.

12       The UCE is stuttering at this point.  Not what they

13   expected.

14       What if he asked me about the issue of weapons?  Tell him a

15   hundred thousand dollars is not significant enough.  Not, tell

16   him we need a million dollars for weapons.  Tell him a hundred

17   thousand dollars -- which who created those conditions for the

18   first time?  They did.  Government, for the first time, didn't

19   create the conditions.

20       Now, let's look at this deal.  Structure.  I get 250-0 down

21   payment.  After receipt of the balance, I'll get -- within a

22   month I'll get 8.75 million.  And if I can't fund weapons,

23   well, I got 8.75 million, and I did what I said I'd do.

24       If you are predisposed and you've been negotiating for four

25   months, don't you offer to commit the crime?  Now, we look at

those numbers.  And it's artful how it is in the indictment.
They sent an invoice.  The invoice, we know how it would be
spent.  And they discuss something else.  But we know how the
money would be spent from what they said in the negotiation.
Artful.

    And the government stood up here and said, it proves it.
It proves it, that they'd send money to do that.

    Now, there are undoubtedly times during all of this that
Mr. Wadi and Mr. Barodi talk about and agree and say they can
and they would ship weapons.  But when it came down to it, they
can't.

    About a year passes from that meeting.  We hear from
Barodi's families again.  Are they calling for weapons?  Gee,
what happened to those weapons?  Where is our bread?  We spoke
about the orphanage.  Are they talking about a dire military
situation?  We have a hundred children.  And the government
acknowledges at points in time here we are talking about
orphans.

    How is your health?  We bought 20 loaves, cantaloupes.
There isn't anything for dinner.

    At this point it's been more than four years.  Mr. Wadi is
frustrated.  He's frustrated about all this talk of weapons.
He's just frustrated, period.  But was it true in 2016 that he
didn't care about the law?  The evidence shows that it wasn't.
In 2016, when the government started this negotiation, Mr. Wadi

1  wanted to build --

2      Oh, is there reasonable doubt?  Because that's what you

3  have to be convinced.  Beyond a reasonable doubt you have to be

4  convinced that Mr. Wadi, in 2016, was predisposed to do this,

5  either because he was doing it, because he wanted to do it.

6      The problem, as I said, is the government didn't give you

7  any statements from 2016.  Baker, from the stand, oh, I knew he

8  was -- slaughterhouse.  We'll see.  We'll test it.  Okay?

9      And the government claims, because we put these heavy-duty

10  incentives -- now, if you want to test, you come to Mr. Wadi

11  and say, I have a wealthy investor who can help your friends in

12  Syria, and he can send you the money.

13      They did that in October -- in August.  They put a promise

14  on it, to some extent.  He didn't do it.  So there's reasonable

15  doubt.  Because I don't have to be absolutely right.  You have

16  to be sure beyond a reasonable doubt that when you look at him

17  sitting there, he was going to do it.

18      And you can't be, because in 2016 Mr. Wadi was not looking

19  to fund terrorism.  He was looking for an investor in a

20  slaughterhouse.  And that means, under the last instruction,

21  when we come to the end of the book, he's not guilty of

22  anything.

23      Now, I'm almost done talking.  Okay?  And the government

24  gets to get up and talk again because they've got to show that

25  what I'm saying is wrong.  Not maybe wrong, not possibly wrong,

1    not even likely wrong, but wrong beyond a reasonable doubt.

2         The moral of this story.  In a Chinese village there was a

3    wise old man.  And some boys decided to come to test him.  Not

4    with a -- with sort of the Socratic method in reverse.  They

5    would see his wisdom.  Their thought was, I have a bird, this

6    little bird.  And we will ask the wise old man, this bird in

7    our hands, is it alive or dead?

8         And it's easy for them to win because they -- no matter

9    what the wise old man says, he'll be wrong.  Because if he says

10   it's dead, you let it go.  If he says it's alive, you just

11   squeeze a little, and it's dead.

12        So they go to the wise old man, and they say -- and say, is

13   the bird alive or dead?

14        And he answered thus:  The fate of the bird is not in my

15   hands.  It's in yours.

16        For the last two years Ms. Saad and our whole defense team,

17   along with myself, have held Mr. Wadi in our hands.  We've also

18   held the idea of the law and protecting against government

19   abuse in our hands.  I hand it to you.  Please do -- carefully

20   with justice.  Thank you.

21             THE COURT:  Ladies and gentlemen, keep in mind your

22   instructions, please.  We'll take a 15-minute recess.

23        (Recess at 11:35 a.m. until 11:49 a.m., jury out)

24             THE COURT:  You may be seated.

25        All right.  We're ready.

1    Mr. Roomberg, you've got more than 45 minutes, if you want

2    it, or need it.

3         MR. ROOMBERG:  Thank you, Judge.

4         THE COURT:  Mr. Harris didn't use -- he only used, I

5    think, 35 maybe.

6         MR. ROOMBERG:  Yes, sir.  Hopefully I won't even use

7    my 45.

8         THE COURT:  Okay.

9    *(Jury enters courtroom)*

10        THE COURT:  You may be seated.

11   Mr. Roomberg, you may proceed.

12        MR. ROOMBERG:  May it please the Court.

13                    CLOSING ARGUMENT

14        MR. ROOMBERG:  Ladies and gentlemen, first let me

15   start with if -- when Mr. Swift was talking about things that

16   you don't remember as being in evidence, there may be a reason

17   for that.  As the Court instructed you, it's not what the

18   attorneys remember the evidence.  What matters is what you

19   remember the evidence to be.

20   Let's talk about entrapment.  As the Court instructed, the

21   government merely providing a favorable opportunity or

22   pretending to be someone else is not entrapment.

23   The government needs to show either, one, that the

24   defendant was not induced by the government or, two, the

25   defendant was predisposed to commit the crime.

1    The evidence shows beyond a reasonable doubt that the

2  defendant did both -- or the defendant was not induced and that

3  he was -- I'm sorry.  The defendant was not induced and that he

4  was predisposed to commit the crime.

5    The whole FBI undercover scenario was based on what the

6  defendant was recorded telling Mr. Baker about his and

7  Mr. Barodi's extremist ties with Muslim Brotherhood arm wing

8  and Fatah al-Sham and about their slaughterhouse opportunity.

9    The evidence shows beyond a reasonable doubt the government

10  did not induce Mr. Wadi.  There was no pressure from the

11  government trying -- in fact, the government was trying to slow

12  the deal up, trying to collect evidence, not pushing it

13  forward.  To the contrary, it was the defendant and Mr. Barodi

14  who were trying to pressure Mr. Baker and Taher, the Sheikh's

15  representative, to get this deal done.

16    The only pressure on the defendant and Mr. Barodi was

17  coming from the fighters in Syria, who wanted their weapons,

18  and from the slaughterhouse sellers, who wanted to sell their

19  property.

20    Mr. Barodi, in his role as the advertising executive and

21  the conduit to the fighters, was sending videos and text

22  messages from the front, showing they need assistance.  Here

23  what they're doing with their fighting.  Here's how we're going

24  to use your money.  We're talking about the beheadings, putting

25  Alawite women and children on the run, setting up a video call

1    with Abdul Jabbar to show his AK-47, saying, this is what we

2    need.  This was all to pressure Baker and Taher, not the other

3    way around.

4        And having a condition about a percentage of the money

5    going for weapons, as part of the deal, as a requirement, is

6    not inducement.  It's a test of their predisposition.

7        They could have just said -- Wadi and Barodi could have

8    said at any point, we don't want to do this deal.  No, we're

9    not going to give these weapons to these bad people.

10       That's not what they said.

11       November 8th, down in Bogota, 2018, not only were they not

12   concerned about weapons going to these fighters in Syria.  They

13   wanted it.  They're outbidding each other to see how much of

14   their own profit they would give to the fighters.  It starts at

15   50 percent, to 70 percent, to 90 percent.

16       This is their incentive.  The money to the fighters for the

17   defendant and for Mr. Barodi was more important than their own

18   profit.

19       You see on the January 17th, 2019, video -- and we know

20   Mr. Wadi gets these same videos.  He says, when you listen to

21   the call from the Mujahideen, you can feel the ecstasy of

22   jihad.

23       Mr. Barodi tells Mr. Baker, as well as the defendant, the

24   pressure he's getting from the fighters.

25       And Mr. Wadi tells Mr. Baker, the fighters are surrounded.

1    And remember, Mr. Wadi said he wanted vengeance against
2  Assad.

3    In his post-arrest statement Mr. Wadi says that he would do
4  anything to help "my Freedom Fighters."  And what's that his
5  code word for?  We heard it previously.  Freedom Fighters are
6  his code word for terrorists.

7    And Mr. Wadi says he tried to buy them weapons once.  If
8  he's a legitimate businessman, who's he going to know in Syria
9  to buy weapons for these terrorists?

10    Most importantly, the government gave the defendant
11  multiple chances to back out of this deal.  January of 2019,
12  Mr. Baker asked Barodi on the phone, and then later in person,
13  because they were all on the same call to Mr. Wadi, whether or
14  not they wanted to still do the deal or whether or not they
15  wanted to get out.

16    Mr. Barodi said he's continuing.  The money will go for
17  weapons to the frontline.

18    Again, through January 2019, each time they're having these
19  conversations they've completed the conspiracy.  How does the
20  defendant respond?  He says he's going through a hundred
21  percent, a million percent.  There's no hesitation on our part.

22    June 17th, 2020, again, Mr. Baker gave the defendant and
23  Mr. Barodi another chance to back out.  But they still said
24  they wanted to do the deal.  Up through June 17th, 2020,
25  knowing all along that the deal was to get the 450,000 for

weapons for these fighters.  The evidence shows there was no
government inducement.

The evidence also shows the defendant and Mr. Barodi were
predisposed.  Mr. Swift argued that Mr. Wadi wouldn't have done
this without the slaughterhouse.  He wanted the slaughterhouse
to cover up -- the evidence shows he was using the
slaughterhouse.  He wanted to do the deal.  He wanted the
profit from the slaughterhouse, but he also was using that
slaughterhouse to cover up the large amount of money that was
going to the fighters for weapons.  The undercover scenario
just matched what the defendant and Mr. Barodi said they've
done in the past, and to go with their slaughterhouse.

The evidence shows the defendant and Mr. Barodi would have
taken the money for the fighters if that's all it was because
they said themselves they sent money to fighters in the past.
But as Mr. Wadi said, it's no problem with the contracts to
send this much money.

How do we know, as Mr. Swift said, that the defendant was
not BSing about all of his past connections?  Because the
details he knew, the details of the battlefield, the details
how to smuggle guns, the details how to smuggle money.  That's
how we know he's not BSing.  He's done this before.

The fact that Mr. Barodi didn't initially recognize Abdul
Jabbar from his brother, who we could have an inference that
they may look alike.  And maybe it wouldn't be an unreasonable

inference that they may have beards.  But, you know, Mr. Barodi
does say, oh, wait.  You've gained some weight.  It's a Skype
call.

The evidence shows the defendant and Mr. Barodi have been
doing this for years.  They had four weapons suppliers.  They
had a network in Turkey where they could sell whatever and get
weapons from Ukraine.  According to the defendant, they knew
how to move money in 20 different ways, including through
*hawala*, where you can move half a million dollars in a suitcase
of cash and not have it go through a bank.

Defendant said, May 24th, 2017, that they can smuggle
anything through the Turkish border.

And the defendant says, when Mr. Baker expressed some
concern, "We've been putting ourselves in danger way before
you."

October 9th, on the drive up to Dallas, 2018, defendant
says he has a Turkish friend named Abu Husayn and he trade --
he can move weapons and has traded arms in huge quantities.

And Barodi then explains how you can send food aid to
Turkey, and the Turkish government will funnel weapons to the
terrorists.

In the meeting in Dallas, October 10th, 2018, the defendant
says he and Barodi have sent smaller amounts, a thousand,
2,500.  But they've never had someone as generous as the
Sheikh.  But, again, there's no problem moving the 450,000 for

1  weapons because of the size of the contracts.

2      At any point in time they could have gone out searching for

3  other investors.  Didn't have to be one.  They could have

4  gotten multiple investors.  But they didn't try.  Why?  Because

5  they wanted to get half a rabbit, half a million dollars to the

6  fighters in Syria.

7      The defendant, as the evidence shows, was traveling the

8  world, getting all these beef contracts, Egypt, Iran.  He had a

9  $16 million letter of credit for beef sales.  He could have

10  gotten a contract with the slaughterhouse for a lower profit

11  margin.  Say, hey, give me this.  Here's the letter of credit.

12  We'll get paid.  He could have gone to a bank with that letter

13  of credit and said, give me a loan for $16 million.

14      Why didn't he do it?  Because if he did that, they wouldn't

15  have gotten the money for the fighters.  And, again, that was a

16  main motivation besides their profit, so much so that they were

17  willing to give up some of their own profit.  Eventually 90

18  percent of the profit would go to the fighters for weapons.

19      They didn't get other investors because for them it was a

20  twofer.  Make money and hit the biggest score for weapons for

21  the terrorists that they've ever done.

22      As the Court instructed, when the evidence shows beyond a

23  reasonable doubt that the defendant and Barodi were ready and

24  willing to commit the crime when the opportunity presented

25  itself, and the government did no more than offer the

1    opportunity, then the defendants were not entrapped.  The

2    evidence shows beyond a reasonable doubt that there was no

3    government inducement.  The only pressure was coming from the

4    defendant and Barodi and the fighters.  The evidence shows

5    beyond a reasonable doubt that they were predisposed to commit

6    the crime, and this was not their first rodeo.

7        Let's talk about the voluntariness of Mr. Barodi's

8    post-arrest statement.  He was told he was arrested.  He was

9    read his rights, and then he read the form with his rights.  He

10   was given water and soda.  It's not like TV.  No one was

11   hitting him or yelling at him.  There were no handcuffs.  He

12   was relaxed.  You see it in the video.

13       Yes, FBI developed a rapport with him first.  Let's talk

14   about Barodi.

15       But the defendant never asked for an attorney.  He gave a

16   conditional question.  If you're accusing me of something, I

17   need to get a lawyer.  But he never said, I want a lawyer.  And

18   that's what has to be done if he wants a lawyer.  Instead, he

19   just went on and answered questions.

20       The agents did nothing wrong.  But for argument's sake,

21   let's throw out everything after 8:47 a.m., and all we are left

22   with is initial lies and minimizing, and we'll leave out the

23   comment about --

24           MR. SWIFT:  Objection, Your Honor.

25           THE COURT:  Overruled.

1          MR. SWIFT:  "Initial lies"?

2          THE COURT:  Overruled.

3          MR. ROOMBERG:  You've seen the recordings.  You've

4    heard the other tapes.  If you recall the times that

5    were stopped -- where I would stop the tape as we were playing

6    that, and I would ask the agent, is that what he said

7    previously on the tape?  No.  But it's your recollection that

8    guides, not mine, not Mr. Swift's.

9          But if we leave out his comment about doing anything to

10   help my Freedom Fighters, and he tried to buy weapons just

11   once, the evidence still proves beyond a reasonable doubt that

12   the defendant and Barodi and Barodi's relatives conspired,

13   agreed to willfully murder, the unlawful killing with

14   premeditation, and maim Syrian and Russian soldiers, behead

15   them after capture, terrorize civilians.

16         Even if you believe defense's theory that Barodi's family

17   was just the Ahrar al-Sham terrorists and not a designated

18   foreign terrorist group, Ahrar al-Sham and Fatah al-Sham still

19   fought and killed each other when they were not in alliances

20   together.  So by attempting to provide money for weapons,

21   including grenades and rockets and rifles and remote-controlled

22   planes with explosives on it, the defendants still agreed, are

23   still guilty of agreeing to give money for weapons to Ahrar

24   al-Sham to kill and maim Russian, Syrians -- Russian and Syrian

25   soldiers and HTS.

1    Likewise, evidence shows beyond a reasonable doubt that

2    they conspired together.  They agreed to provide and attempt to

3    provide material support to Fatah al-Sham, al-Nusra, HTS, when

4    they were fighting together with Ahrar al-Sham in Idlib in

5    March of 2017 and May and June of 2019.

6    The battlefield reports that the defendant and Mr. Barodi

7    were reporting to Mr. Baker was they were all fighting

8    together.  They're in one alliance.  They're agreeing to supply

9    Ahrar al-Sham and, by knowing they're in an alliance, also

10    Fatah al-Sham, a designated foreign terrorist organization.

11    That's what the agreement is about.

12    It has nothing to do with who's the leadership.  It's that

13    the groups on the ground are fighting in an alliance.  They've

14    agreed.  And the important agreement is Mr. Wadi and Mr. Barodi

15    agreed to get them weapons and money for weapons so they could

16    continue their fight.

17    And third, the evidence shows beyond a reasonable doubt

18    that they conspired on Count 3 to provide and attempt to

19    provide material support to murder and maim overseas.  Again,

20    even if Ahrar al-Sham was only still trying to murder and maim

21    Syrian and Russian soldiers, HTS and Alawite civilians, even if

22    you believe the defense theory that Ahrar al-Sham and HTS

23    fought each other at times, even Dr. Abboud agreed both Ahrar

24    al-Sham and HTS did murders, used IEDs, improvised explosive

25    devices, attacked civilians, committed extrajudicial killings

1  and murders, maiming, beheadings.

2      Each meeting, each call, each text, each email was an overt

3  act in these conspiracies.

4      And each person played a role in the conspiracy.  The

5  defendant, Mr. Wadi, he was the salesman to Mr. Baker and to

6  Taher, the Sheikh's representative.  And he was the conduit for

7  weapons to Abu Husayn in Turkey.  Mr. Barodi was the

8  advertising executive passing on the videos of his relatives'

9  terrorist activity to get Mr. Baker and Taher to invest, to

10  show them, we're the real deal.  This is what we do.

11      Abdul Jabbar was the leader of the killers.  He passed on

12  the videos to keep Uncle Barodi happy, to give to the

13  investors.

14      Abu Husayn and the three other weapons dealers, well, that

15  was their role.

16      As the Court instructed, you don't have to do everything or

17  know all the details in a conspiracy.  You can have other

18  people help you.  You just must agree to accomplish or try to

19  accomplish the illegal goal one time.  The defendant and

20  Mr. Barodi agreed and tried to do this deal time and again for

21  three years.  Each time they did it, each time they tried to

22  get Baker and the Sheikh to invest they've agreed, because the

23  condition always was 450,000 for weapons.  They knew it from

24  the beginning, and that's what they were shooting for.

25      And they did it so Abdul Jabbar and his men could murder

1  and maim Syrian and Russian soldiers, Alawite civilians and

2  other opposition fighters when they weren't together.

3      And while the agreement is all you need, we also showed

4  that -- through Dr. Lesch and through Dr. Abboud, that not

5  only -- that some of the battlefield reporting or all of the

6  battlefield reporting was correct when these groups were

7  fighting together.  Dr. Lesch, Dr. Abboud, the defendant,

8  Barodi, March 2017, May and June of 2019, that HTS and Ahrar

9  al-Sham were fighting together in Idlib and in the battle --

10 well, we'll get up to that.

11     Ahrar al-Sham and Fatah al-Sham were fighting on the same

12 sides for days and for weeks.  The defendant and Barodi

13 believed they were in one alliance, and conspired to provide

14 support to HTS through Ahrar al-Sham.

15     Ladies and gentlemen, we're not saying Syrian and Russian

16 soldiers are good people.  What we're saying is, it's illegal

17 for private citizens in the United States, for the defendant

18 here in San Antonio, to choose who dies in an ugly foreign

19 civil war.  The standard is the same if the actions were

20 happening here and they were using these weapons for killing

21 U.S. soldiers and Marines, beheading and wounding them,

22 wounding civilians or murder and maiming.

23     We talk about circumstantial evidence.  Ladies and

24 gentlemen, I submit to you that it's something we do every day

25 in life.  The analogy I like to use is the rain.  You walk

1    outside.  You see the water coming from the sky.  It's raining.

2    Direct evidence.

3        You came in this morning.  It was sunny.  You'd go outside

4    afterwards, sunny, but the ground's all wet.  The cars are wet.

5    Circumstantial evidence that it rained while you were in here.

6    It's something we do every day in life.  Just has a fancy legal

7    name to it.

8        I will submit to you, ladies and gentlemen, that the

9    evidence shows beyond a reasonable doubt that Wadi and Barodi's

10   group really was Fatah al-Sham and HTS, and not Ahrar al-Sham.

11   Mr. Wadi was talking that he worked with this group for five or

12   six years, he and Barodi.  They had four weapons suppliers from

13   Ukraine to work with this group.  They knew the smuggling

14   routes and how to use the Turkish government to get weapons.

15   They had 20 different ways to move money, including a *hawala*

16   with no records.

17       For months the defendant told Baker, and you hear it on the

18   calls, that his group was Fatah al-Sham.  And it wasn't until

19   they called up Mr. Barodi -- and remember, before the call,

20   Wadi told Mr. Baker that Barodi talks in codes.  When Mr. Wadi

21   asked him, "The group's Fatah al-Sham, right," and Mr. Barodi

22   says, "No, it's Ahrar al-Sham."

23       But remember, Mr. Barodi wanted to take over the two holy

24   mosques.  And as Dr. Abboud said, that's more in keeping with

25   Fatah al-Sham and HTS, not Ahrar al-Sham.

1    You heard both Dr. Lesch and Dr. Abboud testify that U.S.

2 forces fought Fatah al-Sham and HTS.  But if you recall, the

3 terrorists the defendant was supporting -- or I'm sorry -- the

4 terrorists the defendant and Barodi were supporting were the

5 ones the defendant said the U.S. forces were fighting, the true

6 opposition.  Dr. Abboud said that would be Fatah al-Sham and

7 HTS, their expert.

8    You can draw a reasonable inference that Barodi said Ahrar

9 al-Sham on the phone because he was afraid he was being

10 monitored.  He was talking in code.  And his group really was

11 Fatah al-Sham.

12    According to Dr. Lesch, these were Salafi jihadists who

13 were starting with the near enemy, fighting in Syria, and then

14 they were going to move on to the far enemy, first in Saudi

15 Arabia and Israel, to get the two holy mosques, and then on to

16 cut the head of the snake, the United States.

17    This is all based on Wadi and Barodi's own recorded words.

18 The evidence shows, I would submit to you, ladies and

19 gentlemen, that their group really was Fatah al-Sham and HTS.

20 But even assuming that their group was Ahrar al-Sham, the

21 evidence still shows beyond a reasonable doubt that they're

22 guilty of each and every crime.

23    The evidence shows beyond a reasonable doubt that Wadi and

24 Barodi agreed to try to get money for weapons to fighters for

25 rockets, rifles, grenades, remote-controlled planes that could

1  drop 50 kilos, over a hundred pounds of explosives -- or I'm

2  sorry -- or fly the explosives into something, because there

3  was testimony that the use of the remote-control planes was to

4  save fighters from having to be suicide bombers.

5      Mr. Barodi himself said the weapons aren't for defending

6  houses.

7      It's beyond a reasonable doubt that Ahrar al-Sham and

8  al-Nusra, Fatah al-Sham, HTS fought together against Syrian and

9  Russian forces.  In March of 2017 both Dr. Lesch and Dr. Abboud

10  agreed, along with Mr. Barodi and Mr. Wadi's battlefield

11  reports saying they were all in one alliance.

12      And if you recall the October 9th, 2018, discussion, the

13  defendant says all the groups are fighting together in Idlib.

14  And this is the one where he says the American military is

15  fighting the group he calls the true opposition.

16      And the defendant said he wanted vengeance against Assad.

17      And Mr. Barodi reports that Ahrar al-Sham and Fatah al-Sham

18  are all in Idlib, and cooperation is mandatory.

19      January 2019, 17th, defendant and Barodi again tell Baker

20  that all the groups are fighting together and took territory

21  around Idlib.

22      The February 13th, '23 -- sorry -- February 13th, 2019,

23  conversation, Mr. Swift made a big deal, saying it's 82,000,

24  it's only two guns.  And if you recall, at the bottom of that

25  clip that he showed, the other issues will be addressed later.

1    Again, this was about moving some money.  And there was nothing
2    to change on the 450,000 going to the fighters in Idlib or the
3    90 percent of the profit coming later, going to the fighters
4    in -- or with -- if you want to believe, Ahrar al-Sham.
5        May 13th, 2019, Barodi sends a text to Baker saying HTS and
6    Ahrar al-Sham are all fighting together in one alliance.
7        Each of these conversations are an overt act.  They're
8    still agreeing to fund these terrorists in Syria, and they
9    still want to do the deal.
10       And let's talk about the last six months of the conspiracy.
11   If you recall, Dr. Abboud testified that January of 2020 till
12   June of 2020 Ahrar al-Sham was under the control of the Turkish
13   government.  And these -- their groups, the Turkish groups were
14   attacking the Kurds in Syria and the U.S.-supported troops.
15   That's according to the defense expert, Dr. Abboud.
16       All of those WhatsApp text and videos Barodi sent to Baker
17   from July 9th, 2018, to May and June of 2019, with the Kafr
18   Nabbudah battle in Idlib province was Barodi's relatives
19   showing their terrorist tactics of beheading surrendered and
20   captured soldiers.  You recall the conversation between the
21   person in Syria and Mr. Barodi.  Mr. Barodi said, I'll send
22   back their bodies.  And then the return one saying, we decided
23   to send back the heads.  Murder and maiming.
24       Terrorizing civilians.  In one of these calls you heard how
25   they put the Alawite women and children on the run.  And

1   another, slaughtering them all like dogs.

2       HTS and Ahrar al-Sham were all fighting together,

3   terrorizing together, murder and maiming soldiers and civilians

4   together.  Mr. Barodi's role was liaison to the fighter, and

5   Mr. Wadi's role was the main salesman to Mr. Baker and to the

6   Sheikh's representative.

7       These are the terrorists the defendant and Barodi agreed to

8   give $450,000 in weapons time and time again, to continue their

9   murder and maiming in Syria.

10      And, again, even if the rest of the time Ahrar al-Sham and

11  HTS were fighting turf battles with each other, killing each

12  other, bombing each other, beheading each other, they still

13  conspired.  The defendant still conspired with Barodi, clearly

14  to Counts 1 and Counts 3, conspiring to murder overseas and

15  conspiring to provide material support to the Ahrar al-Sham

16  terrorists to murder and maim overseas.

17      The evidence shows beyond a reasonable doubt that

18  Mr. Barodi knew what he was doing was illegal and Mr. Wadi knew

19  what he was doing was illegal beyond a reasonable doubt.  They

20  knew they were providing material support to a terrorist

21  organization the defendant considered the true opposition, in

22  fighting U.S. soldiers and Marines.  Again, according to

23  Dr. Abboud, that would be HTS.

24      The defendant knew that sending even a thousand dollars to

25  Syria was illegal.

1    The November 8th, 2018, call, the defendant and Barodi told

2    Baker how Barodi's cousin in California was sent to jail for 30

3    months for sending scopes to Ahrar al-Sham.

4    They both knew the name of al-Nusra, Fatah al-Sham and HTS.

5    And as we heard from Dr. Abboud, you can just look it up on the

6    State Department website who's a designated foreign terrorist

7    organization.

8    Again, sticking with the cocaine analogy that both counsel

9    used, you know you're selling cocaine.  All you have to do is

10   look it up -- if you can tell yourself you didn't know it was

11   illegal, you can at least look it up and know.  Ignorance of

12   the law is no excuse.

13   July 9th, 2018, the texts with the HTS revolutionary,

14   killing civilians, that Mr. Swift brought up in his closing,

15   that, see, these are the bad people that are killing and

16   committing crimes.  They're revolutionaries and committing

17   crimes against civilians.

18   Well, if they're Ahrar al-Sham, then they know that when

19   they're aligning themselves with HTS, from March of 2017 and

20   May and June of 2019, they know they're terrorists.  They're

21   put on notice.  They know what they're doing is illegal.

22   And most importantly, they talk in codes.  You can use your

23   commonsense here.  The defendant and Barodi know what they're

24   doing is illegal.

25   October 9th, 2018, defendant warns Baker that Barodi talks

1   in codes.

2       Down in Bogota, the defendant and Barodi, when giving money

3   for weapons to fighters, say for women, children, elderly and

4   injured, for cover, for appearance.

5       Barodi says, when you talk on the phone, say you're giving

6   it to feed kids, to hide it from the FBI and the CIA and all

7   the filth in existence.

8       You heard the call with Abdul Jabbar.  He was reluctant to

9   talk on the phone.  Barodi had to pull it out of him.  Tell

10  them what you want.  Show us your rifle.  What do you need?  He

11  was reluctant to talk on the phone, too, because they all know

12  what they're doing is illegal, and they know they may be

13  monitored.  So they talk in codes.

14      Back, January 17th, 2019, when Mr. Wadi talks about

15  orphans, he slipped a little.  He said -- his next comment is

16  "getting weapons for the orphans," because we all know orphans

17  need weapons.  It's a code word for terrorists.

18      The defendant says, don't talk about weapons and grenades

19  over the phone since it's monitored.

20      The defendant says, don't say "murder."  The call will be

21  recorded.  Because he knows what he's doing is helping these

22  terrorists to murder people.

23      The defendant says, in the same call, the food and invoices

24  are just for cover to justify moving the money for the weapons;

25  how he inflates the cost of the invoice, so when you sell the

meat, then you can give the leftover proceeds for the weapons
for the terrorists.

Defendant says the fighters need weapons because they've
been cut off.  Ninety percent for the weapons and war support.
Ten percent to others for cover.

Mr. Wadi, the salesman.  Mr. Wadi, the conspirator who knew
and agreed to help fund these terrorists, to the tune of
450,000 for weapons.

February 13th, 2019, the defendant told Baker and Taher
that they're under pressure from the fighters to get the deal
done.  The fighters are surrounded by Russians.  It's not the
government that's putting pressure on the defendant and Barodi.
It's the defendant trying to put pressure on Baker and Taher.

Defendant said he didn't want to talk to Mr. Barodi about
the videos on the phone, but told them that Barodi would send
them the videos.  Barodi's role was the advertising exec.  And
Barodi does send Baker the videos that Mr. Wadi told him to
expect.

In June of 2020 defendant and Barodi still want to do the
deal.  And they're still talking in code.  On the call Mr. Wadi
says, about the word "Mujahideen," can't say sensitive words on
the phone, must talk in codes because it may be recorded.
Direct evidence that he knows he's committing a crime.

We're not working terrorism.  Say Freedom Fighters.  Direct
evidence Mr. Wadi knew he was committing a crime.  But the most

1    important direct evidence, "I have my God's law.  The law of
2    the United States or any other stupid law, as far as I'm
3    concerned, this is the last thing I care about.  I don't give a
4    damn.  They can put me in jail.  I don't give a shit."
5        The evidence shows beyond a reasonable doubt that the
6    defendant and Barodi knew what they were doing was illegal, and
7    they did it willfully, and they did it knowingly.
8        Let's talk a little bit about credibility.  How do we do
9    it?  It's the same way we do it every day in life when you're
10   talking to somebody.  Observe what they say, how they say it.
11   Do they have a bias or a motive to lie?
12       Mr. Baker, he obviously made mistakes not reporting his
13   income.  He should have reported it to the IRS.  He should have
14   reported it on his bankruptcy petition.  There's no excuse for
15   that.  He was told to report.  But there's no evidence he has
16   immunity from anything.  There's nothing to report to the IRS
17   because he self-reported.  And contrary to what defense counsel
18   said, you can amend previous tax years, which he said that's
19   what he was doing.
20       Defense counsel wants you to believe Mr. Baker when it
21   helps them.  Oh, believe him when he says Mr. Wadi exaggerates,
22   even though it's not corroborated by the tapes.  But don't
23   believe Mr. Baker when it goes anything against the defendant's
24   theory, even if it is corroborated word for word in the tapes.
25       Ladies and gentlemen, I submit to you that, based on the

1  evidence, Mr. Baker, when he testified to you, he was telling
2  the truth, and you can hear it on the tapes.
3      And what you're hearing on the tapes, it's not just
4  Mr. Baker talking.  You're hearing the defendant talk.  You're
5  hearing Mr. Barodi talk.  It's their words.  And there's no
6  dispute on the recordings or the translations on these.  All of
7  these were admitted without objection.  Mr. Wadi's and
8  Mr. Barodi's own words prove them guilty beyond a reasonable
9  doubt.
10     And yes, ladies and gentlemen, the burden is proving a
11 defendant's guilty beyond a reasonable doubt.  And thank God
12 that it's that burden.  In many countries in the world today
13 it's still the defendant's burden to show they're innocent.
14     But guilt beyond a reasonable doubt is not a standard --
15 it's not beyond all doubt.  It's not a doubt that's created to
16 avoid an unpleasant duty.  This is the same burden of proof
17 used to convict every criminal defendant in every federal,
18 state and local case since the founding of our Constitution 233
19 years ago.  Prior to that, in the colonies.  Prior to that, in
20 England.
21     The analogy I like to use is you and your family are
22 driving.  You come to a highway, and there's a stop sign, and
23 you want to cross that highway and get to the other side.  You
24 stop at the stop sign.  Traffic is whizzing by.  You look.  You
25 wait.  Finally, coast is clear.  You can't see cars on either

1  side.  After careful consideration, you make a decision to
2  drive forward and cross the highway and get to the other side.
3  Something you do every day in life.  You've convinced yourself
4  beyond a reasonable doubt, in the most important thing in your
5  own life, your life, the life of your loved ones, it's safe to
6  go.  In a sense it's something we do every day.
7          THE COURT:  You have five left of the 45.
8          MR. ROOMBERG:  Thank you, Your Honor.
9  Last Monday, 1:45, I would submit to you the oath that was
10 taken was the most important oath that you heard -- that
11 happened in this case.  It was at that time, ladies and
12 gentlemen, when you took your oath to use your commonsense,
13 listen to all the evidence, follow the law as Judge Biery
14 instructs you, and that when the United States proves the
15 defendant guilty beyond a reasonable doubt, based on the
16 evidence, your duty is to return a guilty verdict.
17    The system won't work without you.  You can't be shown any
18 more credible evidence.  It's your power and your duty to
19 convict the defendant or let him walk out of here based on the
20 evidence.  Not based on sympathy.  Not based -- not because
21 it's pleasant or easy.
22    Many times we look to others in our life to make important
23 decisions, our President, our Congress, our governor, our state
24 legislature.  Sometimes we second-guess them and say, if it was
25 only me, I would have done...

1    Ladies and gentlemen, today we look to you to make the

2    right decision, to render justice.  The United States accepted

3    its burden to prove the defendant guilty beyond a reasonable

4    doubt.  Based on the evidence, ladies and gentlemen, the

5    government has proven the defendant guilty beyond a reasonable

6    doubt based on the evidence.  I'm not here to order you to find

7    the defendant guilty.  You're all honorable people.  I'm asking

8    you, based on your oath, to find the defendant guilty because

9    the evidence shows the defendant is guilty based on the

10   evidence, beyond a reasonable doubt, of each and every count

11   that he's charged with.

12    Thank you, again, for your time and for your service.  The

13   case is now with you.  Do justice.

14          THE COURT:  Ladies and gentlemen, that concludes the

15   activity in this case for the lawyers and the Court, although

16   I'll have some instructions later.  But now it's up to you.

17   The hand -- the case is in your hands.

18    I would suggest that when you get back to your jury room,

19   the first thing you do is select one of your members as your

20   presiding juror, take a break, so forth, and then begin your

21   deliberation.  Ms. Herndon will be back there to explain how to

22   pull up the exhibits if you want to see them.  And then the

23   schedule from this point forward is entirely up to you, and we

24   are at your will.  If you want to leave at the usual 3:30, you

25   can.  If you want to stay longer, not beyond 5:00 -- but you

1  can do that.  I suggest that you report back -- if you don't

2  reach a verdict this afternoon, that you report back at 8:30 to

3  begin tomorrow.  But, again, you may take as long as you need

4  or as little time as you need, but that's entirely up to you

5  all.

6      So with that, then, if you all will be excused.  Mr. Smith

7  will take you to your jury room.  But always keep in mind your

8  instructions all together before you talk about the case.

9  Thank you.

10      *(Jury leaves courtroom)*

11          THE COURT:  You may be seated.

12      All right.  Outside the presence, Mr. Roomberg or

13  Mr. Harris, anything at this time for the United States?

14          MR. HARRIS:  Briefly, Your Honor.  Just for our

15  administrative purposes, you know, yesterday Ms. Saad asked us

16  to send an exhibit.  We sent an exhibit.  For our records could

17  we please get the copy of your Exhibit 13 that you uploaded to

18  JERS?

19          MS. SAAD LINDSEY:  Sure.

20          MR. HARRIS:  I don't know how you would get that to

21  me, but I'm just asking that --

22          MS. SAAD LINDSEY:  Of course.

23          MR. HARRIS:  Okay.  Thank you.

24          THE COURT:  All right.  Anything for the defense?

25          MS. SAAD LINDSEY:  Your Honor, we would just move to

1  unseal the filings we did for Hussain Baker in the case.  We

2  originally did it until trial.  He's now testified.  We can

3  provide to the Court the specific filings that were sealed

4  related to Mr. Baker that now can be public record.

5          THE COURT:  Mr. Roomberg or Mr. Harris?

6          MR. ROOMBERG:  Your Honor --

7          THE COURT:  I don't know what they are but --

8          MR. ROOMBERG:  -- I appreciate Ms. Saad having filed

9  them under seal.  I don't think there's any basis at this point

10 in time to keep them sealed.

11         THE COURT:  Okay.  All right.  Very well.  They may

12 be -- Ms. Herndon, they may be unsealed.

13    Mr. Swift.

14         MR. SWIFT:  Only one point on that.  We'll take a

15 quick look.  Because they were filed completely under seal,

16 that we might need to do a couple of personal information

17 redactions before they become -- because, you know, normally

18 you do that.  But we weren't thinking about it.

19         THE COURT:  Okay.

20         THE CLERK:  If they could send a proposed order, Your

21 Honor.

22         THE COURT:  Okay.  Ms. Saad, if you'll send a proposed

23 order.

24         MS. SAAD LINDSEY:  Yes, Your Honor.

25         THE COURT:  Okay.  Very well.  You all stand by and be

1    available.  I'm sure it will be a while.  Thank you.

2        *(Recess at 12:40 p.m. until 2:29 p.m., jury out)*

3            THE COURT:  You may be seated.

4        *(Jury enters courtroom)*

5            THE COURT:  You may be seated.

6        Good afternoon, ladies and gentlemen.

7        Mr. Morgenroth, Ms. Herndon tells me that the jury has

8    reached a verdict.

9            THE JUROR:  We have.

10           THE COURT:  If you'll give it to Mr. Smith, please.

11    Thank you.

12       All right.  Ladies and gentlemen, before we do that, let me

13    say a few things.  I don't get to talk during the trial.  So

14    now it's my turn, for just a little bit.  I won't keep you too

15    long.

16       First of all, whatever this is, it's the right answer.  And

17    you all are the only 12 people who know what you all have

18    decided to be the truth.  Somewhat reminiscent of -- there was

19    a late-night TV personality that many of you are too young to

20    remember, but his name was Johnny Carson, and he had a shtick

21    called Carnac the Magnificent.  So that's it.  That's the right

22    answer.  And we respect the system, and we respect what you all

23    have done these last two weeks.

24       There was another even older media personality named Paul

25    Harvey, who was a radio fella, and he had a thing at the end

1    called *The Rest of the Story*.  So now I can tell you some of

2    the rest of the story, that doesn't come into a trial like this

3    because we focus just on the facts and so forth.

4        First of all, the rest of -- part of the rest of the story

5    is that this is statistically very rare for people like

6    yourselves to sit for any kind of trial but especially a

7    two-week trial.  Only about -- out of a thousand defendants who

8    go through this courthouse every year, there are only about 20

9    that go to trial, although that number is probably not as high

10   as it used to be.  I mean the total number of defendants.  But

11   at any rate, 98 percent of these cases don't go to trial.  So

12   you have the rare privilege of being that few who do get to

13   participate at this level.

14       Another -- some observations.  You all have been privileged

15   and benefited from a two-week, what I will call a college

16   seminar.  We have covered all kinds of different subjects, and

17   you didn't even have to pay tuition.  I kept a running list as

18   best I could.  We've had 18 different nations mentioned.  You

19   all have heard -- well, you heard how much Dr. Abboud charges

20   for his knowledge and expertise, and, of course, Dr. Lesch

21   similarly.  So you got to hear all of that.

22       All of that, of course, goes back to what we talked about

23   at the beginning of our process, beginning at the Magna Carta,

24   800 years ago.  And now how we have evolved to be at this point

25   with you all participating in it.

1    And I was also reminded of -- one of the courses that we

2    take in law school is called descent and distribution.  And

3    that, in the modern terminology, is called genealogy.  And, of

4    course, we've been hearing and learning a whole lot about

5    Middle Eastern history, and from which those three great

6    religions come.  And the genealogy part of it is interesting.

7    We had a case years ago that required some -- the curiosity of

8    confirming what I thought.  But all of those three great

9    religions stem from a guy named Abraham.  And then you come

10   down to Moses, and then you come down to Jesus, and you come

11   down to Muhammad.

12   So all of those three great religious leaders are cousins.

13   And yet, we can't seem to get along.  But, of course, on a

14   micro-level there are families who are closely related, and

15   they can't get along either.  So maybe it's just part of the

16   human condition.

17   We covered, and you all got to learn about geography,

18   Middle East history and culture, international politics and

19   war, how law enforcement works and how lawyers work.  And I

20   told you at the beginning, you will never watch another lawyer

21   TV show or crime show, *NCIS* or *FBI*, and you'll always say, nah,

22   that's not the way it really works.

23   And so now that we're at this point, those instructions

24   about talking about the case are no longer applicable.  You can

25   tell your family and friends where you've been, what the case

1    was about.  It will be in the media.  So you can watch those

2    stories now.

3         You also learned about the government -- how our government

4    works in certain parts of it.  You heard, let's see, about

5    foreign terrorist organizations.  Oh, international banking.  I

6    learned some stuff about international banking that I didn't

7    know.  The languages -- and, of course, we have translators

8    here for Spanish speakers.  And they're able to immediately

9    hear the Spanish/English, and their brains work like clockwork

10   and they translate.

11        But how these -- the folks who did the translation of those

12   Arabic tapes, that's a pretty amazing talent to have, how they

13   can tell which one is speaking and so forth.

14        And then, let me see.  What was the other one?  Oh, we had

15   a little discussion about Dr. Lesch.  And some of you may be

16   baseball fans.  But some of us are willing to bet that

17   Dr. Lesch is the only Harvard Ph.D. ever to be drafted by a

18   Major League Baseball team.

19        And let's see.  Oh, we talked about the violence of that

20   part of the world during that part of history.  Unfortunately,

21   we see the same type of thing here within our drug culture.

22   One of the next big cases that we have is a fella who, if you

23   get crosswise with him -- some of them do the beheadings in the

24   cartels.  This fella, his modus operandi, allegedly, is to have

25   his henchmen put somebody in a barrel of oil and get them

1    soaked full of oil, take them out and then light a match.  So

2    those are the kinds of people that we have here.

3        I know probably you wondered, well, why couldn't we have

4    gone more quickly in terms of a longer day?  Well, what you

5    don't know until now is, when we leave at 3:30, these folks,

6    they start their second workday.  They go back to their office.

7    In fact, I think it was night before last, I guess -- it runs

8    together.  At any rate, they were sending emails to

9    Ms. Sullivan at 9:30 and 10:00 at night about getting the jury

10   charge ready and so forth.

11       And then I want to say a word about the people who have

12   provided the technical services.  You saw, no doubt, the big

13   binder of evidence here, exhibits.  Well, in the old days,

14   instead of just pushing a finger and these folks knowing how to

15   do it and you looking at it, each of you would have had to be

16   lugging around this binder to find the tab and all that sort of

17   thing.  So we couldn't do what we do nowadays in these

18   especially big, complicated cases without their expertise.

19       The lawyers -- I told you that you were going to see some

20   really good, professional presentations, and I think I kept

21   that promise.  Each of them has a different style.  But they

22   knew the case very well and presented it to you.  And so now

23   you all have made your decision.

24       After I -- after the verdict is received, I'm going to poll

25   the jury and ask each of you if what I read as the jury's

1    verdict corresponds to your own individual judgment.

2        So with that, then, Mr. Wadi, if you'll stand and receive

3    the verdict of the jury.

4        In Count 1, we, the jury in the above-entitled cause, find

5    the defendant, Imad Eddin Wadi, guilty of conspiracy to murder

6    and maim persons in a foreign country, as charged in Count 1 of

7    the superseding indictment.

8        The next boxes for murder and maiming were also checked as

9    being the ones having the specific intention.

10       Count 2, we, the jury in the above-entitled cause, find the

11   defendant, Imad Eddin Wadi, guilty of conspiracy to provide and

12   attempt to provide material support to designated foreign

13   terrorist organization, as charged in Count 2 of the

14   superseding indictment.

15       And in Count 3, we, the jury in the above-entitled cause,

16   find the defendant, Imad Eddin Wadi, guilty of conspiracy to

17   provide and attempt to provide material support to terrorists

18   as charged in Count 3 of the superseding indictment, signed

19   Dustin Morgenroth, presiding juror.

20       You may be seated.

21       Mr. Morgenroth, I assume your signature indicates that

22   conforms with your individual judgment?

23           THE JUROR:  Yes, sir.

24           THE COURT:  Ms. Mendoza, does that conform with your

25   individual judgment?

```
 1              THE JUROR:  Yes, sir.
 2              THE COURT:  Ms. Washington?
 3              THE JUROR:  Yes, sir.
 4              THE COURT:  Mr. Gonzales?
 5              THE JUROR:  Yes, sir.
 6              THE COURT:  Mr. Barrios?
 7              THE JUROR:  Yes, sir.
 8              THE COURT:  Mr. Sonnen?
 9              THE JUROR:  Yes, sir.
10              THE COURT:  Mr. Mancha?
11              THE JUROR:  Yes, sir.
12              THE COURT:  Mr. Ehrlich?
13              THE JUROR:  Yes, sir.
14              THE COURT:  Ms. Winton?
15              THE JUROR:  Yes, sir.
16              THE COURT:  Ms. Enright?
17              THE JUROR:  Yes, sir.
18              THE COURT:  Ms. Lubbock?
19              THE JUROR:  Yes, sir.
20              THE COURT:  And Ms. Valla?
21              THE JUROR:  Yes, sir.
22              THE COURT:  All right.  Mr. Roomberg, do you wish the
23    Court to -- or admonish or poll -- excuse me -- poll the jury
24    further?
25              MR. ROOMBERG:  No, Your Honor.  Thank you.
```

1          THE COURT:  Do you have anything else before the jury

2    is excused?

3          MR. ROOMBERG:  No, Your Honor.

4          THE COURT:  Mr. Swift or Ms. Saad?

5          MS. SAAD LINDSEY:  No, Your Honor.

6          THE COURT:  All right.  Very well, ladies and

7    gentlemen.

8      Ms. Herndon, they have their instructions on what they need

9    to do, or will?

10         THE CLERK:  The forms are in there for them.  And they

11   just need to leave their badges.

12         THE COURT:  Okay.  All right.  The instructions under

13   which you have been working no longer apply.  Even though these

14   are very experienced lawyers, they -- we call it practicing law

15   because we never get to be perfect.  So if it should happen

16   that you happen to run into one of the lawyers or if they

17   contact you -- they probably won't, but they could -- and if

18   you wish to talk with the lawyers about your observations of

19   how they presented their case, so that they can improve, you

20   may do so.  If you don't want to talk with them, you don't have

21   to.

22     Again, thank you very much.  Mr. Smith will help you gather

23   your -- oh, and, of course, you can keep your copy of the jury

24   charge.  You can also keep your notepad if you'd like to keep

25   that as well.

1    Thank you very much.

2    *(Jury leaves courtroom)*

3    THE COURT:  You may be seated.

4    Mr. Roomberg, refresh the Court's recollection.  What is

5    the punishment range and, in particular, is it mandatory

6    minimum or not?

7    MR. ROOMBERG:  There's no mandatory minimum, Your

8    Honor.  The punishment range for Count 1 is life, since they

9    found murder.  The punishment range for Count 2 is up to 20

10   years.  The punishment range for Count 3 is up to 15 years.

11   Under the advisory guidelines, because these are crimes of

12   terrorism -- I'm sorry -- 3A1.4 would apply, which means the

13   defendant has a criminal-history category automatically of six,

14   and his guideline range would be 45.  The guidelines only go up

15   to 42.  So his guideline range would be life.

16   THE COURT:  Okay.  All right.  And what is the

17   government's position on self-surrender or beginning the

18   punishment?

19   MR. ROOMBERG:  Your Honor, this case, we've actually

20   asked for detention.  At this point the defendant is convicted.

21   We believe he is both a danger to the community and certainly a

22   risk of flight.  There's no basis for him at this point to

23   stay.  He's shown -- we've seen in the evidence that he travels

24   all over the world.  He was more than willing to live in

25   Colombia, just to come back -- and just come back and visit his

1   family.  Certainly, at this point the defendant needs to be

2   detained.

3           THE COURT:  All right.  Ms. Saad and Mr. Wadi, come up

4   here, please.

5       Ms. Saad.

6           MS. SAAD LINDSEY:  Yes, Your Honor.  Mr. Wadi has been

7   on pretrial release without incident since 2021, Your Honor, so

8   a two-year period where he's been on an ankle monitor and has

9   been compliant.  There has been no report of any type of

10  violation during that time.  So we would strongly request the

11  Court consider keeping him out on bond until sentencing.

12      As the Court has put it and as the Court -- this case was

13  close.  Clearly, the jury has made their decision.  In terms of

14  the evidence -- the Court also hesitated on Count 2 in terms of

15  the evidence in this case.  And so we'd ask the Court to take

16  all of those things into consideration in terms of release

17  until sentencing.

18      Mr. Wadi continues to work, doing handyman work and helping

19  to provide for his family.  He is residing here in San Antonio

20  and has the ankle monitor as well.

21          THE COURT:  All right.  Well, Mr. Wadi, I have a few

22  questions, and you don't have to answer them, or if you want to

23  consult with Ms. Saad before you do answer them.

24      There was some reason to think that a lot of this -- as the

25  lawyers argued, that a lot of this was exaggeration and puffery

 1  about building yourself up with the people involved and in

 2  terms of your international business matters.

 3      Did you -- did you actually go to all those places?

 4          THE DEFENDANT:  Yes, sir, I did.

 5          THE COURT:  Okay.  And, of course, we'll find out at

 6  sentencing in terms of your -- of your financial background.

 7  But some of this stuff just doesn't add up in terms of your --

 8  all of that presumably successful business ventures and, yet,

 9  what the Court understands is a very modest lifestyle.

10      Another thing, in addition to all of the quotes of your own

11  words on tape, that the lawyers pointed out, one that struck me

12  is when you said -- and I may not have an exact quote.  But I

13  think it's pretty close -- my family doesn't know about all of

14  this.  So were you keep -- obviously, if that's true, you're

15  keeping all of this hidden from your family?

16          THE DEFENDANT:  May I answer, Your Honor?  May I

17  answer, Your Honor?

18          THE COURT:  Oh, yes.  Sure.

19          THE DEFENDANT:  The reason I kept that secret from my

20  family, because I have very repetitive failure.  And my

21  family -- pretty much like I was a crying wolf because I have

22  many, many venture that didn't come to a success.  I was

23  successful up to 2000 -- up to the year 2000, where we had the

24  four truck stops and we had four million gallons' worth of fuel

25  that we were -- we were distributing.  After failure of that

1    business, I could not manage to get up.  And I tried many,

2    many, many times, with failures.

3         So when this true adventure came about, I did not want to

4    tell them until I realized the fruit out of it.  And as far as

5    all the claims that all the expert that -- I mean, the

6    traveling that I did, I traveled very, very frugally.  I slept

7    in Dubai on the bench for three days because I did not have the

8    money to put --

9              THE COURT:  Okay.

10             THE DEFENDANT:  Still, I had friends in many of those

11   countries, where I stayed with them.  And I tried hard.  I

12   don't want to call for --

13             THE COURT:  Okay.  All right.  So tell me about --

14   another thing that concerned me, and we didn't get into it for

15   obvious reasons, about all the details, but I think I

16   understood that you came to this country under false documents

17   and false pretenses?

18             THE DEFENDANT:  No, sir.  No.  No, Your Honor.

19             THE COURT:  What was --

20             THE DEFENDANT:  I came to this country as a student,

21   as a civil engineer, and I studied -- I came on a student visa.

22   I finished my degree in 1984.  I went and worked for

23   construction company for three years.  At the '87 -- layoff,

24   all the S&L failure.  Construction was no longer good in Texas.

25   They laid me off, and then I started my own business.

1          THE COURT:  Okay.  So, Ms. Saad, why did I have that

2     idea?  Or was it somebody else that had --

3          MS. SAAD LINDSEY:  You're referring to Mr. Barodi.

4          THE COURT:  Okay.  All right.

5     All right.  Well, Mr. Wadi, as with all of these cases --

6     and this is a very interesting job that I do, but this is the

7     part of it that I dislike the most.  And so the jury has

8     spoken.  And, of course, you heard what Mr. Roomberg said in

9     terms of the punishments.

10         Also, Ms. Saad, what you said in terms of Count 2, I don't

11    see any reason why the punishments won't run concurrently,

12    whatever they may turn out to be.  So that, as a practical

13    matter, probably moots the Count 2 situation.  But we'll look

14    into all that later on.

15         But given the circumstances, Mr. Wadi, you are remanded to

16    the custody of the United States Marshal to begin serving your

17    sentence.  You will get credit for the time that you're serving

18    between now and the sentencing.

19         And, Marshals, if you all will come forward, please.

20         All right.  The sentencing date is set for August 22nd,

21    subject to change if need be.

22         Mr. Roomberg or Mr. Harris, anything further?

23         MR. ROOMBERG:  No, Your Honor.

24         THE COURT:  Ms. Saad or Mr. Swift?

25         MS. SAAD LINDSEY:  Your Honor, just to -- we would

 1  move for the judgment of acquittal, as I've been referring to,

 2  particularly for Count 2.

 3          THE COURT:  All right.  Very well.  That is noted and

 4  denied.  Thank you.

 5      *(At the bench off the record)*

 6          THE COURT:  You all can reconsider or reevaluate

 7  whether you want to move forward on the two motions to show

 8  cause.  And if so, we'll find a time.  We're getting ready to

 9  go into two more multi-week trials.  But we'll do that as

10  necessary.

11      All right.  Mr. Roomberg, anything further?

12          MR. ROOMBERG:  No, Your Honor.

13          THE COURT:  All right.  Ms. Saad?

14          MS. SAAD LINDSEY:  No, Your Honor.

15          THE COURT:  All right.  Thank you.  We're in recess.

16  * * *

17      *(2:56 p.m.)*

18

19

20

21

22

23

24

25

1                              -oOo-

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5    Date:  9/22/2023        /s/ Chris Poage
                             United States Court Reporter
6                             262 West Nueva Street
                             San Antonio, TX  78207
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25