**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. SA-21-CR-244-FB** |
| | ) | |
| **IMAD EDDIN WADI** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW, the United States of America, by and through its undersigned Assistant United States Attorneys, hereby files its Sentencing Memorandum, and states:

Defendant Imad Wadi was convicted at trial. The Defendant's objections to the Revised Presentence Investigative Report (PSR) are contrary to the facts proven at trial when viewed in the light most favorable to the Government as the verdict winner, and certainly more so than the preponderance of evidence standard for sentencing factors. Wadi should be sentenced to life imprisonment as set forth in the advisory sentencing guidelines that place him at an offense level 45, reduced to the maximum guideline level of 43, and a criminal history category of VI as well as under the 18 U.S.C. §3553 factors. The Presentence Investigative Report (PSR) correctly applies the sentencing guideline Terrorism enhancement, §3A1.4, as all three crimes for which the jury convicted the Defendant were enumerated crimes of terrorism under 18 U.S.C. §2332b(g)(5) and were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct as defined by current Fifth Circuit caselaw. Count 1 carries a guideline offense level of 45 and a recommended sentence of life for all criminal history categories I through VI. To protect the public, to avoid sentencing disparity, to provide general

deterrence, and to provide specific deterrence, Wadi should certainly be given a longer sentence than the two most recent defendants who <u>pled guilty</u> to similar crimes in this district and division, that is providing material support to a foreign terrorist organization, and were given sentences of 20 years and 18 years, respectively. The Defendant's proposed grounds for downward departure are wholly unwarranted and are not credible.

### A. THE PSR IS CORRECT AND THE DEFENDANT'S OBJECTIONS SHOULD BE OVERRULED

**1.** **<u>Terrorism Enhancement Correctly Applied in PSR</u>**

The PSR correctly applies the §3A1.4 Terrorism enhancement and correctly states the credible facts as determined by the jury's verdict as viewed in the light most favorable to the United States as the verdict winner including all credibility determinations beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. del Carpio Frescas*, 932 F.3d 324, 328, 330 (5th Cir. 2019); *United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019). At sentencing, the court need only find the sentencing factors by a preponderance of evidence. *United States v. O'Brien*, 560 U.S. 218, 224 (2010).

The Defendant's proposed additional "facts" are not credible and are contrary to the jury's verdict. The Defendant's proposed additional "facts" he made as objections to the PSR are the parts of the trial that Defendant argued to the jury in support of the Defendant's entrapment defense, were definitely rejected by the jury, and were correctly excluded from the PSR.

## A. <u>Section 3A1.4 Is Clearly Applicable in This Case</u>

Sentencing guideline §3A1.4 states

**(a)** If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
**(b)** In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

18 U.S.C. §2332b(g)(5) defines the term "Federal crime of terrorism" as an offense that--

**(A)** is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
**(B)** is a violation of--956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), … 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations)

In *United States v. Fidse,* a case of first impression in the Fifth Circuit, this honorable Court was affirmed after it correctly determined that the §3A1.4 Terrorism enhancement applied where the Defendant obstructed an investigation by conspiring to make a false statement in an FBI investigation regarding §2339A and §2339B and the Al-Shabbab designated Foreign Terrorist Organization (FTO). In affirming this Court's decision, the Fifth Circuit Court of Appeals explained how § 3A1.4 applies stating

> Courts, including ours, have recognized that the structure of § 3A1.4 establishes two bases for applying the enhancement. *See Fidse I*, 778 F.3d at 481; *United States v. Arnaout*, 431 F.3d 994, 1001–03 (7th Cir. 2005); *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001). The first—if the offense "involved" a federal crime of terrorism—has been understood to apply when "a defendant's offense or relevant conduct *includes* a federal crime of terrorism." *Arnaout*, 431 F.3d at 1001 (emphasis added); *accord United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008); *Mandhai*, 375 F.3d at 1247–48; *Graham*, 275 F.3d at 516. Thus, "an offense 'involves' a federal crime of terrorism only if the crime of

3

conviction is itself a federal crime of terrorism," *Parr*, 545 F.3d 491 at 504, or if the "relevant conduct includes such a crime," *United States v. Awan*, 607 F.3d 306, 313–14 (2d Cir. 2010).

Alternatively, the enhancement applies "[i]f the offense ... was intended to promote[ ] a federal crime of terrorism." U.S.S.G. § 3A1.4(a); *accord Arnaout*, 431 F.3d at 1001….In such cases, "the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's *purpose* that is relevant, and if that purpose is to promote a terrorist crime, the enhancement is triggered." *Mandhai*, 375 F.3d at 1248 (emphasis added).

*United States v. Fidse II*, 862 F.3d 516, 522 (5th Cir. 2017). The Fifth Circuit affirmed this

Court's determination that

Fidse's offense of conspiring to make false statements and other relevant conduct could still "qualif[y] for the enhancement if it was *intended to promote*—that is, 'was intended to encourage, further, or bring about'—a federal crime of terrorism."

*Id.* at 523.

In *Fidse II*, the Fifth Circuit further stated

The district court's identification of a qualifying statutory provision alone does not constitute "identify[ing] a federal crime of terrorism," because a "[f]ederal crime of terrorism means an offense that" not only is a violation of one of the enumerated statutory provisions listed in § 2332b(g)(5)(B), but also "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." § 2332b(g)(5)(A), (B). "The definition is stated in the conjunctive, so both requirements must be met." *Parr*, 545 F.3d at 504.

*United States v. Fidse II*, 862 F.3d at 524. In *Fidse II*, the Fifth Circuit affirmed this Court in its

determination that Fidse's conspiracy to make false statements in a terrorism investigation was

sufficient to be calculated to promote a conspiracy to provide material support to the FTO al-

Shabbab making Fidse subject to the §2332b(g)(5)(A) definition of crime of terrorism and thus the U.S.S.G. §3A1.4 terrorism enhancement. In affirming this Court, the Fifth Circuit stated

> It is plausible that the offenses encompassed by the Task Force investigation were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." § 2332b(g)(5)(A); *see also Harris*, 434 F.3d at 773 ("In reviewing whether there was evidence to support the district court's conclusion that [the] offense was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' [this court] review[s] [the district court's] factual findings for clear error."). The Government was investigating a conspiracy to provide material support to al-Shabaab, an organization that the district court noted wishes "to influence and to affect the conduct of multiple governments by intimidation and coercion and through retaliation." *See El–Mezain*, 664 F.3d at 571 (describing the foreign terrorist organization Hamas as having the "goal of meeting the Palestinian/Israeli conflict with violent jihad and [rejecting] peace efforts and compromise solutions," noting that the defendants knew that they were supporting Hamas, and highlighting their close ties to the Hamas movement). Further, the district court highlighted statements Fidse made throughout the investigation suggesting that the conspiracy contemplated by the Government investigation was "calculated" as described in § 2332b(g)(5)(A).

*United States v. Fidse II*, 862 F.3d at 524–25. Likewise, in the *Awan* case, cited as authority by the *Fidse II* court stated

> The government argued before the district court (1) that each of Awan's counts of conviction was intended to promote a conspiracy to commit murder, kidnaping, or maiming outside the United States in violation of 18 U.S.C. § 956(a), a federal crime of terrorism, and (2) that Awan's international money transfer conviction was also intended to promote another federal crime of terrorism, to wit, the provision of material support and resources to be used in a conspiracy to commit murder, kidnaping, or maiming outside the United States as prohibited by 18 U.S.C. § 956(a), in violation of 18 U.S.C. § 2339A. Although we express no views on the merits of these factual contentions, we note that the application of § 3A1.4 in such circumstances does not require a finding that Awan was personally motivated by a desire to influence or affect the conduct of government. **Rather, the government need only demonstrate that Awan intended to promote a crime calculated to have such an effect, *i.e.,* that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5),**

**whatever Awan's reason for committing them.**

*United States v. Awan*, 607 F.3d 306, 315–16 (2d Cir. 2010)(Emphasis added).

As the PSR factual statements drawn from the credible trial evidence demonstrates, the Defendant's case at hand is exponentially more compelling for the §2332b(g)(5)(A) definition of crime of terrorism and thus the U.S.S.G. §3A1.4 terrorism enhancement than the *Fidse* case and the other cases cited by the Fifth Circuit. The evidence at trial proved Defendant Wadi conspired with his primary cohort Ahmad Daniel Barodi as well as Barodi's terrorist nephews and Wadi and Barodi's four separate Turkish and Ukrainian arms suppliers to murder and maim foreign soldiers, civilians, other opposition fighters, and also knowing these terrorists were fighting United States soldiers in Syria. Wadi knowingly agreed with these other coconspirators to provide material support in the form of money with the specific intent to purchase rockets, grenades, rifles, and unmanned aerial vehicles (UAVs) with explosives in support of a designated Foreign Terrorist Organization (FTO), Al-Nusrah Front/Fatah Al Sham/Harar Tahrir Al Sham (HTS) to murder and maim human beings in Syria as the jury found beyond a reasonable doubt. As he was recorded saying on October 9, 2018, Wadi knew and continued to support the "true opposition" despite knowing his terrorist group was fighting U.S. forces. G.E. 9,  9A at 13,[1] Tr. 424. Even the cross-examination testimony of defense expert Dr. Samer Abboud supports these facts. Dr. Abboud testified the U.S. military fought against HTS and Ahrar Al Sham (AAS) at least prior to 2016, Tr. 1203; Abboud testified that it was his opinion that when someone referred to the "true opposition" fighting U.S. forces after 2016, that would have been a reference to HTS, the FTO. Tr.1202-1204. Dr. David Lesch testified that there was

---

[1] Exhibit page numbers coincide with the PDF number in the upper tool bar.

credible news reporting that the non-designated terrorist organization Ahrar Al Sham (AAS) attacked United States forces in 2017. Dr. Abboud testified that AAS was under Turkey's protection in July 2017. Tr. 1146. Dr. Abboud testified that as of October 2019, AAS was part of the Syrian National Army controlled by Turkey and attacking the Kurdish-led Syrian Democratic forces. Tr. 1151-1153. As Dr. Lesch testified, the United States supported the Kurds. Tr. 264. Likewise, Dr. Abboud testified that AAS targeted United States soldiers and Marines in 2020 at the direction of Turkey during the time frame of the ongoing conspiracy. Tr. 1204-1205. Based on his recorded conversations, including January 17, 2019, where Wadi says "you can feel the ecstasy of Jihad," Wadi was receiving the same text and video messages from Barodi that the CHS received showing the attacks on Russians and Syrians who Wadi referred to as "dogs." G.E. 13, 13A at 11, Tr. 516-519; just as Wadi knew not only were Syrian and Russian troops being targeted by his group, but also prisoners were being beheaded, and women and children were being attacked as discussed in the other messages Barodi sent to the CHS, *id.; see also* G.E. 17, 17A1 at 4, Tr. 571;  G.E. 20A, 20A1 at 6, 7, 9, 10, Tr. 576-578; G.E. 20B, 20B1 at 6-8, Tr. 594; G.E. 23, 23B at 6, 8, Tr. 1040. Dr. Abboud also testified that both the HTS FTO and AAS both committed acts of terrorism against civilians. Tr. 1200, 1207-1209. Even Dr. Abboud was forced to concede that HTS and AAS fought together at times between March 2013 and June 2019, Tr. 1173-1174, 1183, 1184, 1185-1186, 1196-1197, 1199-1200. In other words, the evidence shows both of these groups agreed together to kill common enemies and Wadi and Barodi agreed to provide them with the funds to buy the weapons to accomplish this goal of killing people in Syria. Dr. Abboud's testimony corroborated Wadi and Barodi's multiple recorded statements that HTS and AAS were fighting together in Idlib, at one point Wadi stated it was "mandatory"

that the groups cooperate together. G.E. 9, 9A at 14-15, 41-42, 49; Tr. 438-439, 442; G.E. 13,

13A at 11-12, 32, G.E.16, 16A, Tr. 567-568; G.E. 17A, 17A1 at 3-4, Tr. 569-570; G.E. 20B,

20B1, Tr. 598.

      While the Defendant in his sentencing memorandum wants this Court to believe that the

credible evidence at trial was his entrapment defense that the jury rejected beyond a reasonable

doubt and the PSR "provides no factual support from the record to support" Wadi intended to

influence or affect government conduct through intimidation or retaliation," the PSR, trial

testimony, and government exhibits put forth the credible facts that the jury found beyond a

reasonable doubt that Wadi and Barodi agreed they wanted to intimidate and retaliate against

Syrian and Russian governments by giving $450,000 to their Syrian terrorist brethren to purchase

weapons to kill those troops while knowing that their terrorist brethren were also fighting U.S.

troops. As the Defendant correctly points out, "[t]he defendant bears the burden of presenting

rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially

untrue." *United States v. Cervantes*, 706 F.3d 603, 620-21 (5th Cir. 2013) (quoting *United States

v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010)). The Defendant has wholly failed to put forth

credible rebuttal evidence to the PSR's stated facts.

      Regardless of which group Wadi maintains he was supporting, there is no doubt he knew

he would be providing money for weapons for all of these attacks seeking to murder and maim

Syrian and Russian government troops, civilians, as well as U.S. troops, in support of terrorist

activity to promote crimes or terrorism and to influence the conduct of government by

intimidation or coercion, or to retaliate against government conduct. The result is the same even

the only intended targets were Syrian and Russian government troops as the §2332b(g)(5)(A)

"calculated to influence or affect government conduct" definition does not require the

government to be American. *See El–Mezain*, 664 F.3d at 571 (The Hamas FTO targets the Israeli

government). The PSR correctly applied the U.S.S.G. §3A1.4 Terrorism Enhancement.

**2.**     **Defendant's Incorrect Factual Requests**

>       **a. While the Conspirators Mentioned Different Commodities To Give False**
>       **Appearances or Other Ways to Transmit Funds for Weapons, Defendants**
>       **Never Wavered on Providing Material Support to Terrorists to Murder**
>       **Overseas Hiding the Support Through the Basic Deal of Using a**
>       **Slaughterhouse for Weapon Purchases**

While the Defendant argued the point to the jury that discussion over numbers and

commodities varied at times over this three-year conspiracy and therefore there was no

conspiracy, the PSR states correctly states the credible evidence as determined by the jury: Wadi

and Barodi wanted investors for their proposed business and willingly agreed to a percentage of

the initial $9 million investment - $450,000 - and at least 50% of their profits to go to the

terrorists for weapons. G.Ex. 6, 6A at 22-23, 28, Tr. 879-883; G.E. 10, 10A at 6, 10-11, 13, 20-

21, 28, Tr. 885-887, 889-890, 893, 896-898, 901-902; G.E. 11, 11A at 4-5, 29, Tr.914, 916, 918,

922; G.E. 13, 13A1 at 23, Tr. 515, 526. In fact, Wadi and Barodi started at 50% of the profit

going to the terrorists and increased that percentage to 70% of their profits being given to the

terrorists and even up to 100%. G.E. 11, 11A at 11-12, 16, Tr. 916, 918; G.E. 13, 13A1 at 23, Tr.

526. Of all those monies, Wadi and Barodi stated that 90% would go for weapons and 10%

would go to the injured terrorists and the terrorists' women and children to give an appearance of

legitimacy and to hide the money for the weapons. G.Ex.11, 11A at 29, 31, 42, Tr. 905-906; G.E.

13, 13A1 at 17, 20, 29, Tr. 543. As Barodi said on November 8, 2018, while they were all

together in Columbia that when they speak on the phone, they should talk about 'feed[ing] the

kids" to cover the weapon transfers in order to hide the weapons from "the FBI and the CIA and all that filth that is in existence." G.E. 13, 13A at 31, Tr. 906, 908. Other mention of commodities and humanitarian assistance such as "dates," "rice," "clothes," "potatoes" and "carrots" were code words or decoys for false appearances, but in fact were going to be for weapon purchases such "rifles, grenades, and rockets" and "remote controlled" aircraft that can carry 50 kilos of explosives to kill people in Syria. G.E. 9, 9A at 44, Tr. 441; G.E. 13, 13A1 at 21-22, Tr. 521, 523-525, 535, 541. On February 13, 2019, even when there was a discussion of doing a partial downpayment through the sale of sugar because the fighters were pressuring Barodi and Wadi, Wadi and Barodi were explaining the weapon transfers to the UCE and CHS and pressuring the UCE and CHS to do this partial shipment to get weapons quickly to the fighters, G.E. 14, 14A at 12-18, Tr. 550-552, 558-559, 930-932, with the remainder of the $9 million deal to be completed after initial payments. Tr. at 561-562; G.E. 15, Tr. 936-938; G.E.20B, 20B1 at 3-4, Tr. 593; G.E. 22, 22A at 22, 22, 25, Tr. 610; G.E. 23, 23B at 22, Tr. 1043; Tr. 1029. Wadi knew he was committing crimes by supplying money for weapons to these terrorists in his warnings to the CHS about using certain words in their conversations over the phone because government authorities could be listening and recording, such as "grenades," "weapons," "murder," and "we want to kill someone." G.E. 13, 13A at 40-41, Tr. 539-540. Wadi even was part of the video phone conversation with Barodi's terrorist nephew on November 8, 2018, discussing weapons, military situation, and needs of these terrorists and letting them know "half a quilt" and "half a rabbit," meaning $500,000, was going to be sent to assist them. G.E. 11, 11A at 17-20, Tr. 922-923, 925-926.

Furthermore, Wadi knew Barodi's nephew was serving a 30-month sentence for sending binoculars to AAS. G.E. 11, 11A at 51, Tr. 917. Wadi knew he could not legally send even an $1,000 from America to Syria, yet he wanted to ignore that by sending $450,000 for weapons to kill people there. G.E. 10, 10A at 22-23, Tr. 895.

The request for funds, $13 million for the slaughterhouse, came from Wadi and Barodi, not the CHS nor the UCE. Tr. 448-450. Wadi and Barodi told the CHS and the UCE how they were supporting Barodi's family members who were fighting in Syria with weapons. Tr. 470-471, 509-510, 540-541; and according to even defense witness Dr. Abboud, both HTS and AAR were committing terrorist acts, Tr. 1207-1209. The CHS and the UCE agreed to provide $9 million with the condition that 5% would go to Barodi's family fighters for weapons, approximately "half a quilt" or half a million dollars, i.e., $450,000. Tr. 373, 482-483, 509-511. Wadi and Barodi did not balk at this condition, Wadi said he and Barodi were doing this since 1998. Tr. 483. Eventually, the decision was to transfer the money through a Columbian bank. G.E. 13C, Tr. 548; G.E. 14, 14A at 2, 9-10, Tr. 550, 553-554, G.E. 15.  Even during his statement to FBI, the Defendant admitted that $9 million of the investment was going for the slaughterhouse with a percentage going to the "freedom fighters," e.g., his code word for terrorists, that were all fighting together. G.E. 23, 23B at 22-23, Tr. at 1040, 1042. This core of the deal never changed. The basis for the whole undercover operation was based on Wadi and Barodi's predisposition to continue providing money for weapons to Barodi's terrorist relatives through Wadi and Barodi's regular arms suppliers as they were recorded telling first the CHS and then also the UCE. Wadi and Barodi were given multiple chances to back out of the deal and never waivered since they were committed to continue getting weapons to the fights to kill

11

people in Syria as well as making money. G.E. 13, 13A at 12, 18, 20-22, Tr. 520. Wadi was

emphatic that he would not back out of the deal and he was in "one million percent." G.E. 13,

13A at 45-46, Tr. 544. Wadi and Barodi succinctly explained on January 17, 2019, that the

fighters they wanted to send weapons to have no need for food or for weapons to defend their

homes; these fighters needed weapons for war support and "to return the Two Mosques." G.E.

13A at 24, Tr. 526-528, 534.

The Defendant's proposed factual changes to the PSR are not credible. The PSR is

correct. The Defendant raised this "changing business terms" argument with the jury and the jury

obviously did not find it persuasive.

### b. Barodi's Relatives Were HTS, but Even if They Were AAS, They Still Were Terrorists and Conspired with the HTS FTO During the Conspiracy

The PSR is correct. The credible evidence, drawing all reasonable inferences in favor of

the United States as the verdict winner, shows that Barodi's relatives were in the HTS FTO and

at the very least, conspired with HTS as the jury found beyond a reasonable doubt in Count 2.

On May 13, 2017, Wadi told the CHS that Barodi's "people" "are all revolutionaries" and

"all of them belong to" Fatah Al-Sham and Jabhat Al-Nusrah. G.E. 1, 1A at 17. On May 24,

2017, Wadi was recorded confirming to the CHS Barodi's was Fatah al Sham and Wadi had

ways to get money to them even though the CHS called them a "terrorist entity." G.E.3, 3A,

p.21-23, Tr. 367, 369-70. In this same conversation, Wadi says he and Barodi talk in codes. G.E.

3, 3A at 55. On August 29, 2018, Wadi again confirms that Barodi's relatives are affiliated with

Fateh Al-Sham. G.E. 6, 6A at  2, Tr. 404, 877. On October 9, 2018, Wadi discussed with the

CHS the different rebel groups in Syria and explained the differences, including Fatah Al-Sham,

and told the CHS that he believed Barodi's "people" were with Fatah Al-Sham. G.E. 9, 9A at 11-

12, Tr. 425. Barodi joined the conversation later and said the group was AAS. G.E. 9, 9A at 35,

Tr. 432. Before Wadi called Barodi on the October 10, 2018, Wadi told the CHS that Barodi

talks in code in case someone is listening. G.E. 10A at 31, Tr. 469. The reasonable inference that

can be drawn from this conversation alone is that Wadi and Barodi knew that Barodi's relatives

were Fatah Al-Sham/HTS since they had been supporting them for years, but Barodi was trying

to hide the fact since they were on the phone and practicing operational security. Another

indicator that Wadi and Barodi knew Barodi's relatives were with Fatah Al-Sham and were

talking in code rather than a misunderstanding based on fluidity of the Fatah Al-Sham and AAH

fighters going back and forth between the two groups as Dr. Lesch and Dr. Abboud testified,

Wadi was recorded saying the that the United States military was fighting "the true opposition."

Defense expert Dr. Abboud testified that he believed that if someone said this, that the reference

to the "true opposition" would be referring to HTS and not AAS, again leading to the credible

inference that Wadi supported HTS. Additionally, Barodi was recorded saying that he wanted to

take the "two mosques" back, G.E. 13, 13A at 24, Tr. 527, 534; Dr. Abboud testified that this

was the philosophy of HTS and not AAS. Thus, the reasonable and credible inference that can be

drawn is that Wadi and Barodi were supporters of HTS and this was the group for which

Barodi's family fought and that they spoke in code over the phone to hide this fact from the FBI

and the CIA.

However, what is most important is that Wadi and Barodi were recorded multiple times

throughout the conspiracy saying that all the groups – HTS and AAS - were fighting together in

Idlib. Both the government expert, Dr. David Lesch, and the defense expert, Dr. Abboud, agreed

that during these same time periods, HTS and AAS were actually fighting together to kill Syrian

13

government and Russian soldiers; thus, they clearly conspired to provide material support to HTS, a designated foreign terrorist organization. Dr. Lesch and Dr. Abboud also agreed that these groups were killing civilians.

The PSR correctly states the credible evidence. The credible evidence shows that Wadi and Barodi conspired together to commit terrorism crimes intending to intimidate and retaliate against a government. The Defendant's request to change the facts to suit their theory is contrary to the credible evidence when read in the light most favorable to the United States as the verdict winner and the jury's verdict. The PSR is accurate and the §3A1.4 Terrorism enhancement was correctly applied.

### c. Wadi and Barodi Openly Discussed Their Weapons Suppliers and Wadi Admitted During His Law Enforcement Interview He Tried Obtain Weapons

The Defendant is not entitled to his proposed factual changes to the PSR because the PSR is accurate and the Defendant's proposed changes are not credible.

The credible evidence comes from the Defendant's recorded statements. On May 24, 2017, Wadi told the CHS to tell the Sheikh that Wadi and Barodi have "a way to smuggle anything" through Wadi's friend Abu-Husayn to Fatah Al-Sham and they "have been putting our lives in danger way before you[CHS]…." G.E. 3, 3A at 57-58, Tr. 371. Wadi initially suggested the money would go through a hawala to Abu-Husayn to hide the money trail from a bank to smuggle it to Fateh Al-Sham. G.E. 6, 6A at 9, Tr. 411-412, 882, 886-887. According to Wadi, his arms dealer friend Abu-Husayn would sell containers of meat and give cash to the fighters to buy weapons or buy the weapons for Fatah Al-Sham himself since he had been doing it for a long time. G.E. 7, 7A at 4-5, Tr. 419. On October 9, 2018, when the Defendant had no idea he was being recorded, he told the CHS that his friend Abu-Husayn had purchased and moved

weapons for Wadi and Barodi for years. See G.E. 9, 9A at 18, Tr. 427. On January 17, 2019,

Wadi again tells the CHS how Abu Husayn "will get weapons for them" and "Abu Husayn has

sold more weapons than I can tell." G.E. 13, 13A at 12, Tr. 518, 522. Barodi then said he would

use Abu Faruq in Turkey and Adham in Ukraine to get explosives. G.E. 13, 13A at 28-29, Tr.

528-534. In that same conversation after Barodi hung up, Wadi explained to the CHS how

Adham and Abu Faruq and other mujahidin smuggled weapons purchased in Turkey and

Ukraine to Barodi's relatives who are leaders of the terrorists. G.E. 13, 13A at 41-45, Tr. 542,

545.  Wadi discussed particular weapons and smuggling routes in detail and what weapons

would be purchased with the "Sheikh's" money again lending credence to his comments that he

had dealt in weapons before. G.E. 13, 13A at 21-22, Tr. 521, 523-525. Wadi also cautioned the

CHS and UCE about operational security and how to use code words when talking on the phone

about weapons and supporting terrorists saying "[w]e are not working with terrorism….say

freedom fighters." G.E. 22, 22A at 34, Tr. 611-613. When the Defendant spoke to the FBI after

his arrest, he admitted trying to assist the terrorists using the code word "freedom fighters." G.E.

23, 23A at 21-22, Tr. 1040. Furthermore, after initially lying about discussions of weapons

purchases, G.E. 23, 23B at 3, Tr. 1039, when confronted by law enforcement, Wadi admitted that

he tried to purchase weapons for the deal, G.E. 23, 23B at 23, Tr. 1042-1043. If the Defendant

was so innocent about buying weapons as he tries to portray himself to be, then how would he

know who in Syria to call to make the purchase for $450,000 or even $82,000 in weapons; the

Defendant's false weapons neophyte portrayal contrary to his recorded statements of his

experience in weapons dealing is not credible. When reading the evidence in the light most

favorable to the United States as the verdict winner, the PSR correctly states the fact that Wadi

and Barodi were experienced in using their particular weapons suppliers. The Defendant is not entitled to the proposed changes as they are contrary to the credible evidence.

### D. The Defendant Knew the Terrorist Group He Supported Was Fighting United States Troops

The PSR correctly states the fact that the Defendant knew the terrorist group he supported were fighting United States troops. The Defendant, while discussing his and Barodi's support of their fighters in Syria, was recorded telling the CHS that the United States was fighting the "true opposition," the logical inference being his and Barodi's fighters. Tr. 424-425. As stated previously, the defense expert said that this reference to the "true opposition" would have been to the HTS FTO and not AAS. The defense expert also testified that AAS also fought against United States troops at the direction of Turkey in 2020 during the pendency of the conspiracy. Wadi demonstrated his detailed knowledge of actions occurring on the ground in Syria. Drawing the reasonable inference when viewed in the light most favorable to the government as verdict winner, Wadi stayed inform of what groups were fighting each other including against United States forces.

The fact that Wadi's son served in the military is certainly a credit to his son's patriotism and loyalty to the United States but it is completely irrelevant to the Defendant as the Defendant sought to provide $450,000 of weapons to be used against these same United States Marines and soldiers in Syria where his son was not deployed. The Defendant's son's service shows the extreme contrast with Wadi's own lack of loyalty to the United States in his proven violations of United States law by conspiring to murder people overseas, conspiracy to provide material support to a United States' designated foreign terrorist organization, and conspiracy to provide material support to terrorists.

Most tellingly, on June 17, 2020, after Turkey ordered AAS to attack U.S. troops, the Defendant showed his utter contempt for United States law and utter lack of loyalty to the United States in his recorded quote:

> I have my God's law. The law of US or any other stupid law…As far as I am concerned this is the last thing I care about.  I don't give a damn, they can put me in jail, I don't give a shit.

G.E. 22A at 36, Tr. 613.

Both HTS and AAS fought against United States troops both before and during the pendency of the conspiracy. The PSR correctly states the facts as determined by the jury's verdict when reading the evidence in the light most favorable to the Government as the verdict winner. The Defendant is not entitled to have his proposed non-credible evidence placed into the PSR.

### e. This Is Not a Victimless Crime as the Defendant Conspired to Murder Individuals Overseas, Conspired to Provide Material Support to Foreign Terrorist Organizations, and Conspired to Provide Material Support to Terrorists

The fact that there is no identifiable victim due to the United States not providing the Defendant and his conspirators with the funds to purchase weapons for their terrorists to murder people overseas, does not mean it is a victimless crime and it is offensive to argue as such. As the Defendant had said, he and Barodi had been supporting these types of terrorists fighting the Syrian government since 1998 by sending money and doing weapons purchases likely killing some of the people they intended to target including Syrian soldiers and Alawite women and children. The United States' undercover operation put a stop to Wadi and Barodi's conspiracy and prevented them from murdering any more foreign troops, Alawite civilians, and potentially United States troops. The fact that Defendant conspired to murder and maim people in a foreign

government he opposed, whether or not it was a "brutal" regime, is not for private citizens to decide and in no way minimizes the Defendant's criminal conduct. The victim is the United States and the potential victims had the Defendant been able to carry through on his plan were Syrian government troops, Alawite civilians, and possibly United States troops. What is credible and relevant as found by the jury was that the Defendant and Barodi knowingly violated United States law by conspiring to murder people overseas to include United States troops and innocent women and children civilians and doing so by conspiring to provide material support to a designated foreign terrorist organization. The fact that the FBI's undercover operation never intended to provide the funds for terrorists Wadi was seeking does not mitigate Wadi's culpability or in any way affects the sentencing guideline calculation or the §3553 factors.

### f. The Reasonable Inference from the Credible Evidence Is That Wadi Knew Which Terrorist Group He Had been Supporting for Years

The PSR correctly states the credible facts. For the reasons previously set forth in subparagraph B, *supra* at 12-14, the Defendant's proposed factual changes are not credible.

## B. THE 18 U.S.C. §3553 FACTORS SUPPORT THAT THE ONLY FAIR AND JUST SENTENCE FOR THE DEFENDANT'S CRIMES ARE LIFE IMPRISONMENT

In Title 18, United States Code, § 3553, Congress set forth the factors courts should consider when imposing a fair and just sentence. Section 3553(a) states the Court "shall impose a sentence sufficient, but not greater than necessary." Section 3553(a) requires to the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from

18

further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The Court shall also consider the kinds of sentences available and the sentencing range established under the sentencing guidelines. 18 U.S.C. § 3553(a)(4), (5). Section 3553(a)(6) also requires the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct when imposing its sentence.

1.      <u>**Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**</u>

There are few crimes that come close to the seriousness of the offenses the Defendant was convicted of by a jury of his peers: conspiracy to murder and maim people overseas, conspiracy to provide and attempt to provide material support to a foreign terrorist organization, and conspiracy to provide and attempt to provide material support to terrorists to murder and maim overseas. In particular, Defendant Wadi conspired to commit these crimes knowing the terrorists he was supporting fought against United States Marines and soldiers. After a nine-day trial, the jury found the Defendant guilty beyond a reasonable doubt and his entrapment defense incredible beyond a reasonable doubt by the jury after a brief 100-minute deliberation.

The evidence at trial proved, over a more than three-year period, Defendant Wadi conspired with his primary cohort Ahmad Daniel Barodi as well as Barodi's terrorist nephews and Wadi and Barodi's four separate Turkish arms suppliers to murder and maim foreign soldiers, civilians, other opposition fighters, and most importantly, United States soldiers in Syria. Wadi knowingly agreed with these other coconspirators to provide material support in the form of money with the specific intent to purchase rockets, grenades, rifles, and unmanned aerial vehicles (UAVs) with explosives

in support of a designated Foreign Terrorist Organization (FTO), Al-Nusrah Front/Fatah Al Sham/Harar Tahrir Al Sham (HTS) to murder and maim in Syria. According to the defense expert, Dr. Abboud, the HTS groups fought against United States military forces and even the non-designated terrorist organization AAS targeted United States soldiers and Marines in 2020 at the direction of Turkey during the time frame of the ongoing conspiracy.

From early on in May 2017, the Defendant was recorded explaining he had ways to smuggle anything through the Turkish borders and had been doing so for a long time stating he and Barodi had been "putting ourselves in danger way before you." During the October 9, 2018, conversation, the Defendant told the CHS that the American military was fighting the "true opposition" in Syria; defense expert Dr. Abboud opined that meant the U.S. forces were fighting the HTS FTO. Wadi then stated his Turkish friend Abu Husayn can move the weapons for them and "has traded arms in huge quantities." Wadi, and later Barodi, confirmed that the HTS groups and the non-FTO AAS were all cooperating fighting in Idlib together against the Syrian and Russian forces. Because of his clear predisposition evidenced by his own words and despite a complete lack of government inducement, Defendant Wadi did not hesitate to agree to the "Sheikh's" $9 million slaughterhouse investment with $450,000 of that amount going to the HTS group and Barodi's nephews for fighting.

In the November 2018 Colombia meeting, Defendant Wadi knew the wrongfulness of his conduct by stating that when giving the money for weapons for fighters, to say the money is for women, children, and injured people for "cover" and for "appearances." Harkening back to Wadi's October 9, 2018, warning that Barodi speaks in codes, Barodi further stated, and Wadi agreed, that when they talked on the phone, to say the money was given "to feed kids" to hide it from the "FBI

and CIA and all that filth in existence." Barodi discussed how he was a rebel fighter in Syria when he was younger. Barodi and Wadi outbid the CHS and UCE to give more of their future profits to the terrorist fighters eventually agreeing on 70% and up to 100% of their profit to go to the fighters. Barodi then set up a video call with his terrorist nephew Abdul Jabbar, who while also reluctant to speak on the phone, told the CHS and the UCE that the fighters were in tough shape and needed weapons. The undercover operation was tailored to what Wadi and Barodi had said they had done in the past regarding providing material support to terrorists. Based on the Defendant and Barodi's statements, it is clear why the jury quickly found them predisposed to commit these crimes and completely disbelieved the Defendant's entrapment defense.

In the January 2019, meeting with the Defendant and CHS in San Antonio, and Barodi on the phone in Colombia, the Defendant stated how all the groups including the HTS were all fighting on the same side in Idlib. Wadi said that when he listens to the calls from mujahidin, "you can feel the ecstasy of battle!" When the CHS asked for clarification how the $450,000 money initial amount will be spent on the fighters, Defendant Wadi said that the money will go for war assistance, to purchase "rifles, grenades, rockets, remote control planes to carry 50 kilos explosive" on front lines. Barodi said that these are not weapons "for defending houses." Again, demonstrating his knowledge of the wrongfulness of his actions, the Defendant cautioned the CHS to not talk about weapons or grenades over phones since the calls are being monitored. Defendant Wadi, knowing he was discussing people being murdered overseas cautioned the CHS to not say "murder" or "we want to kill someone" or the call will be recorded. Defendant Wadi reiterated that 90% of the funds going to the mujahidin will go for weapons and war support. Barodi then told the Defendant and the CHS the pressure Barodi was getting from fighters to get

them money for weapons. Defendant Wadi then tried to pressure the CHS by saying the fighters were surrounded. As the jury found, the Defendant and Barodi were not being pressured or induced by the CHS and the UCE; to the contrary, the Defendant and Barodi were pressuring the CHS and the UCE to finish the deal so that the Defendant and Barodi could get the weapons to the terrorists. Not once in the three-year conspiracy did Wadi or Barodi talk about them personally needing money. Each time Wadi and Barodi tried to pressure the CHS and the UCE to do the deal was due to the pressure they were receiving from Barodi's relatives to get them the needed weapons.

And when the CHS gave the Defendant a chance to leave the conspiracy by asking "are you going ahead with Sheikh or do you not want to continue?" Wadi responded he's "going through 100%, 1 million percent, no hesitation on our part."

In trying to keep the pressure on the CHS to finish the deal, Barodi sent the CHS numerous WhatsApp texts and videos showing the terrorists fighting the Syrians and Russians as well as Barodi discussing the beheading of captured prisoners and debating whether to send the heads or bodies back along with discussing suicide martyrdom operations. Even defense expert Dr. Abboud agreed both Ahrar Al Sham and the HTS groups committed murders, used improvised explosive devices (IEDs), attacked civilians, and committed extrajudicial killings-all terrorist acts.

In June 2020, the CHS again gave Defendant Wadi and Barodi the chance to back out of the deal, and again, Wadi and Barodi said they still want to continue to do the deal. Again, Defendant Wadi showed his criminal and terrorist intent when he stated that on calls when referencing "al-Mujahidin" that they "cannot say sensitive words on phone" and they "must talk

in codes" because the calls may be recorded. Wadi further instructed that when referencing the terrorists they are supporting "we are not working terrorism, say freedom fighters." Most tellingly was Defendant Wadi's total disrespect for the laws of the United States when he stated

> "I have my God's law. The law of US or any other stupid law…As far as I am concerned this is the last thing I care about." "I don't give a damn, they can put me in jail, I don't give a shit."

After being arrested and given his Miranda warnings, the Defendant attempted to obstruct the investigation by lying to the interviewing agents. Defendant Wadi falsely claimed that: (1) the money they were going to send to Syria was just for orphans; (2) there was never any discussion about weapons; (3) Barodi's nephew was not associated with any rebel group; and (4) Wadi had no connections to help and his friend Abu Husayn could not help. When confronted with the fact that the UCE was a government agent, Defendant Wadi admitted that the money was going to the "freedom fighters," e.g., terrorists, and that he tried to make a call to get weapons.

Clearly, given the overwhelming weight of the evidence based primarily on the Defendant's recorded statements on the undercover tapes as well as Barodi's recorded statements, the jury showed in its one hour and 40 minutes deliberation after a two-week trial that it quickly saw through the Defendant's unbelievable entrapment defense.

Regarding the nature of the crime, the Defendant was well aware that not only was he conspired to murder Syrian and Russian soldiers overseas, more importantly, he was knowingly supporting terrorists who he knew were attacking U.S. Marines and soldiers and civilians. This was not some one-time, short-term conspiracy. The Defendant persisted in this conspiracy for over three years, and despite the multiple chance he had to renounce this deal and decide against it, the

Defendant did all he could to complete and encourage the conspiracy. The Defendant's history of supporting Syrian rebels since 1998, G.E. 11, 11A at 6, Tr. 914, helping to provide weapons through his and Barodi's four arms dealers, and the Defendant's age eliminating any youthful error claim all weigh in favor of a sentence in the applicable advisory guideline range.

2.      **Avoiding Unwarranted Sentencing Disparity for Similar Cases**

The Government respectfully submits that a guideline sentence is required to avoid unwarranted sentencing disparity for similarly situated cases in the most recent terrorism case sentencing. For Count 1, conspiracy to murder overseas in violation of 18 U.S.C. § 956, Defendant Wadi's base offense level is 33. U.S.S.G. § 2A1.5. Section 956 is defined as a "federal crime of terrorism." 18 U.S.C. § 2332b(g)(5)(i). Sentencing guideline § 3A1.4 states

> **(a)** If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> **(b)** In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Therefore, the Defendant's advisory guideline range for Counts 1 and 3 would be offense level 45 with a criminal history Category VI calling for a life sentence. For Count 2, conspiracy to provide material support to a foreign terrorist organization, the advisory guideline would be offense level 40 with a criminal history category of VI for an advisory guideline range of 360 months to life. As the guideline offense level table tops out at level 43, even with a criminal history Category I, the guidelines recommend a life sentence for Counts 1 and 3.

On July 1, 2022, in the only recent similar case in this District, the Honorable Orlando Garcia sentenced Kristopher Matthews and Jaylyn Molina to 20 years imprisonment and 18 years imprisonment, respectively, following their guilty pleas pursuant to plea agreements to a single

24

count of conspiracy to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B in criminal cause SA-20-CR-488-OLG. Matthews and Molina's guidelines were comparable to the Defendant's here, but their sentences were capped because of their guilty pleas.

In regard to the one Western District of Texas case mentioned in the Defendant's memorandum, Michael Wolfe, the Defendant fails to mention that Wolfe received 82 months based on plea bargained-for consideration.[2] In the only other Texas case mentioned by the Defendant, Said Rahim was convicted at trial and was sentenced to 360 months in the Northern District of Texas.

Defendant Wadi agreed to a deal to provide $450,000 to purchase rockets, grenades, rifles, and unmanned aerial vehicles (UAVs) with explosives for their terrorist conspirators to kill as

---

[2] Of the 17 defendants listed in the Defendant's memorandum at 22-25, it is not noted anywhere that 14 of these defendants pled guilty; from a cursory review of the cases, most if not all pled guilty pursuant to plea bargains to one-count plea agreements. Georgianna Giampietro pled guilty to a plea agreement. The five defendants in *United States v. Hodzic* pled guilty, including Ramiz Zijad Hodzic, Sedina Unkic Hodzic, Nihad Rosic, Mehida Medy Salkicevic, and Armin Harcevic; Ramiz Hodzic, Rosie, Salkicevic, and Harcevic pled guilty to one-count plea agreements. Mohammed Hamzah Khan pled guilty and agreed to cooperate. Shannon Conley pled guilty. Sultane Salim pled guilty. Anthony Hayne pled guilty to a plea agreement. Samantha El-Hassani pled guilty. Muhammad Dakhlalla pled guilty to a plea agreement. Connor Stevens pled guilty; it must be noted that the Defendant failed to list two of Stevens' co-defendants received more time and who also pled guilty were sentenced to 138 months and 117 months. Mohammad Zaki Amawi, the ringleader,  and Wassim Mazloum were convicted at trial, and sentenced to 240 months and 100 months, respectively, along with a third unmentioned defendant who was sentenced to 156 months imprisonment.

.

many people as they could target in Syria, knowing that the group he was supporting was also fighting United States troops. Defendant Wadi was convicted by a jury of a more serious crime in Count 1, conspiracy to murder overseas, carrying a potential life sentence than the charge for which Matthews and Molina pled guilty and accepted the responsibility for their actions.

It is certainly Wadi's right to put the Government to trial. Matthews and Molina, as well as Wolfe, accepted responsibility for their criminal conduct, pled guilty to a single count pursuant to plea agreements, and limited their respective sentences. To give the Defendant, who never accepted responsibility and was found guilty of a more serious crime carrying a life sentence than Matthews, a lesser sentence for more egregious criminal conduct than Matthews creates a grave and unwarranted sentencing disparity.

The Defendant should be given the recommended advisory guideline sentence of life imprisonment.

### 3.     Specific Deterrence

Defendant Wadi has wholly failed to take responsibility for his criminal conduct and has no respect for the law of the United States. And while he may not have been caught previously for his wrongdoing, by his own recorded admissions, the Defendant and Barodi supported supplying money and weapons for their fighters to kill overseas since 1998. Wadi bragged to the UCE and the CHS that he violated the Iranian embargo law stating how he "played numerous games and outmaneuvered" the United States, even using his sister in Dubai as a conduit for illegal activity. G.E. 10, 10A at 24, Tr. 898, 900. Wadi knew and continued to support the "true opposition" despite knowing his terrorist group was fighting U.S. forces. Based on his recorded conversations, he was receiving the same text and video messages from Barodi that the CHS received; therefore, he knew

26

not only were Syrian and Russian troops being targeted by his group, but also civilian women and children. The only remorse the Defendant has voiced thus far appears to be that he is sorry he trusted the CHS to be part of his and Barodi's schemes and that he will now have to suffer the consequences of his own criminal conduct. The need for a guideline sentence to provide specific deterrence to the Defendant is demonstrated by the Defendant himself when, believing he did not have an audience beyond those he was conspiring with, stated

> I have my God's law. The law of US or any other stupid law…As far as I am concerned this is the last thing I care about. I don't give a damn, they can put me in jail, I don't give a shit.

## 4. General Deterrence

It is never justified for a group of private individuals to support murder and maiming overseas, whether the intended victims be soldiers of a dictator, but certainly not innocent civilians or United States military personnel. Likewise, it is never justified to conspire provide material support to purchase weapons for designated foreign terrorist organizations or for terrorists. It is solely for government officials answerable to the citizenry to make the solemn and grave choice to wage war in foreign lands. If individuals consciously choose to make such a criminal choice, they need to be punished uniformly without regard to race, religion, age, or ethnic background. To deter these crimes by others, the advisory Sentencing Guidelines call for a substantial sentence to justly punish those convicted of these serious crimes.

In *Boim v. Holy Land Found, for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc), the Seventh Circuit held that giving money to Hamas, in violation of § 2339B, necessarily involves an act "dangerous to human life." As *Boim* reasoned, providing financial

support to Hamas, "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people[.]" *Id*. at 694.

*Boim*'s reasoning is doubly persuasive in this case. Not only did Defendant Wadi and Barodi want to provide funds to terrorists to buy weapons to murder Syrian and Russian soldiers, Wadi and Barodi knew that the group they were supporting, the "true opposition," were fighting U.S. soldiers and Marines. Again, according to defense expert Dr. Abboud, that "true opposition" fighting U.S. forces would have been the designated terrorist organization HTS. However, even if it was to be believed that Wadi and Barodi supported the non-designated Ahrar Al Sham, Dr. Abboud testified that that group also attacked U.S. Marines and soldiers in 2020 at the behest of Turkey, during the pendency of the conspiracy.

A guideline sentence is warranted in this case to deter such heinous future criminal conduct by others who might also choose to assist those targeting overseas U.S. troops.

### C. THE DEFENDANT'S PROPOSED REASONS FOR DOWNWARD DEPARTURE ARE WITHOUT MERIT AND NOT CREDIBLE

Sentencing guideline §5K2.0(1)(A) states that the "sentencing court may depart from the applicable guideline range if the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance." The court may also depart if "there exists an aggravating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." §5K2.0(1)(B). The court may also depart if it identifies some circumstance the sentencing commission" may have not adequately taken into consideration in determining the applicable guideline range (e.g., as a specific offense characteristic or other adjustment). U.S.S.G.

§5K2.0(2)(A). "A departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. §5K2.0(2)(B).

In the case at hand, the Defendant has not raised any credible factor that was not taken into account by the Sentencing Commission or is in any way an exceptional case warranting a downward departure from the advisory guidelines.

### 1. Sentencing Entrapment

In *United States v. Stephens,* the Fifth Circuit stated

> We have never recognized sentencing entrapment as a defense, *see United States v. Jones,* 664 F.3d 966, 984 (5th Cir.2011), and we have consistently noted that, were we to accept it, it would only be cognizable in cases involving "true entrapment," *United States v. Tremelling,* 43 F.3d 148, 152 (5th Cir.1995) (quoting *United States v. Cotts,* 14 F.3d 300, 306 n. 2 (7th Cir.1994)), or "overbearing and outrageous conduct" on the part of the Government, *id.* at 151.

United States v. Stephens, 717 F.3d 440, 446 (5th Cir. 2013)(We "see no evidence of a lack of predisposition on the part of Stephens that would be required for a showing of true entrapment;" "and we also see no evidence of overbearing or outrageous conduct.")

Even under the unpublished, and therefore not binding case of *United States v. Cantu*, 2023 WL 4363116 at *2 (5th Cir. July 6, 2023), cited by the Defendant, the Defendant's argument for a departure for sentencing entrapment is meritless in that it is a roundabout way for the Defendant to again raise his entrapment defense that the jury quickly and overwhelmingly rejected beyond a reasonable doubt. Therefore, in the Fifth Circuit, the Defendant's sentencing entrapment fails to meet the required showing.

First, as the jury found beyond a reasonable doubt, the Defendant and Barodi were

predisposed to commit these crimes and the government merely provided them the opportunity to commit these crimes. The undercover operation was derived from Wadi and Barodi's stated past support the conspirators provided to terrorists over the years and that they were seeking investors for a $13 million slaughterhouse. Wadi admitted that they have been assisting these types of terrorist groups for over 20 years - since 1998. Wadi and Barodi were recorded saying they supplied money and weapons through their arms-dealing coconspirators to terrorists and were extremely experienced at doing so. The Defendants were not induced to commit these crimes for which they were convicted; to the contrary, the Defendants were receiving pressure from their terrorist groups to get them the weapons to fight, and thus, the Defendants pressured the UCE and CHS to complete the deal to be able to get weapons to the terrorists. When Wadi and Barodi each were given the chance to back out of the deal two times, each unequivocally stated they wanted to complete the deal. The jury rightly rejected the Defendant's claim of entrapment.

Second, unlike an actual case of sentencing entrapment where the sentencing guidelines change based on the quantity of illegal contraband, such as drugs or guns, the concept of sentencing entrapment is inapplicable to conspiracy to murder and maim overseas, conspiracy to provide material support to an FTO, and conspiracy to provide material support to murder and maim overseas. There is no increase or decrease in the offense level based on the amount of conduct, nor is there an increase or decrease in the criminal history. Congress and the Sentencing Commission have determined that these crimes carry one respective sentencing level, and that when it is proven that these are crimes of terrorism or to promote crimes of terrorism as was clear beyond a reasonable doubt in this case, then the § 3A1.4 terrorism enhancement is applied and the offense level and criminal history category are uniformly increased.

There was no sentencing entrapment, nor any true entrapment, and the concept is inapplicable to the crimes for which the Defendant was convicted. The PSR correctly applied the §3A1.4 terrorism enhancement to the Defendant's crimes and correctly calculated the offense level and criminal history as Congress and the Sentencing Commission have determined for such serious offenses against the United States.   A guideline sentence is warranted. There is no exceptional circumstance warranting a downward departure and this honorable Court should refuse to grant a downward departure on this basis.

### 2.  Mental Condition/Diminished Capacity

The United States will file its response to this issue in a separate sealed filing.

### 3.  Overrepresentation of Criminal History

The Defendant's argument that the Defendant's criminal history is overstated is without merit given the dangerous and extremely serious crimes for which he was convicted by the jury. In point of fact, given that the Defendant had been supplying funds and weapons to Syrians fighting and killing overseas since 1998 through his and Barodi's arms suppliers, that Wadi bragged about violating the Iran embargo by tricking the United States, and by knowingly to conspire to murder overseas to include getting for weapons to fight United States troops, the only reason the Defendant can argue that he should have a lower Criminal History category is because he was not previously caught. Conspiracy to maim and murder overseas has an offense level of 45 that is reduced to 43 since that is the maximum guideline level. According to the sentencing guideline table, an offense level 43 carries an advisory guideline of life imprisonment regardless of criminal history whether it be criminal history category I or VI, as Congress and the Sentencing Commission determined is the correct criminal history for crimes of terrorism or promoting crimes of terrorism.

Again, the PSR is correct and has not overrepresented the Defendant's criminal history. The Sentencing Guideline took this factor into consideration and the Sentencing Commission and Congress made the conscious choice to assign a Criminal History category VI for each of the crimes for which the Defendant was convicted beyond a reasonable doubt. This is not an exceptional circumstance for which a downward departure is warranted.

### 4.    Age and Family Responsibilities

In this case, age and family responsibilities cut against a downward departure. Unlike other Western District of Texas defendants Matthews, Molina, and Wolfe, who were relatively young men and had to serve or now continue to serve lengthy prison sentences during the prime of their youth, Defendant Wadi cannot claim age and lack of maturity were factors in causing him to commit this crime.

Wadi, a mature man, himself told the CHS that he and Barodi were doing weapons deals for Syrians fighting the Assad regimes since 1998, that he and Barodi had been putting themselves in danger way longer than the CHS, and that he knew and encouraged the purchase of weapons at the very least for a group fighting with terrorists. The reality was, by his own admission, that his fighters, "the true opposition," were fighting against United States forces. As Wadi stated, he could not lawfully send even a $1,000 to Syria, yet he kept pushing the CHS and UCE to do the deal to buy rockets, grenades, rifles, and exploding drones because the fighters were in dire need of weapons. Neither his age, nor his family responsibilities of living off his children's generosity are no bases that rises to any exceptional circumstance that would be valid grounds for this honorable Court to grant a downward departure.

## **CONCLUSION**

WHEREFORE, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to avoid unwarranted sentence disparity, the United States respectfully requests this honorable Court sentence the Defendant to a sentence in the advisory guideline range of life imprisonment.

Respectfully submitted,

JAIME ESPARZA
United States Attorney


/s/
MARK T. ROOMBERG
Assistant United States Attorney
State Bar 24062266
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100


/s/_____
WILLIAM R. HARRIS
Assistant United States Attorney
Ohio Bar No. 0017818
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100

33

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of February 2024, a true and correct copy of the

foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF

System that will transmit notification of such filing to the following CM/ECF participant:

Angela Saad, Esquire
Charles Swift, Esquire

Monica Beltran, U.S. Probation Officer


/s/_____
          MARK T. ROOMBERG
          Assistant United States Attorney